# EXHIBIT 1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

NO. 04-11577GAO

PAUL WATSON, JANET WATSON, ANDREW WATSON,
DAVID WATSON and PAUL WATSON, in his
capacity as TRUSTEE of MITSON REALTY TRUST,
     Plaintiffs

vs.

TOWN OF BELLINGHAM,
RICHARD F. RANIERI, in his official capacity and individually,
LEE G. AMBLER, in his official capacity and individually,
SCOTT AMBLER, in his official capacity and individually,
BERTRAND GUERIN, in his official capacity and individually,
DENNIS FRAINE, in his official capacity and individually,
JERALD A. MAYHEW, in his official capacity,
JOHN EMIDY, in his official capacity and individually, and
EDWARD WIRTANEN, in his official capacity and individually,
     Defendants

DEPOSITION OF PAUL WATSON, taken pursuant
to the provisions of the Federal Rules of Civil
Procedure, before Loretta E. MacDonald, a Certified
Shorthand Reporter and Notary Public in and for the
Commonwealth of Massachusetts, at the offices of
Curley & Curley, 27 School Street, Boston,
Massachusetts on November 29, 2005 commencing at
10:15 AM.

MELVIN LIPMAN
101 TREMONT STREET
BOSTON, MASSACHUSETTS 02108
(617)-227-3985

---

APPEARANCES OF COUNSEL

LAW OFFICE OF CURLEY & CURLEY
by Attorney Martin S. Rooney
27 School Street
Boston, Mass. 02108
for the Defendants

LAW OFFICE OF KRESSLER & EHRHARD
by Attorney James P. Ehrhard
11 Pleasant Street
Worcester, Mass. 01609
for the Plaintiffs

---

I N D E X

EXAMINATION OF:  PAUL WATSON

           PAGE

Examination by Mr. Rooney    5

E X H I B I T S

| NUMBER | DESCRIPTION |
| --- | --- |
| 1 | Letter dated 8-28-85 |
| 2 | Letter dated 1-15-86 |
| 3 | Report of Inspections |
| 4 | Letter dated 5-21-86 |
| 5 | Letter from Board of Health |
| 6 | Letter dated 7-9-87 |
| 7 | Letter dated 7-14-87 |
| 8 | Letter dated 7-29-87 |
| 9 | Letter dated 11-2-87 |
| 10 | Letter dated 5-3-89 |
| 11 | Letter dated 8-22-89 |
| 12 | Letter dated 1-31-91 |
| 13 | Letter dated 2-5-91 |

---

P R O C E E D I N G S

STIPULATIONS

It is stipulated by and between counsel for
the parties that all objections, except those as to
form, and motions to strike are reserved until the
time of trial; that the witness will read and sign
the deposition transcript under pains and penalties
of perjury within 30 days of receipt of same.

PAUL WATSON,

having been sworn was examined and testified as
follows:

MR. EHRHARD:  Usual stipulations, for the
record, except for privilege and form of the
question.

MR. ROONEY:  Fine.  All objections except as
to form and motions to strike reserved until the time
of trial.

MR. EHRHARD:  Read and Sign.

1  EXAMINATION BY MR. ROONEY:
2   Q   Could you tell us your name?
3   A   Paul Watson, W-a-t-s-o-n.
    Q   Where do you live, sir?
    A   7 Sherman Road in Millis, Massachusetts.
6   Q   How long have you lived there?
7   A   28 years.
8   Q   Does anyone live there with you?
9   A   My wife currently.
10  Q   What is her name?
11  A   Janet, J-a-n-e-t.
12  Q   How long have you been married?
13  A   1972.
14  Q   Do you have any children?
15  A   We have three children.
16  Q   What are their names?
17  A   Andrew, David and Mark, M-a-r-k.
18  Q   Where does Andrew currently reside?
19  A   In New York, Brooklyn, New York.
20  Q   How about David?
21  A   David is in San Diego, California.
22  Q   And Mark?
23  A   Mark is in Pennsylvania.
24  Q   Where were you born, sir?

5

1   Q   What year did you graduate?
2   A   I did not graduate, and the year was 19 --
3   we're really going back.
4   Q   1956?
5   A   Thank you.
6   Q   Did you ever get a graduate equivalency,
7   diploma?
8   A   No, I did not.
9   Q   Have you had any other formal schooling
10  beyond high school in Kingston?
11  A   The school of hard knocks, hard work and
12  hard knocks.
13  Q   Do you currently hold any licenses of any
14  sort?
15  A   Driver's license.
16  Q   Anything else, contractor license, plumber,
17  electrician, anything like that?
18  A   No, I do not.
19  Q   Real estate license?
20  A   No, not currently.  I did have.
21  Q   When did you have your real estate
22  license?
23  A   I think I got that in 1983, '82 or '83.
24  Q   How long did you hold that license?

7

1   A   In Jamaica, in the West Indies.
2   Q   When were you born?
3   A   May 25, 1938.
4   Q   When did you first come to the United
5   States?
6   A   In 1977.
7   Q   Where did you come to when you left
8   Jamaica?
9   A   We came to Massachusetts through Miami.
10  Q   Who came with you at that time?
11  A   My wife and the first two of our three
12  boys.
13  Q   Since coming to Massachusetts, have you
14  become a U.S. citizen?
15  A   Yes, I have, we have, the whole family.
16  Q   When did you become a U.S. citizen?
17  A   I think it was 1982, we became citizens as
18  soon as we could, there's a mandatory five year
19  waiting period.
20  Q   Could you tell me what your educational
    background is, please?
22  A   High school.
23  Q   Where did you go to high school?
24  A   In Kingston, Jamaica.

6

1   A   I don't quite remember, into the 90's.
2   Q   Did you have to take a test to become a real
3   estate agent?
4   A   Yes, it was a broker.
5   Q   Did you take any classes to prepare for
6   that?
7   A   Yes.
8   Q   Where?
9   A   I took the last test that they give to make
10  you a broker just before they changed the law, where
11  you had to become a mandatory salesperson first.  I
12  got in the last class, I guess, the last exam and I
13  passed.
14  Q   When you first came to Massachusetts, where
15  were you employed?
16  A   I was employed by Peterson Awning Company in
17  Avon.
18  Q   What did you do for Peterson?
19  A   I was his operations manager.
20  Q   What did that entail?
21  A   Running the entire awning, and he used to
22  also erect tents during the spring, summer, autumn
23  season.
24  Q   How many people did you supervise?

8

1    A    Manufacturing crew of probably eight or ten,
2 and they had some seasonal, you know, part-timers.
3 Probably a full-time crew of about eight, and then
4 erecting crews of probably 20.
5        Q    When did you begin working for Peterson?
6    A    I think it was in May of '77.
7    Q    How long did you continue to work for
8 Peterson?
9    A    Not very long.  I was laid off in, I think
10 it was October of that year.
11    Q    What did you do next for employment?
12    A    I was employed at Hamlet and Hayes, a
13 chemical company in -- north of Boston.
14    Q    What did you do for them?
15    A    The town famous for the witches.
16        MR. EHRHARD:  Salem.
17    A    Salem, thank you.
18    Q    What did you do for them?
19    A    I was production supervisor.
20    Q    How long did you work for the chemical
21 company?
22    A    I can't honestly remember.  Then I went to
23 Canada Dry as a production supervisor, they were in
24 Waltham, Mass. at the time.

9

1    Q    During what period of time were you employed
2 by Canada Dry?
3    A    It was in early 80's, I did not particularly
4 like the job, either at Hamlet or Canada Dry.  That's
5 when I started studying to take my real estate
6 license.
7    Q    When did you get that license?
8    A    I think it was about '82, '83.
9    Q    After you obtained that license, did you
10 begin working in your real estate field?
11    A    Not immediately.  After Canada Dry, I was
12 hired away from Canada Dry by Pepsi-Cola in
13 Burlington, Vermont.
14    Q    Did you move to Burlington?
15    A    I commuted on a weekly basis.
16    Q    What did you do for Pepsi?
17    A    I was operations manager, that was short
18 lived, it was just three months.
19    Q    What did you do after Pepsi?
20    A    I started doing real estate.
21    Q    Did you work on your own or did you work
22 with another agency?
23    A    I worked -- I started with another agency in
24 Millis, and the very first sale that I made I was

10

1 told that I had to share my commission.  I didn't
2 like that, so I started operating on my own out of
3 home.
4    Q    What was the name of your real estate
5 agency?
6    A    My personal agency, Hermitage Associates.
7    Q    Where was that located?
8    A    7 Sherman Road in Millis.
9    Q    What was the name of the agency you worked
10 with when you first started?
11    A    I don't recall at this time, forgive me.
12    Q    Was Hermitage Associates incorporated?
13    A    No.
14    Q    Is Hermitage Associates still doing
15 business?
16    A    No, it's not.
17    Q    When did they cease doing business?
18    A    Shortly after I formed Mitson Realty Trust
19 and I bought them out.
20    Q    When did you form Mitson Realty?
21    A    1985, as Mitson Realty Trust.
22    Q    Why did you form Mitson Realty Trust?
23    A    For purposes of owning and operating the
24 mill at 26 Pearl Street in Bellingham.

11

1    Q    At that point in time, were any of your
2 family members working for you?
3    A    No, not for me, no.
4    Q    How did you first become connected with 26
5 Pearl Street?
6    A    It was a listing of mine, a sales listing.
7    Q    For Hermitage Associates?
8    A    Yes.
9    Q    When did you obtain that listing?
10    A    If I remember correctly, it was sometime in
11 1983.
12    Q    Who listed that property with you?
13    A    The former owner, Louis Goldstein.
14    Q    Do you know where Mr. Goldstein currently
15 resides?
16    A    I have no idea whatsoever.
17    Q    Where did he last reside, that you know
18 of?
19    A    Somewhere in Rhode Island, to the best of my
20 knowledge, he always resided in Rhode Island.  He
21 commuted to the mill from Rhode Island.
22    Q    When was the last time you saw Mr.
23 Goldstein?
24    A    1991, I think.

12

1    Q    When was the last time you heard from Mr.
2 Goldstein?
3    A    1991.
     Q    How did you obtain the listing for 26 Pearl
  Street?
6    A    Cold call, knocked on the door.
7    Q    What type of property is 26 Pearl Street?
8    A    It's an old mill building on approximately
9 22 acres of land on the Charles River.
10   Q    When you obtained that listing, had you had
11 any experience with that type of commercial
12 property?
13   A    What do you mean, in selling it or in trying
14 to sell an old mill building?
15   Q    Correct.
16   A    A similar building, yes.
17   Q    What was that similar building?
18   A    The Schraff Candy Factory.
19   Q    Where was that located?
20   A    Here in Boston.
21   Q    Did you have a listing or did Hermitage
22 Realty have a listing for that property?
23   A    It was co-listing.
24   Q    When you first met Mr. Goldstein concerning

                                                    1 3

1 listing the mill property, do you recall that
2 meeting?
3    A    Roughly, he was interested in selling the
4 property and was very amenable to listing it.
5    Q    Had the property been for sale prior to your
6 contact with him?
7    A    I think he had made personal efforts to try
8 and sell it, but he had had no success.
9    Q    To your knowledge, the listing with you was
10 the original, formal real estate listing for that
11 property?
12   A    No.  I couldn't say that for sure because he
13 had owned it for -- at the time that I purchased it
14 in '85, he had owned it, I believe, for approximately
15 16 years.  So I have no idea how many attempts he
16 made to sell it before.
17   Q    Do you recall where that meeting took place
18 with Mr. Goldstein?
19   A    In his office at 26 Pearl Street.
20   Q    Prior to going on that cold call, had you
   ever been to that property before?
22   A    I had driven past it, thought it was
23 interesting.
24   Q    At the time you listed that property or Mr.

                                                    1 4

1 Goldstein listed that property, what was the sale
2 price, do you recall?
3    A    He was asking $550,000.
4    Q    Were you involved at all in coming up with
5 that sales price?
6    A    No, not at all.
7    Q    Did you do anything to determine at that
8 point in time whether that was a fair and reasonable
9 price for the property?
10   A    He allowed me to go through the property and
11 I looked at it, it's relation, where it was
12 geographically relative to 495, route 126.  I thought
13 that it was a reasonable price.
14   Q    Did you take a look at any specific
15 comparables or do a formal appraisal or evaluation of
16 the property?
17   A    No, I did not.
18   Q    You indicated that you toured the
19 premises?
20   A    Yes.
21   Q    How long a period did you spend doing
22 that?
23   A    His son, David Goldstein, took me through
24 the property, and we spent probably three quarters of

                                                    1 5

1 an hour to an hour walking through there.
2    Q    What was the condition of the property at
3 that point in time?
4    A    Deplorable.
5    Q    Can you be more elaborate, please?
6    A    It was in a very advanced dilapidated state.
7 Many leaking sections of roof, rotted flooring,
8 sprinkler system that was inactive or you couldn't
9 see in certain sections where the pipes had swollen
10 and burst or disconnected.
11   Q    Can you describe for me the general layout
12 of the property at 26 Pearl Street?
13   A    It runs -- with the building on the property
14 or the property itself, the land?
15   Q    Let's back up and do it one at a time.  The
16 land property you said is 22 acres?
17   A    Approximately, yes.
18   Q    On the banks of the Charles in Bellingham?
19   A    The property is broken into two sections, a
20 very small section known as 23 Pearl Street which is
21 approximately 1.1 acres.  And the pond, the dam are
22 on that side of the street, and the remainder of the
23 property is on 26 Pearl Street.  And from memory, 26
24 Pearl Street had some 960, 980 feet of road frontage.

                                                    1 6

1 23 Pearl Street would have had actually more than
2 that.
3    Q    When you describe the mill property, are you
4 referring to both parcels or just one of the two
5 parcels?
6    A    The mill property, I'm referring to both
7 parcels together.
8    Q    The pond and the dam proper, are they part
9 and parcel of that property or are they owned by the
10 town or state?
11    A    They are currently taken by the town.
12    Q    At the time you first listed the property in
13 1985 or 1983, who was the title holder for the dam?
14    A    I think it was Tastex Corporation,
15 T-a-s-t-e-x.
16    Q    With regard to the 23 Pearl Street property,
17 are there any buildings on that property?
18    A    One small building.
19    Q    What type of building is that?
20    A    Brick building.
21    Q    Was that an office, warehouse, storage,
22 pumping?
23    A    It was used as a garage.
24    Q    Do you know what the approximate square

17

1 footage of that building is?
2    A    From memory, I think it's 1,200.
3    Q    Are there any buildings on 26 Pearl
4 Street?
5    A    Yes, two separate buildings.
6    Q    Can you describe each of those?
7    A    We can do the smaller of the two first.
8 There's a Quonset hut, I guess, pre World War II type
9 metal building of about 6,000 square feet.
10    Q    When you first listed the property, was that
11 Quonset hut occupied?
12    A    Yes.
13    Q    Do you recall what was in that Quonset
14 hut?
15    A    If I remember correctly, there was a
16 trucking company in there.
17    Q    When you listed the property, was the sale
18 subject to the tenancies that existed?
19    A    Yes.
20    Q    When you listed that property, do you recall
21 what sort of lease agreement the trucking company had
22 with Goldstein and Tastex?
23    A    There were no leases, they were just all
24 tenancy at wills.

18

1    Q    The second building, can you describe that
2 for us?
3    A    The second building consisted of the
4 original mill, which I really can't define because
5 there were so many additions over the years.  You
6 know, I could never tell you exactly which portion
7 was the original.
8         Presumably it was at least one section right
9 against the river and, in fact, there's a portion of
10 the building that actually crossed the river.  So
11 there were no dated cornerstones or anything to say
12 this section is the original.
13         So to the best of my memory, David Goldstein
14 didn't know either.  I can't even say that I asked,
15 to tell you the truth.  And it was one of these
16 situations, I think, where they just added as they
17 needed.
18         To the best of my memory, zoning laws came
19 into being, I think, just in the 1940's or 50's, so
20 prior to that, I guess, people built what they
21 wanted, where they wanted as they needed, and I think
22 this building is typical of that.
23    Q    Do you know when the most recent addition to
24 that building had been completed?

19

1    A    I really don't, to that particular building.
2 I think the most recent construction on the site
3 at all was the Quonset hut.
4    Q    With regard to the mill building, did
5 Goldstein ever indicate to you what the square
6 footage of usable space was?
7    A    He figured that it was, if I remember
8 correctly, he figured somewhere about 150 to 160,000
9 square feet, but that turned out to be more the gross
10 area.
11    Q    By that, you mean that's the total square
12 footage of every inch of the flooring at that
13 property?
14    A    Approximately, yes.  And then, you know, the
15 net area would sort of depend on how you ended up
16 breaking it up for current modern use.
17    Q    At the time you first looked at the building
18 for the listing, was any of the mill building
19 occupied?
20    A    Yes.
21    Q    Do you recall what percentage of the
22 building was occupied at that point in time?
23    A    Probably about 50, 55,000 square feet.  Of
24 course, Goldstein as owner, you know, he had space

20

1 that could have been rented and it wasn't rented.

2 He'd stick some of his stuff here, there and.

3    Q The 50 to 55,000 square feet, that was area

4 that was actually leased out to third parties?

5    A Right, rented, yes. I say rented instead of

6 leases because there were no leases.

7    Q Of that property that was rented, that was

8 to parties other than Goldstein and Tastex?

9    A Yes.

10    Q Do you recall approximately how much of the

11 building Mr. Goldstein was occupying?

12    A As I say, he had stuff sort of all over the

13 place. When I ended up buying the place, he

14 reconfigured everything, and he rented, if I remember

15 correctly, initially about 12,000 square feet.

16    Q What type of business was Tastex?

17    A It was a synthetic yarn company.

18    Q Manufacturing?

19    A No. My understanding was he, what they

20 call, Air Textured, A-i-r, yarn, synthetic yarn that

21 was then, I guess, sent out and dyed elsewhere, then

22 woven into shoe laces. And I believe, according to

23 him, virtually all the shoe laces for the military

24 passed through that property because this was a

21

1 specialized operation.

2    Q At the time you first listed the building,

3 did you make any inquiry as to what occupancy permits

4 existed?

5    A No, I did not.

6    Q When you listed that building, did you check

7 with the town to see what permits existed for that

8 property?

9    A No, I did not.

10    Q How long was that listing, how long did that

11 listing run with Hermitage?

12    A I think he initially listed it, it was a

13 non-exclusive listing, and I think he listed it for

14 initially two years.

15    Q You said that was approximately 1983?

16    A Yes.

17    Q So the listing would have run approximately

18 to sometime in 1985?

19    A Yes.

20    Q During that two-year time period, did you

21 find any buyers or potential buyers?

22    A Yeah, I found two potential buyers, I don't

23 remember the names. One was an investor from New

24 York, and he was here to look at the Schraff Candy

22

1 Factory, and he was interested in old buildings, so I

2 mentioned this and he took a look.

3    If I remember correctly, he and one other

4 actually made an offer on the mill. One offer was

5 for approximately half the price, and the other was

6 for a quarter of the price.

7    Q So 250,000 and 125,000?

8    A I think it was actually 120,000.

9    Q I take it those were rejected?

10    A Yes.

11    Q During the two-year period, as one of the

12 listing agents, brokers for that property, did you

13 have other occasions to inspect and be in that

14 property?

15    A Yes, I did have, I had other customers that

16 I showed the property to. I can't remember how many,

17 what number. But of the total number that I showed,

18 there were two that just made those offers, there

19 were only two offers.

20    Q During any of the showings, was there any

21 discussion with anyone, Mr. Goldstein, the buyers,

22 potential buyers, whoever concerning the mechanical

23 systems in the building?

24    A I don't recall any direct discussions, but I

23

1 do recall them looking at them and suggesting that

2 they were not up to snuff.

3    Q In what sense were they not up to snuff?

4    A Well, as I mentioned, the sprinkler system

5 was for all intents and purposes inoperable. There

6 were leaks in the steam pipes in the boiler room and

7 elsewhere in the building.

8    The system had been converted to a low

9 pressure steam system, the original was high

10 pressure. I have no idea when it was converted to

11 low pressure. At the time that I came across it, it

12 was already low pressure.

13    As I say, there were also question of, you

14 know, broken windows, holes in the roof, leaking

15 roofs. And much to my surprise, in some of the

16 tenanted area, it had leaking roofs.

17    Q Did you ever have any discussion with Mr.

18 Goldstein about those problems with the property?

19    A Yes, I asked him about them. In fact, the

20 building particularly, the exterior of the building

21 had very, very poor appearance, it was in really

22 shoddy condition.

23    And I suggested to him that particularly

24 after getting the very low offers, I suggested today

24

1 him that, you know, spending a little money in
2 cleaning up the place, even a coat of paint and
3 replace some of the broken window panes, particularly
4 the front of the building would improve the general
5 appearance from the street.
6         And he -- why, I can't say -- I guess what
7 it came down to was, no. He wasn't prepared to talk
8 about that, but I thought if he spent not a huge sum
9 of money, just something on cleaning up the place
10 would improve the appearance, but he wasn't
11 interested in doing that.
12         If you are interested, I could tell you what
13 I found out later, the reason why.
14    Q    Sure.
15    A    His bank was about to foreclose on him.
16    Q    During the two years you were the listing
17 agent for that property, do you recall whether or not
18 there were any issues with the town of Bellingham
19 concerning that property?
20    A    Yes. On a few occasions, when I first met
21 the fire chief, Mr. Richard Ranieri, and apparently
22 he made fairly frequent visits there. And there was
23 one particular tenant that Mr. Goldstein had, A.B.
24 Pallet Company, if I remember correctly, that had

25

1    Q    Sure, go right ahead.
2    A    Well, when I became interested, of course, I
3 didn't have any money of substance to put down on the
4 building. Mr. Goldstein wasn't sure whether I'd be
5 able to raise the money, so he was very concerned
6 that he did not want his tenants to know that I might
7 be trying to buy the building until such time as he
8 was sure that I could actually do it.
9         So what he did is he appointed me manager of
10 the building. And as things progressed, this led to
11 my formulating leases because the only way I would
12 buy the building was if all tenants had leases.
13         So during this period of time, of course, I
14 was at the building more frequently, this sort of
15 legitimized my being there as a manager. Of course,
16 I then saw Mr. Ranieri quite frequently, and as
17 manager, once he learned I was manager, he then
18 applied quite a bit of pressure on me.
19         He realized I didn't hold the purse strings
20 even though I was manager, but he wanted me to try to
21 get Mr. Goldstein to, you know, do something about
22 the condition there. And Mr. Goldstein would either
23 smile, laugh, look to heaven.
24    Q    When approximately did you become the

27

1 rented approximately 30,000 square feet.
2         And this was an area, approximately half of
3 it was a concrete floor, the remainder was old wooden
4 floor, wooden walls, wooden roof. And it had pallets
5 stacked from the floor all the way up to the ceiling,
6 jammed between sprinkler pipes, windows and doors all
7 boarded, and the place was heated by a wood stove.
8         And I guess you could say on occasion Mr.
9 Ranieri was really tearing his hair, in fact, on one
10 occasion, he asked me if I would have a word with Mr.
11 Goldstein.
12    Q    Concerning?
13    A    Trying to get the thing remedied or get rid
14 of the tenant.
15    Q    What was the result of that discussion?
16    A    It went nowhere with Mr. Goldstein, he
17 laughed.
18    Q    On how many occasions can you recall during
19 this two-year listing period did you meet with the
20 fire chief?
21    A    Well, if you want us to get into that,
22 then -- not to tell you how to question me, but we
23 need then to get into sort of when I became
24 interested and do you want to do this on record?

26

1 manager of the building?
2    A    If I remember correctly, probably somewhere
3 about April of '85, April or May.
4    Q    Was that a paid position?
5    A    Paid, of course not, not likely.
6    Q    What percentage of your time were you
7 spending working as manager of the mill beginning in
8 the spring of 1985?
9    A    Not an awful lot initially but when working
10 with my accountant and putting together some figures,
11 financial projections, and visiting various banks, I
12 think there was the third bank that we visited, which
13 was then the Milford Savings Bank said that they
14 would take a serious look at it. And they went and
15 appraised the building for a million dollars, and
16 offered me 80 percent, an 80 percent loan.
17    Q    Approximately when did you get that
18 commitment from Milford Savings?
19    A    Mr. Rooney, I can't quite remember.
20 Somewhere between maybe June and July of 1985.
21    Q    When did you first make an offer to purchase
22 the building to Mr. Goldstein or his corporation?
23    A    I think that was probably April of 1985, and
24 I think we entered into a purchase and sale agreement

28

1 in May.

2  Q   The sale price was how much?

3  A   550,000.

   Q   I take it, it was contingent upon
financing?

6  A   Yes, 100 percent.

7  Q   Any other contingency that you can recall?

8  A   Oh, subject to the tenant base, subject to

9 Goldstein remaining as a tenant, subject to property

10 being environmentally clean, subject to the other

11 usual terms and conditions.

12  Q   At the time you made this or entered into

13 this agreement for the purchase of the property, had

14 you already leased up the existing tenants?

15  A   If I remember correctly, I think so because

16 even if I didn't buy it, he wanted to sell it. He

17 was looking to sell it as an ongoing business, you

18 know, he had to have leases if they were even tenancy

19 at wills, at least they should be in writing. And he

20 eventually agreed with that and had me prepare those

21 things and get them signed.

22  Q   Did his corporation also enter into a

23 lease?

24  A   Yes, with me.

                                    29

1  Q   That was for the 12,000 square feet you had

2 mentioned?

3  A   Yes.

4  Q   What was the term of that lease?

5  A   I think it was five years with an option to

6 renew for another five.

7  Q   Whose option or mutual option?

8  A   His option to renew.

9  Q   Prior to entering into the purchase and

10 sales agreement, did you have the property inspected

11 by anyone on your behalf?

12  A   Yes, I had it environmentally inspected.

13  Q   Who did that inspection, do you recall?

14  A   Maybe the name will come to me a little

15 later, forgive me.

16  Q   What was the result of that environmental

17 inspection?

18  A   I got a report, and in essence a letter that

19 in sum and substance that the property was clean and

20 free of all hazardous and toxic material as of the

21 date of the letter.

22  Q   Did you have any other type of inspection

23 done at that point in time?

24  A   No, I did not. Well, not formal inspection.

                                    30

1 I had an electrician go through the place with me,

2 major electrical problems.

3  Q   Who was the electrician?

4  A   I just don't remember offhand, I'm sorry.

5  Q   Could it have been Paul Hurley of Anderson

6 Electric?

7  A   That's it, there you go, okay.

8  Q   They found major problems with the

9 electrical system?

10  A   Yes.

11  Q   Did he prepare --

12  A   It was a very antiquated system.

13  Q   Did Anderson Electric advise you or prepare

14 a report about what work needed to be done?

15  A   No. He walked through the place with me,

16 and I recognized that the place was in bad shape,

17 okay. And, again, I don't know how you want to do

18 this.

19  Q   Say anything you like, I'll follow up, we're

20 in no rush?

21  A   Prior to doing all this, the very first

22 thing that I did after getting a bank loan, I went to

23 see the building inspector because, quite frankly,

24 what I saw in the building, the building should have

                                    31

1 been closed.

2        It was a building that should not have been

3 allowed to be open, particularly tenanted. And this,

4 in fact, was the opinion of the building inspector,

5 but then he did agree with me that the structure

6 itself was very substantial in spite of the leaking

7 roofs here and there and the rotted floors.

8        And somebody willing to spend the time,

9 energy and money, if the money were available was

10 certainly something that could be turned around. And

11 my biggest concern was having no up-front money

12 myself.

13        I wanted to be sure that the town would be

14 amenable to a phased type rehab. And his initial and

15 immediate response was he said, "Well, Paul, there's

16 really nothing that you can do to make the building

17 any worse. Anything you do has got to be an

18 improvement." And he said he'd be more than happy to

19 work with me on that.

20  Q   That was Maurice Gregory?

21  A   Right.

22  Q   The building inspector?

23  A   Right, the building inspector at the time.

24 And I had never attempted anything like this before,

                                    32

1 and I did not at the time feel even in speaking with
2 Mr. Ranieri, you know, gee, here are conditions with
3 any number of reasons for him to close the building
  nd he didn't.
       And the same thing with the building
6 inspector, you know, they both, and I spoke with Mr.
7 Ranieri too about a phased rehab.  And he says in his
8 opinion anything that you do has got to be better
9 than what's here.
10      Unfortunately, I did not get that in writing
11 from any of them at the time, I didn't think it was
12 necessary, I did not get that in writing.
13   Q   So you purchased property, the closing was
14 in December of 1985?
15   A   Yes, the 5th of December.
16   Q   In addition to the environmental inspection
17 and the electrical inspection, did you have any other
18 inspections performed?
19   A   I had Goldstein's plumber, who I decided to
20 continue using, a fellow named Everett Brown.  He was
21 not just a plumber, he was a licensed steam fitter.
22 And he looked after the boilers and things.
23      He said, in his opinion there's stuff he
24 could do to fix the leaking steam pipes and what have

33

1 be able to hit potable water somewhere between 25, 35
2 feet.
3       And they felt where it was right part of the
4 Charles River Aquifer system, there shouldn't have
5 been any problem in being able to extract between 3
6 to 5 million gallons a day.
7       One of my reasons for thinking in that
8 direction was because I remember reading somewhere in
9 the newspapers at that time that Bellingham and the
10 town of Franklin were both short of drinking water.
11   A   And the property actually abuts Franklin on
12 the river, so I also consulted them, but nothing to
13 do with the building itself.
14   Q   At the time of the purchase, was the
15 building on town water?
16   A   Yes.
17   Q   You were thinking of replacing the town
18 water with private well?
19   A   No, not for the building, no.  I was
20 thinking of possibly selling the water.
21   Q   As a separate business?
22   A   As separate business, yes, production of and
23 sale of drinking water.
24   Q   Prior to the sale being consummated, did you

35

1 you.  But I also spoke with him about abandoning that
2 system all together because I had hired an
3 environmentalist.  And when they saw those steamers
4 and the horrible black cloud that settled over the
5 valley from the chimney, I wasn't really interested
6 in maintaining those boilers.
7       And I found out that there was natural gas,
8 there's a huge gas line right in the street.  And, in
9 fact, in the back of the property, right adjacent to
10 the property running beside the property is the trunk
11 gas line that comes up from somewhere down south.  So
12 there's natural gas all around, huge supplies, that's
13 the way they go.
14   Q   Any other inspections in addition to the
15 electrical, plumbing and environmental?
16   A   One of the things I was interested in was
17 possibly the production of drinking water, potable
18 water.  So I then brought in R.E. Chapman, who are, I
19 think, among the foremost well drillers in the
20 northeast.
21      I didn't get an actual survey, but I had a
22 talk with them.  They were very familiar with the
23 area and they felt that, you know, if the property is
24 clean, environmentally clean, they figured you should

34

1 speak with Chief Ranieri about the sprinkler system
2 at all?
3   A   Yeah, we spoke about it and his -- not what
4 I was going to so much do because he knew that my
5 plans called for, you know, rehabbing the whole
6 place.
7       And I told him that initially as much as I'd
8 like to get rid of the boilers and what have you, the
9 initial funds had to be spent on improving the
10 facade, dressing up the property in the front just to
11 get people in and, you know, we'd take it from there.
12      And the thing was, as I went along and got
13 more tenants and improved the income, we'd do more
14 and more, and he was amenable to that, verbally
15 amenable to that.
16   Q   You indicated that during this time period,
17 1985, the chief was still after you though to
18 pressure Mr. Goldstein to keep making progress on
19 repairing the systems?
20   A   Either that or getting rid of the tenant.
21   Q   A.B. Pallet?
22   A   A.B. Pallet.  The really horrendous thing
23 was his method of heating the place with the wood
24 stove.  And, of course, he wanted to do that because

36

Volume III
Pages 1-103

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

PAUL WATSON, JANET WATSON, ANDREW WATSON,   )
DAVID WATSON AND PAUL WATSON, in his   )
capacity as TRUSTEE of MITSON REALTY TRUST,   )
                    Plaintiffs,   )
     v.   )
                         )
TOWN OF BELLINGHAM, RICHARD F. RANIERI, in   )
his official capacity and individually,   )
LEE G. AMBLER, in his official capacity and )
individually, SCOTT AMBLER, in his official )
capacity and individually, BERTRAND GUERIN,  )
in his official capacity and individually,   )
DENNIS FRAINE, in his official capacity and  )
individually, JERALD A. MAYHEW, in his   )
official capacity, JOHN EMIDY, in his   )
official capacity and individually, and   )
EDWARD WIRTANEN, in his official capacity   )
and individually,   )
                  Defendants.   )

DAY THREE DEPOSITION OF PAUL
WATSON, a witness called on behalf of the
Defendants, taken pursuant to the Massachusetts
Rules of Civil Procedure, before Diane Hulme,
Court Reporter and Notary Public in and for the
Commonwealth of Massachusetts, at the Law Offices
of Curley & Curley, 27 School Street, Boston,
Massachusetts, on Friday, February 24, 2006,
commencing at 11:14 a.m.

MELVIN LIPMAN
COURT REPORTER
101 Tremont Street - Suite 700
Boston, Massachusetts  02108
Tel. (617) 227-3985

---

APPEARANCES:

LAW OFFICES OF KRESSLER & EHRHARD, P.C.
  (by James P. Ehrhard, Esq.)
  11 Pleasant Street, Suite 200
  Worcester, Massachusetts  01609
  for the Plaintiffs

LAW OFFICES OF CURLEY & CURLEY
  (by Martin S. Rooney, Esq.)
  27 School Street
  Boston, Massachusetts  02108
  for the Defendants

---

I N D E X

| WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Paul Watson (by Mr. Rooney) | 4 | | | |

E X H I B I T S

| Exhibit No. | | Page |
|---|---|---|
| 36 | Letter Dated 1/17/92 to Lee G. Ambler | 4 |
| 37 | Letter Dated 2/11/92 from Mitson Realty Trust to Dennis Fraine | 4 |
| 38 | Log of Phone Messages | 13 |
| 39 | Letter Dated 9/21/92 | 28 |
| 40 | Water & Sewer Department Town of Bellingham Letter Dated 1/18/94 | 40 |
| 41 | Notice from Office of Board of Assessors Dated 5/23/94 | 44 |
| 42 | Docket of Land Court Tax Lien Dated 9/19/94 | 48 |
| 43 | Search Warrant | 63 |
| 44 | Inspection of Buildings - Violations | 74 |
| 45 | Report of Inspection | 74 |
| 46 | Judgment | 85 |
| 47 | Mr. Ranieri, Fire Department, Letter to Mr. Watson Dated 12/8/98 | 88 |
| 48 | Preliminary Injunction | 92 |
| 49 | Tax Lien Dated 4/13/99 | 97 |

---

                 PROCEEDINGS

       (Exhibit No. 36, Lee G. Ambler
Letter Dated 1/17/92, premarked for
identification.)

       (Exhibit No. 37, Mitson Realty
Trust Letter Dated 2/11/92, premarked for
identification.)

       CONTINUED DIRECT EXAMINATION

Q.  (By Mr. Rooney)  Good morning.

A.  Good morning, Mr. Rooney.

Q.  We're back on the record and you're still under
oath and we're continuing your deposition in our
favorite case.  Let's begin by taking a look at
what we've now marked as Exhibit 36, which is a
letter your attorney wrote to Mr. Lee Ambler
dated 1/17/92.

       MR. EHRHARD:  It's already marked
and admitted?  That's the next exhibit, it's not
been put in yet.

       MR. ROONEY:  We've just marked it
now.

       MR. EHRHARD:  I just want to make
sure I'm in line as you pull them down, otherwise
it will be a long day.

13

```
 1        the copy instead?  It doesn't matter to me.
 2                  THE WITNESS:  And then we can
 3        photocopy that later.
 .                  MR. EHRHARD:  I think he's going to
 .        copy it now.
 6                  MR. ROONEY:  Well, I can copy it
 7        now.  Or we can mark this one and we can just
 8        copy it during break.
 9                  THE WITNESS:  Yeah, that's fine by
10        me Mr. Rooney.
11                  (Exhibit No. 38, log of phone
12        messages, marked for identification.)
13    Q.  Anything else you wanted to say, sir, about
14        Exhibit 36, which was the letter from your
15        attorney to the town concerning the mistreatment
16        and discrimination?
17    A.  I'm not sure that there's anything else that I
18        can think of right at the moment.
19    Q.  Well, let me show you then Exhibit 37 and ask you
20        if you recognize that letter?
21    A.  Yes.  This is a letter from me to Dennis Fraine
22        the executive secretary administrator on the
23        board of selectmen in Town of Bellingham.
24    Q.  For what purpose did you send that letter?
```

14

```
 1    A.  If I may read it.
 2    Q.  Oh, I'm sorry.  Do you recall what prompted you
 3        to write this letter of February 11th to the town
 4        administrator?
 5    A.  Well, the Goldsteins were, as the letter states,
 6        the Goldsteins were my primary tenants, were
 7        leaving, breaking of a lease that they had just
 8        renewed and were leaving.  They actually started
 9        moving out right after the criminal case was
10        dismissed.  In fact, they attended the hearing,
11        which the case was dismissed, both Lewis
12        Goldstein and his son David.
13    Q.  In Exhibit 37 you again make reference to what
14        you believe to be buoyantly discriminatory
15        practices being carried out; is that correct?
16                  MR. EHRHARD:  39?
17                  MR. ROONEY:  37.
18                  MR. EHRHARD:  I think it would be
19        39.  Wouldn't it be 39?
2'                  MR. ROONEY:  No.  We marked this
2.        one before we marked that.
22                  MR. EHRHARD:  Oh, we did?
23                  MR. ROONEY:  Yes.  We marked two of
24        them at once in the beginning.
```

15

```
 1                  MR. EHRHARD:  I apologize.
 2    Q.  I was asking you in this letter you had made
 3        reference to what you believe again to be the
 4        discriminatory practices of the town, correct?
 5    A.  Of the town, right.
 6    Q.  Again, as of February of '92, you believe you
 7        were being discriminated against by the Town of
 8        Bellingham?
 9    A.  Yes.
10    Q.  When the Goldsteins left their occupancy at the
11        mill building, did you commence any litigation
12        against them for breach of their lease?
13    A.  No, I did not.
14    Q.  Why not?
15    A.  I had so many other legal problems at hand and so
16        many expenses and limited income and even more
17        limited income with them having left that I
18        wasn't able to do so.
19    Q.  Did you believe they were in breach of their
20        lease when they left?
21    A.  Well, they had just renewed it for another five
22        years through their lawyer, which was an option
23        that they had.  Their original lease was five
24        years with the option to renew for another five.
```

16

```
 1        They had just the year before, if I remember
 2        correctly, in October the year before, they'd
 3        officially through their attorney renewed the
 4        lease for another five years.  Then the case was
 5        dismissed in December '90 --
 6    Q.  '91?
 7    A.  -- '91.  Thank you.  -- and they started moving
 8        out the week after.
 9    Q.  And the question is:  Did you believe that to
10        have been improper on the part of the Goldsteins
11        in breach of their lease?
12    A.  Yes, it was in breach of their lease.
13    Q.  Now on February 18th, '92, Attorney Ambler wrote
14        to your attorney Mr. Gesmer with a five-page
15        response from Chief Ranieri to the combined
16        allegations.  Did you ever receive that
17        information?
18    A.  Yes.
19    Q.  You understood that the chief was disputing most
20        of what you were alleging?
21    A.  Yes.
22    Q.  With regard to the Goldsteins environmental
23        issues, did you ever receive a copy of a letter
24        that Attorney Ambler sent to Attorney Gesmer
```

45

1       abatement?
2    A.  That document refers to an abatement application.
3        I'm not sure that that's accurate.
     Q.  What's not accurate?  Did you apply for an
         abatement?
6    A.  I'm not sure that it was an official abatement
7        application.  What I had said earlier -- what I
8        had said earlier was that, to the best of my
9        memory, I had not filed for an abatement because
10       the law required that the taxes be paid before an
11       abatement can be legally considered and the taxes
12       had not been paid and, therefore, I cannot
13       legally apply for an abatement.
14           What I think I did at some point in time I
15       wrote them bringing to their attention the fact
16       that the property is contaminated and, therefore,
17       may have from a tax point of view a lesser value.
18       And I think that that should have actually seen
19       what document prompted that response.
20           You know this is under oath so I'm hesitant
21       to say that it was an official, legal abatement
22       application because I tend to doubt that.  But I
23       think I did write them at one point bringing to
24       their knowledge at this time I had one or two

46

1        companies to do some very, very basic
2        environmental study.
3            And so there was a letter from the FDIC
4        stating that as a result of this, which I have
5        not yet received, they had abandoned the property
6        and written off the debt indicating that the
7        property was probably worthless than that.  So I
8        think that was just a letter that I had written
9        them and they took it, you know, and responded in
10       terms as that it was an actual official abatement
11       application.
12   Q.  Did you ever have an in-person hearing on that
13       application or letter?  Did you ever meet with
14       the board of assessors?
15   A.  To the best of my memory, I don't recall meeting
16       with them.  I recall meeting with selectmen and
17       Dennis Fraine the administrator.  Offhand I don't
18       recall meeting with them.
19   Q.  Following receipt of this letter notice, did you
2´       file any appeal with the appellate tax board?
2.   A.  To the best of my memory, I don't think so.
22   Q.  Why not?
23   A.  Because as I said earlier that I was under the
24       opinion, certainly still am, that in order to

47

1        file for an abatement the taxes have to be paid.
2    Q.  When you read this, you saw though that wasn't
3        the basis for the town's actions, it was based
4        upon the valuation for calendar year 1990 market
5        sales?
6    A.  Right.
7    Q.  Did you consult an attorney concerning that issue
8        when you received this notice?
9    A.  I don't recall whether or not I did.
10           MR. ROONEY:  I've got a little
11       after one.  Do you want to take a lunch break?
12           (Off the record.)
13           (On the record.)
14   Q.  In July of 1994, you received notice from an
15       attorney on behalf of the town concerning the
16       foreclosure of your rights regarding the tax
17       titles.  Do you recall that?
18   A.  Yeah, I recall something like that.  The exact I
19       don't recall offhand.
20   Q.  Did you do anything with regard to the tax title
21       foreclosure at that point in time?
22   A.  I don't recall what I may or may not have done.
23       I'm pretty certain I must have consulted with
24       Mr. Bennett my attorney at the time.

48

1            The thing is if the town hadn't been chasing
2        away my tenants I had the ability to not only pay
3        the taxes but I would have had the ability to
4        finish the rehab.
5    Q.  I understand that's your position.  We've not
6        been able to identify, other than perhaps one or
7        two people, anybody specific who you believe that
8        happened with.
9            MR. ROONEY:  Mark this as the next
10       exhibit, if we could.
11           (Exhibit No. 42, docket of the Land
12       Court dated 9/19/94, marked for identification.)
13   Q.  Let me show you what has now been marked as
14       Exhibit 42, which is the docket of the Land Court
15       of the Commonwealth of Massachusetts dated
16       September 19th, 1994.
17           In 1994 you were represented for some period
18       of time by Richard Bennett with regard to the
19       Land Court matter?
20   A.  Yes.
21   Q.  Now, in May of 2001, this matter apparently came
22       on for hearing before the Land Court.  Do you
23       recall that?
24   A.  Yes.

49

1  Q.  And a default entered in open court for failure
2      to appear and defend at that hearing; is that
3      correct?
4  A.  That's what's written there.
5  Q.  Did you appear in court on that day to answer?
6  A.  Probably not.  And from memory at the moment, as
7      I recall there's probably some extenuating
8      circumstances.
9  Q.  In fact, on May 22nd, 2001, you filed a motion to
10     remove the default?
11 A.  Yes.
12 Q.  Presumably raising those extenuating
13     circumstances?
14 A.  Yes.
15 Q.  And Judge Trombley heard that motion on June 21st
16     of '01 or thereabouts?
17 A.  Or thereabouts.
18 Q.  You had a hearing on that motion?
19 A.  I believe so, yes.
20 Q.  And the judge denied your motion to remove the
21     default?
22 A.  I believe so, yes.
23 Q.  And in accordance a judgement was entered in July
24     of 2001 against you, your wife and your property?

50

1  A.  I believe so, yes.  Now that would be for 23
2      Pearl Street.  There's 23 Pearl Street and 26
3      Pearl Street.  23 was held in the name of Janet
4      and Paul Watson.  26 Pearl Street was held in the
5      name of Mitson Realty Trust.
6  Q.  It doesn't give us an address.  It just gives
7      us the book and page.  But the defendants were in
8      additionally Roaring Brook Realty Company?
9  A.  That was the company under which Goldstein the
10     former owner had it registered.  Both properties
11     both 23 and 26 Pearl Street were registered to
12     the one company.
13 Q.  Is 23 the section that's across the street next
14     to the pond?
15 A.  That's right.  Incorporating the land around the
16     pond, yes.  You were there that small brick
17     building that's part of the 23 Pearl Street.
18     Yes.
19 Q.  Now on September of '94, you are continuing to
20     deal with the Attorney General's office
21     concerning the environmental problems at the
22     property; is that accurate?
23 A.  I suspect to.
24 Q.  Do you remember a Lieutenant Gail Larson Chief of

51

1      the State Environmental Police Strike Force?
2  A.  I don't recall offhand, but quite possibly.  If
3      it's referenced there, you know, it has to be so.
4      I don't quite recall that.
5  Q.  It's your letter of September 21st.  Look at that
6      and see if that refreshes your memory.
7          Does this refresh your memory that you had
8      dealings with the state police and the Attorney
9      General's office concerning the environmental
10     issue at the mill in '94?
11 A.  Yeah, and I'm not sure which particular --
12     unfortunately I'm not sure which particular
13     environmental situation that is really in
14     reference to.
15         There was another incident -- forgive me for
16     not recalling the date of it -- it may be in '91
17     or '92, Mr. Rooney, in which a local trapper was
18     working on the river with my permission,
19     witnessed a pickup truck entering the back of the
20     property and dumping old tires and motor
21     car/truck batteries on the property very close to
22     the river and he immediately came and reported
23     them to me.  He was able to secure the license
24     number and a description of the vehicle and

52

1      everything.
2          I immediately reported it to the Bellingham
3      Police Department and, as expected, nothing
4      happened.  However, we were able to trace the
5      truck to, if I recall correctly, a gas station
6      in, I think, it was Milford an adjacent town and
7      absolutely nothing happened.
8          At one point in trying to get something done
9      some action taken, I was either advised to or I
10     thought of myself, I can't recall which it was
11     right now, of getting in touch with the state
12     police.  One way or the other we did get in touch
13     with the state police and much to my amusement,
14     again, absolutely nothing happened.
15         The batteries and tires remained there for a
16     long type and then mysteriously over a weekend
17     the batteries disappeared, the tires remained.
18     Of course, the danger with the batteries are lead
19     contaminated from the acid content.
20         It's just another one of these things that
21     absolutely blew my mind that none of the
22     authorities cared enough to take any action
23     either the head of the department at Bellingham,
24     the Environmental Department in Bellingham, the

53

1      Health Department, the Police Department, nobody
2      cared. Nobody gave a damn. The state police
3      didn't do anything either.
4   Q. Nor the State Department and the Environmental
       Protection?
6   A. Nobody. Nobody.
7   Q. The state Attorney General's office?
8   A. Nobody did anything.
9   Q. Do you believe they were all conspiring against
10     you?
11  A. No, I'm not suggesting that for a minute. But
12     considering the significant body of water that
13     the Charles River is and the fact that it's aqua
14     system supplies so many tens of thousands if not
15     hundreds of thousands of people they're drinking
16     water, I thought they would have been more
17     interested in my adopted country. I was very
18     disappointed to say the least.
19        So to get back to that specific letter, I'm
20     not 100 percent certain that what that was in relation
21     to. It may not have been any of the
22     contamination caused by Goldstein. It may have
23     had to do with -- The letter, unfortunately,
24     doesn't make reference to any specific situation.

54

1         Again, you know, I don't know what you may or
2      may not read into it. But, again, as best I can
3      as a civilian, who knows very little about the
4      law, I'm trying to protect myself and my interest
5      in the property.
6   Q. At the end of 1994, did you have any assessment
7      made of the value of the property at Pearl
8      Street?
9   A. To the best of my memory, no, I did not.
10  Q. Did you prepare any internal estimate as to the
11     property value?
12  A. I may or may not have, sir. I really don't
13     recall offhand. Somewhere in the files there may
14     be. If I can find it, I'd be more than happy to
15     show it to you.
16  Q. As you sit here today, do you have any memory of
17     what your estimate of the value of the property
18     was in late 1994?
19  A. Do I have an idea now of what it may have been
20     worth in 1994?
21  Q. Did you have an idea at that point in time that
22     you recall today?
23  A. No, I don't. I don't recall offhand. No.
24             MR. ROONEY: Why don't we take our

55

1      lunch break now. It's almost 25 after 1.
2              (Off the record at 1:21 p.m. for
3      lunch.)
4              (On the record at 2:20 p.m.)
5   Q. In 1994 you, Janet Watson, Andrew Watson, David
6      Watson, Mark Watson, Paul Watson as trustee of
7      Mitson Realty Trust filed a lawsuit concerning
8      all the things we've been talking about the last
9      two and a half days; is that correct?
10  A. Yes, sir.
11  Q. At that point in time, the defendants were the
12     Town of Bellingham, Richard Ranieri, Lee Ambler,
13     Dennis Fraine, Anthony Mazzola, Elizabeth Lowry,
14     William Bissonnette, Lawrence Cibley and John
15     Tuttle; is that correct?
16  A. To the best of my memory, yes.
17  Q. And the last five were the selectmen for the Town
18     of Bellingham at the time?
19  A. Yes, I believe that's correct.
20  Q. Dennis Fraine was the town administrator?
21  A. Yes.
22  Q. Lee Ambler town counsel?
23  A. Yes.
24  Q. And Ranieri is chief of the fire department?

56

1   A. Yes.
2   Q. What became of that lawsuit?
3   A. I believe that lawsuit was eventually dismissed
4      because I was unable -- my attorneys did not --
5      I'm not sure what the word is -- they didn't
6      perform and eventually I was left on my own and
7      this case got called one day for a hearing along
8      with another case that they have tried to tie to
9      and the Court had actually previously denied and
10     that was a lawsuit that I had filed against my
11     first attorney Patricia Weber.
12        Working on my own, I had to do a little
13     small -- I'm not sure what you call it -- I'm not
14     sure it's even a word processor -- it's one of
15     those little type things and it appears two lines
16     on a screen and the -- I forget now -- I lost
17     power or something, I lost part or all of what I
18     was working on needed for the Court and I was
19     under particular pressure because they called
20     these two separate cases which the judge had
21     previously denied in joining. They called them
22     both for hearing on the same day so I was trying
23     to do both of them.
24        And, once I got the word processor going

57

1      again, I called the court to tell them that I was
2      going to be late. And then by the time I got
3      through it was actually too late to make it to
4      the court. And I tried phoning but the clerk's
5      office was closed by then so the judge dismissed
6      the cases.
7  Q.  If I was to suggest that it happened on or about
8      November 22nd of 1996, does that sound correct?
9  A.  Approximately.
10 Q.  Did you ever file for a reconsideration or have
11     that default removed or to explain the
12     circumstances you just told us?
13 A.  I don't think I did, sir, because I just had so
14     much else on my plate and so many expenses. I'm
15     not sure that -- It's just stuff that I don't
16     think I was capable of doing myself. It was
17     another problem trying to represent myself.
18         You know, when we first started this, you
19     delved somewhat into my education and background
20     and, as you're aware, it's rather limited. So
21     trying to do stuff like this on my own is
22     extremely difficult, to say the least, not to
23     mention I have very little knowledge of the law.
24 Q.  In looking at the docket sheet, you were

58

1      originally represented by Richard Bennett who
2      filed the suit; is that correct?
3  A.  Yes.
4  Q.  And Gary Brackett of Brackett and Lucas took the
5      case over?
6  A.  Not really. He was co-counsel at the time.
7      Mr. Bennett told me that he was not -- which I
8      appreciated -- he was not that familiar with
9      municipal law and recommended that we hired, you
10     know, co-counsel. And he actually took me to a
11     training session that Mr. Brackett was giving to
12     other attorneys and he recommended that we hire
13     him.
14         So we spoke to Mr. Brackett at the end of the
15     session and then had a meeting with him in his
16     office, which I think is in Worcester. He
17     eventually agreed to represent us. And then he
18     recommended a change and so there was a motion to
19     make some changes in the original case.
20 Q.  Paperwork?
21 A.  Right, that Mr. Bennett had filed.
22 Q.  Then in 1996 an Keith Langer took the file over?
23 A.  Yes.
24 Q.  And Mr. Langer withdrew?

59

1  A.  Mr. Langer didn't get much done. He didn't
2      really get anything done.
3  Q.  Initially it looks like the trial court denied
4      Mr. Langer's request to withdraw and went up to
5      the appeals court.
6  A.  Well, I think I filed -- I think I filed a
7      personal motion objecting to his leaving.
8  Q.  Right.
9  A.  And I can't -- I think my motion was favorably
10     considered. And then I don't recall if his went
11     to -- What court was it you say it went to?
12 Q.  The appeals court for the Commonwealth?
13 A.  I'm not aware that it went there. I don't think
14     I'm aware of that.
15 Q.  While the matter was still pending in Norfolk
16     Superior Court, did you answer a set of
17     interrogatories on behalf of yourself and the
18     trust?
19 A.  To the best of my memory, I think we did.
20 Q.  I don't need to go into this very much but let me
21     just show you the last page of the plaintiff Paul
22     Watson's answers to defendants' interrogatories.
23     I'm going to ask you if that's your signature?
24 A.  Yes.

60

1  Q.  Similarly you filed answers on behalf of the
2      trust answers to interrogatories?
3  A.  Beg your pardon?
4  Q.  You similarly filed answers to interrogatories on
5      behalf of the Mitson Realty Trust?
6  A.  Yes, I believe I did.
7  Q.  And on behalf of your three minor children at the
8      time?
9  A.  I believe so.
10 Q.  And those answers accurately reflected at that
11     point in time your best memory and knowledge of
12     the events that had been occurring?
13 A.  I would think so.
14 Q.  In 1995 the mill still had ongoing tenants; is
15     that correct?
16 A.  Yes.
17 Q.  Was one of them DBR, Inc., David Rosales?
18 A.  I believe so.
19 Q.  Suite 121-D?
20 A.  Yes, I believe so.
21 Q.  And you moved to evict him or that entity at some
22     point in time?
23 A.  Could be.
24 Q.  He was some thousand dollars behind in his rent?

61

1   A.   May have been, yes, sir.

2   Q.   Now in 1995 a matter was filed with the Worcester

3        Housing Court involving the trust; is that

4        correct?

5   A.   Yes.

6   Q.   What did you understand the nature of that

7        complaint to be?

8   A.   Building code violations.

9   Q.   In August of 1995, did John Emidy attempt to

10       inspect the property with regard to it's

11       condition the property being the mill property?

12  A.   To the best of my memory, on or about that time,

13       Mr. Emidy and several other members of the town

14       and several other inspectors including the

15       electrical inspector, the plumbing inspector,

16       Fire Chief Ranieri, assembled at the mill to do

17       an inspection and my wife was present at the time

18       and I had not yet arrived at the office.

19  Q.   Did you personally, at some point in time, deny

20       those individuals entry into the building to do

21       an inspection?

22  A.   Not that I'm aware of.  There was at one point, I

23       believe, Mr. Emidy wrote giving a date of an

24       inspection or asking to do an inspection and I

62

1        responded that, you know, provided it was

2        legitimately done and provided -- I don't

3        remember the words I used, forgive me -- you

4        know, provided it was done legally, meaning that

5        they do not discuss matters with the tenants,

6        because to the best of my knowledge, they had no

7        business doing that and if there were problems it

8        should be addressed to the landlord to fix it or

9        sort it out with them, you know, one way or the

10       other.  So I do recall something to that effect.

11       The exact dates I don't remember offhand.

12  Q.   In the summer of 1995, was Robert Furbish a

13       tenant at 26 Pearl Street?

14  A.   I recall that name.  Yes, I believe so.

15  Q.   Did he furnish a written complain to you about

16       multiple code violations on your premises?

17  A.   No.

18  Q.   Are you aware that Mr. Emidy reported that

19       Mr. Furbish called and complained that the

20       building was without proper fire suppression,

21       improper ventilation, holes in the floor, illegal

22       spray booths and an incomplete alarm system?  Did

23       you ever become aware of those allegations?

24  A.   I'm not aware that Mr. Furbish --  What did you

63

1        say that Mr. Furbish reported those to the town?

2        I'm not aware that he did in advance.

3   Q.   At some point in time in August or the 1st of

4        September, were you served a search warrant to

5        compel you to allow Mr. Emidy to inspect the

6        premises?

7   A.   No, I was not.

8   Q.   I show you a copy of the search warrant.

9             MR. ROONEY:  Why don't we mark that

10       as the next exhibit.

11            {Exhibit No. 43, search warrant,

12       marked for identification.}

13  Q.   Let me show you what we've marked as Exhibit 43

14       and ask if you recognize that document?

15       Have you reviewed Exhibit 43?

16  A.   Yes, I have, sir.

17  Q.   In August or September of 1995 do you recall

18       receiving that document?

19  A.   I believe I received it sometime in September or

20       September or October in court.  I was not served

21       the search warrant on the day in question.

22       From memory, there's also a problem with the

23       date of the alleged search warrant and the date

24       of the inspection.

64

1   Q.   What sort of problem?

2   A.   From memory, from memory I think the date of the

3        inspection was there was an inconsistency in the

4        date, let me put it to like that verified.  I

5        believe the inspection exactly occurred the day

6        before the search warrant or something to that

7        effect.

8        From memory, no, sir, I'm not 100 percent

9        certain which it was.  It's either the inspection

10       occurred the date before the application or --  I

11       just don't recall exactly what it is at the

12       moment.  But there were several -- there were

13       several problems associated with this.

14       First, if I also remember correctly, this was

15       filed a day or two after I filed an official

16       complaint with the Ethics Commission in Boston,

17       therefore, I believe this was a retaliation on

18       act on the part of the town.

19  Q.   How would the town know that you filed an ethics

20       claim?

21  A.   Because they were advised that we did.

22  Q.   By whom?

23  A.   I think it was Mr. Bennett.

24  Q.   Your attorney told them that you were filing

89

1    stolen. But I believe I can verify that by
2    possibly finding the check in payment for them,
3    but somebody there didn't want me to have that
4    building, Mr. Rooney. Somebody didn't want me
5    there.
6  Q. You're certainly not suggesting the town
7    officials broke into the building and stole your
8    fire extinguishers?
9  A. The building was literally open twenty-four hours
10   a day. The tenants had twenty-four hour access
11   so virtually anybody could go in there. But it's
12   a problem that I never had before.
13 Q. Now, in March of 1999 the town moved for an order
14   to vacate concerning the building. Do you recall
15   that?
16 A. Yes. On or about that date, yes.
17 Q. Pursuant to this motion was that Judge Martin
18   went out and walked through the building?
19 A. I can't recall exactly whether he did that prior
20   to or as a result of that. Somewhere there
21   should be a record of the date of his
22   walk-through. I don't, you know -- right now,
23   sir, I don't recall exactly.
24 Q. As part of that motion to or an order to vacate

90

1    the premises, do you recall receiving a number of
2    different letters and reports of violations with
3    regard to the property?
4  A. I don't recall exactly when I received those or
5    whether there they were separate from the case
6    that was filed.
7  Q. At least in the copy that I have, there was a
8    report from the building inspector -- two reports
9    from the building inspector, one from the fire
10   department, one from the electrical inspector,
11   one from the Board of Health, one from Bay State
12   Gas and a letter from Dennis Fraine concerning
13   the survey board concerning the overall status of
14   the property. Do you remember receiving any
15   other reports or complaints concerning the
16   property in '99?
17 A. I don't recall offhand, no.
18 Q. Just because it's here in front of me, according
19   to the Bay State Gas Company, and this is part of
     their report dated 2/11/99, they say that the
21   tube tight infra red heaters installed in the
22   bays and vented into the hallways must be
23   engineered to divide the mechanical ventilation
24   system to exhaust problems of combustion. That's

91

1    different than your understanding of what those
2    gas heaters required; is that correct?
3  A. Yes. What's strange about this is if there's one
4    thing in a building that's looked at very, very
5    closely before any approval is given it has to do
6    with natural gas any appliance using natural gas.
7    All I can tell you is those units were not only
8    inspected by the town.
9  Q. Who at the town?
10 A. It would be the plumbing and gas. The plumbing
11   inspector and also the gas inspector, to the best
12   of my memory. Not only were they inspected by
13   them, without his approval certificate, Bay State
14   Gas, no gas company would ever give you a gas
15   connection. They would not turn on the gas if
16   those things had not been inspected and approved.
17          MR. EHRHARD: The documents you're
18   referring to are different than the 1988 case?
19          (Mr. Rooney nods.)
20 A. That's what I started.
21 Q. I understand that you're saying. I'm just saying
22   the Bay State Gas Company wrote to the city and
23   to you saying that's as a matter of law not
24   correct cite 248 CMR 619?

92

1  A. And yet they were inspected by the town, approved
2    by the town gas. They were functional and that's
3    why I was being called down to vent them because
4    they were functional. Them functional means that
5    they had gas or gas supply. It means that Bay
6    State Gas turned on the gas, which means that
7    they had to seen an approval certificate before
8    they would have done that.
9  Q. And Bay State just changed their minds
10   apparently?
11 A. (The witness puts up hands.) What can I tell
12   you, sir?
13 Q. Now, at some time, whatever the date was Judge
14   Martin went to the property and did his
15   inspection and then he eventually issued an
16   order; is that correct?
17 A. That's right.
18          (Exhibit No. 48, preliminary
19   injunction, marked for identification.)
20 Q. Let me show you now what's been marked as Exhibit
21   48. A copy of that was served upon you as shown
22   by the constable's signature at the bottom; is
23   that correct?
24 A. Yes.

93

1  Q.  And, according to this order, Mitson Realty Trust
2      was prohibited and joined from renting, leasing
3      or putting anybody in the building at 26 Pearl
4      Street, Bellingham until further order from the
       Court?
6  A.  Yes.
7  Q.  After you received this order, what did you do?
8  A.  The building was closed, with the exception of my
9      office.
10 Q.  And you weren't renting, leasing or putting
11     anybody else in the building so you were not
12     covered by this order, correct?
13 A.  Well, the judge gave me specific permission to
14     remain there.
15 Q.  When did he do that?
16 A.  At one of the hearings, I don't recall which one.
17 Q.  Now according to the docket, there was an
18     additional hearing held a week after this order
19     issued at the courthouse.  Do you recall that?
20 A.  The tenants were appealing to the judge to try
21     and remain because the closing exacted extreme
22     hardship on them and their businesses.
23 Q.  What, if anything, did the judge say to them?
24 A.  If I remember correctly, I think he gave them a

94

1      ceratin time to find -- because if they had to
2      move out immediately, you know, it would have
3      meant the end of their businesses.
4  Q.  And there's also a notation in that docket there
5      was another hearing held in May of '99.  Do you
6      have any memory of what that was about?
7  A.  I don't recall offhand exactly what that was
8      about.  Probably it may have to do with the
9      tenants appealing again.
10 Q.  After that hearing in May of '99, whatever it was
11     about, at least according to the document,
12     nothing else ever happened in that case?
13 A.  Which case is that now?  The '88 case or --
14        MR. EHRHARD:  '98.
15 A.  The '98 case or the '95 case?
16 Q.  The '98 case.  Following the order to vacate and
17     the time given to the tenants to ordinarily move
18     out, did anything else ever happen in that case?
19 A.  Not to the best of my memory, no.  Let me say
2ᶜ     that that order did not include the Quonset hut
2ₓ     even though it says at 26 Pearl Street.
22 Q.  Well, it says the building at 26 Pearl Street.
23 A.  Even though it says the building at 26 Pearl
24     Street.

95

1  Q.  Not the Quonset hut?
2  A.  It did not include the Quonset hut because the
3      Quonset hut remained opened.  And the Quonset hut
4      is at 26 Pearl Street.
5  Q.  Right.  I hear what you're saying and I'm
6      agreeing with you because I only read this to
7      include the main building, not the outline of the
8      Quonset hut.
9  A.  Not my office, which was an office that was
10     actually also a separate building.  The door had
11     sort of a tunnel connection to the main building.
12 Q.  I remember that from our inspection.
13 A.  Right.
14 Q.  Again, in October of '02, a Mass rule of
15     appellate procedure AB(3) notice was sent and you
16     picked up the tapes at the courthouse; is that
17     correct?
18 A.  Yes.
19 Q.  And following picking up those tapes, did
20     anything else happen with that case?
21 A.  No.  That says appellate?  That means an appeal?
22     I don't recall making any statement to them about
23     an appeal.  Why they would say that I don't know.
24 Q.  Docket entry No. 22 says then on 10/15/02 tapes

96

1      received, MRAP, which is the abbreviation for
2      Mass Rules of the Appellate Procedure, AB(3) NDC,
3      notice sent?
4  A.  Could you translate that for me, sir, I don't
5      understand what that means?
6  Q.  It says the Court gave you a notice pursuant to
7      the rules of appellate procedure about the tapes
8      from the hearings.
9  A.  I don't recall receiving any notice from the
10     Court.  All I received was the tapes, which I had
11     previously paid for.  When you first brought up
12     that thing about an appeal, is that what that
13     also said.
14 Q.  Um-hum.
15 A.  I didn't receive -- I will check with my son
16     Andrew who was with me.
17 Q.  According to this, it was done the same day so
18     they probably handed it to you while you were
19     there.
20 A.  Let me check with my son Andrew.  I don't recall
21     receiving any notice regarding an appeal.
22     Absolutely not.
23 Q.  Your understanding is no appeal has ever been
24     taken or prosecuted since October of '02?

97

1   A.   No, other than this case.

2   Q.   Right.  The appeal from Judge Martin's order to

3        vacate the premises.

4   A.   No.

5   Q.   The next court action comes in 1999 in April.  Do

6        you recall the town again moving to foreclose

7        your right of redemption on the property?

8   A.   1999.  I don't recall that offhand, but they --

9        I'm not sure on the date.

10                   MR. ROONEY:  Why don't we mark it

11       for ease of reference.

12                   (Exhibit No. 49, tax lien dated

13       4/13/99, marked for identification.)

14  Q.   Let me show you now what we've marked as

15       Exhibit 49, which is the docket from the land

16       court, date filed 4/13/99, which indicates that

17       this was on the foreclosure of a tax lien.

18                   (Off the record.)

19                   (On the record.)

20  Q.   You had an opportunity, Mr. Watson, to review

21       Exhibit 49?

22  A.   Yes, I did.

23  Q.   This, again, indicates that a hearing was held on

24       5/901 concerning that matter, which is the same

98

1        date as the last Land Court hearing that we

2        looked at.

3   A.   Yes.

4   Q.   And the same thing happened you were delayed, you

5        tried to call the Court.  You weren't able to do

6        so and the Court entered a default against you?

7   A.   No.  I think you're possibly getting this mixed

8        up with the case that I had filed -- the case

9        that I had filed against them.  But just trying

10       to be accurate the case that Bennett had filed.

11  Q.   We're confusing terms, and let me pull out the

12       exhibit.  Exhibit 42, which was the tax lien case

13       involving 23 Pearl Street, which was the Paul and

14       Janet Watson Roaring Brook Realty Property?

15  A.   Yes.

16  Q.   And that shows, again, that on 5/9/01 the matter

17       was called and no one appeared?

18  A.   Yes.

19  Q.   That's the same date as on 49?

20  A.   If I understood you correctly, what you were just

21       saying was that were you thinking in terms that

22       this was the time that my word processor failed?

23  Q.   (Nods head.)

24  A.   No, this was not.  That was the case the lawsuit

99

1        that Bennett had filed.

2   Q.   In Norfolk Superior Court?

3   A.   In this particular case, in this particular

4        case --  I'd like the opportunity when we get

5        back together I need to do a little research for

6        you on this.  I think this was a case where I

7        just had another attorney who was supposedly a

8        Land Court expert and he failed to tell me that

9        he was not going to appear.

10            I know it shows that here.  I'm aware of

11       that.  But at one time, I did hire another

12       attorney who was supposed to be a Land Court

13       expert and he either did not notify me that there

14       was a hearing due or he was supposed to appear

15       and failed to appear without notifying me.  But

16       I'd like the opportunity, if I may, to do some

17       research on that and let you know on it.

18  Q.   Okay.

19  A.   I appreciate your help and your consideration.

20  Q.   No problem.  There's enough paperwork here for

21       all of us to lose track.

22  A.   You're very kind to bear with me.  You've been

23       doing it for twenty years.

24  Q.   By the end of 1999, the mill property was

100

1        completely emptied, except for the Quonset hut?

2   A.   And my office.

3   Q.   And your office.  And the only income coming in

4        at that point in time was from the Quonset hut?

5   A.   From the Quonset hut, yes.

6   Q.   And, again, with regard to the financials, did

7        you have any estimates or appraisals made of the

8        financial value of the mill property at the end

9        of 1999?

10  A.   No, I did not.

11  Q.   During 1999 did you obtain any refinancing of the

12       building?

13  A.   No.  I don't know who would have refinanced it at

14       that point.  No, I did not.

15                   MR. ROONEY:  Why do we break here

16       for today.  The end is in sight.  We got '02 to

17       deal with and that's about it.

18                   THE WITNESS:  We can revisit a few

19       of these things.

20                   MR. ROONEY:  Yup.

21                   (Whereupon the deposition suspended

22       at 4:11 p.m.)

23

24

1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

VOLUME IV

- - - - - - - - - - - - - - - - - - - - - - - - - - -

PAUL WATSON, JANET WATSON,    )
ANDREW WATSON, DAVID WATSON   )
AND PAUL WATSON, IN HIS       )
CAPACITY AS TRUSTEE OF        )
MITSON REALTY TRUST,          )
                PLAINTIFFS,   )
        V.                    )  CIVIL ACTION
                              )  NO. 04-11577-GAO
TOWN OF BELLINGHAM,           )
RICHARD RANIERI, IN HIS       )
OFFICIAL CAPACITY AND         )
INDIVIDUALLY, LEE G. AMBLER,  )
IN HIS OFFICIAL CAPACITY AND  )
INDIVIDUALLY, BERTRAND        )
GUERIN, IN HIS OFFICIAL       )
CAPACITY AND INDIVIDUALLY,    )
JERALD A. MAYHEW, IN HIS      )
OFFICIAL CAPACITY, JOHN       )
EMIDY, IN HIS OFFICIAL        )
CAPACITY AND INDIVIDUALLY,    )
AND EDWARD WIRTANEN, IN HIS   )
OFFICIAL CAPACITY AND         )
INDIVIDUALLY,                 )
                DEFENDANTS.)

- - - - - - - - - - - - - - - - - - - - - - - - - -

        CONTINUED DEPOSITION OF PAUL
WATSON, TAKEN PURSUANT TO THE APPLICABLE
PROVISIONS OF THE MASSACHUSETTS RULES OF CIVIL
PROCEDURE, BEFORE KAREN A. GARABEDIAN, NOTARY
PUBLIC, AT THE OFFICES OF KRESSLER & EHRHARD,
P.C., 11 PLEASANT STREET, SUITE 200,
WORCESTER, MASSACHUSETTS, 01609, ON FRIDAY,
MAY 5, 2006, COMMENCING AT 10:08 A.M.

        MELVIN LIPMAN
        COURT REPORTING
        101 TREMONT STREET
        BOSTON, MA  02108
        (617)  227-3985

Multi-Page

**Page 2**

```
1
2    APPEARANCES:
3
4    KRESSLER & EHRHARD, P.C.
5    11 PLEASANT STREET, SUITE 200
6    WORCESTER, MA  01609
7    BY: JAMES P. EHRHARD, ESQ.
8    REPRESENTING THE PLAINTIFFS.
9
10   CURLEY & CURLEY
11   27 SCHOOL STREET
12   BOSTON, MA   02108
13   BY: MARTIN J. ROONEY, ESQ.
14   REPRESENTING THE DEFENDANTS.
15
16
17
18
19
20
21
22
23
24
```

**Page 3**

```
1
2                I N D E X       VOL. IV
3
4    WITNESS:       DIRECT CROSS REDIRECT RECROSS
5    PAUL WATSON
6
7    BY MR. CURLEY      4          90
8    BY MR. EHRHARD         87
9
10
11
12             E X H I B I T S, CONTINUED
13
14   NO.                            PG.
15
16   50      LETTER DATED JANUARY 31,      10
17           2002, FROM DENNIS FRAINE
18           TO PAUL WATSON.
19
20   51      CORRECTED COPY OF EXHIBIT     12
21           NO. 50.
22
23
24
```

**Page 4**

## STIPULATIONS

```
1
2
3         IT WAS STIPULATED AND AGREED,
4    BY AND BETWEEN COUNSEL FOR THE RESPECTIVE
5    PARTIES, THAT ALL OBJECTIONS, EXCEPT AS TO THE
6    FORM OF THE QUESTION, AND ALL MOTIONS TO
7    STRIKE, WOULD BE RESERVED UNTIL THE TIME OF
8    TRIAL.
9         IT WAS FURTHER STIPULATED AND
10   AGREED THAT THE DEPONENT WOULD READ AND SIGN
11   THE DEPOSITION TRANSCRIPT UNDER THE PAINS AND
12   PENALTIES OF PERJURY, WITHIN 30 DAYS OF
13   RECEIPT THEREOF, OR IT WOULD BE DEEMED SIGNED,
14   AND THAT THE FILING AND NOTARIZATION WOULD BE
15   WAIVED.
16
17
18         THE WITNESS, PAUL WATSON,
19   CALLED BY THE DEFENDANTS, WAS DULY SWORN, AND
20   TESTIFIED AS FOLLOWS:
21
22   CONTINUED DIRECT EXAMINATION BY MR. ROONEY
23
24 Q  ALL RIGHT, MR. WATSON.
```

**Page 5**

```
1         WE'RE BACK ON THE RECORD.
2         YOU'RE STILL UNDER OATH, AND
3    WE'RE CONTINUING NOW WITH DAY 4 OF YOUR
4    DEPOSITION IN THIS CASE.
5         AND WHEN WE LEFT OFF WE WERE
6    TALKING ABOUT THE FORECLOSURE OF THE RIGHT OF
7    REDEMPTION FOR THE PROPERTY FOLLOWING THE TAX
8    TAKING BY THE TOWN OF BELLINGHAM.  OKAY?
9 A  RIGHT.
10 Q  AND AT THAT POINT IN TIME YOU WERE EXPLAINING,
11   OR YOU HAD EXPLAINED, WHY A DEFAULT ENTERED
12   AGAINST YOU IN THE LAND COURT IN JUNE OF 2001.
13   ACTUALLY, THE DEFAULT ENTERED IN MAY OF 2001.
14   DO YOU RECALL THAT?
15 A  I THINK I DO.  YES.
16 Q  AND THEN LATER THAT SUMMER YOU FILED A MOTION
17   TO REMOVE THE DEFAULT, IS THAT CORRECT?
18 A  I BELIEVE SO.  YES.
19 Q  AND AT THAT TIME YOU WERE APPEARING PRO SE?
20 A  AT THE TIME I FILED THE MOTION TO REMOVE?
21   YES, I WAS.  YES.
22 Q  AND THAT MOTION WAS DENIED BY THE COURT.  IS
23   THAT ACCURATE?
24 A  AS I RECALL, YES.
```

Page 6

1 Q AND THEN A JUDGMENT FINALLY ENTERED IN JANUARY
2   OF 2002, FORECLOSING YOUR RIGHT OF REDEMPTION?
3 A I WAS NEVER AWARE OF THAT.
4 Q LET ME SHOW YOU WHAT WE MARKED LAST TIME AS
5   EXHIBIT 49, AND JUST ASK YOU TO TAKE A LOOK AT
6   THE LAST ENTRY ON THAT DOCKET.
7       (HANDED TO THE WITNESS.)
8 Q CAN YOU SEE WHERE IT SAYS:
9       "JUDGMENT ENTERED"?
10 A (NO RESPONSE.)
11 Q ON THE SECOND PAGE.
12 A OH, "JUDGMENT ENTERED," YES.  1/8/2002.  YES.
13 Q YOU NEVER RECEIVED ANY NOTICE FROM THE COURT
14   ABOUT THAT?
15 A NO, SIR.  ABSOLUTELY NOT.
16 Q DID YOU KNOW THAT YOUR MOTION TO REMOVE THE
17   DEFAULT HAD BEEN DENIED?
18 A WELL, I-- I'M NOT A HUNDRED PERCENT CERTAIN
19   OF THAT.
20       CAN YOU MAYBE POINT OUT TO ME
21   WHERE IT SAYS DENY THE-- THE MOTION TO REMOVE
22   DEFAULT WAS ENTERED.  WHERE DOES IT SAY THAT
23   THAT WAS DENIED?
24 Q SURE.

Page 7

1 A I'M NOT SURE OF THE DENIAL DATE.
2 Q ON THE DOCKET SHEET WHICH WAS EXHIBIT 49, THE
3   TENTH ENTRY IS:
4       "MOTION BY PAUL WATSON TO
5   REMOVE DEFAULT,"--
6 A OKAY.
7 Q --"TO BE HEARD ON 6/21."
8 A OKAY.
9 Q DOCKET ENTRY NO. 11:
10      "MOTION TO REMOVE DEFAULT TAKEN
11   UNDER ADVISEMENT."
12       AND THAT HAPPENED ON 6/21/01?
13 A RIGHT, RIGHT, RIGHT, RIGHT.
14 Q AND YOU HAD A HEARING BEFORE THE JUDGE ON THAT
15   DATE?
16 A ON THAT DATE, RIGHT.
17 Q OKAY.  THEN DOCKET ENTRY NO. 12:  "ORDERED"--
18 A (INTERPOSING.) RIGHT.  RIGHT.
19 Q "MOTION TO REMOVE DEFAULT ENTERED ON 7/11/01,"
20   SO, ROUGHLY, THREE WEEKS LATER?
21 A THREE WEEKS LATER, RIGHT.
22 Q ALL RIGHT.
23       AND MY QUESTION IS:
24       DID YOU RECEIVE A NOTICE THAT

Page 8

1   THE COURT HAD DENIED YOUR MOTION?
2 A TO BE HONEST WITH YOU, MR. ROONEY, I DO NOT
3   REALLY RECALL AT THIS TIME, AND I,-- I-- YOU
4   KNOW, TO BE PROPER, I DON'T WANT TO SAY YES,
5   AND I DON'T WANT TO SAY NO.  I'M AFRAID I JUST
6   DO NOT RECALL AT THIS TIME.  BUT, CERTAINLY,
7   AS FAR AS THE LAST MOTION, THE JUDGMENT
8   ENTERED, I DEFINITELY DID NOT-- I DID NOT
9   RECEIVE NOTICE OF THAT.
10 Q DOCKET NO. 13, ON EXHIBIT NO. 49, INDICATES
11   THERE WAS A DISCLAIMER OF INTEREST FILED BY
12   THE F.D.I.C.?
13 A YES.
14 Q IN JANUARY OF '02?
15 A YES.
16 Q DO YOU RECALL WHETHER OR NOT YOU RECEIVED A
17   COPY OF THAT--
18 A (INTERPOSING.)  I DON'T BELIEVE I DID.
19 Q --FINDING?
20 A BUT AGAIN, I'M NOT-- I DON'T REMEMBER.  YOU
21   KNOW, I DON'T-- I DON'T RECALL EVER RECEIVING
22   SUCH A DOCUMENT.  IN 2002 MY MOTHER-- MY
23   MOTHER WAS DYING.  IN FACT, THE DAY THEY
24   ARRESTED ME I HAD GONE THERE TO GET PAPERS

Page 9

1   READY FOR MY MOTHER-- FOR HER LIVING WILL, AND
2   THAT SORT OF THING, BECAUSE SHE WAS DYING.
3   AND I WAS DUE TO FLY DOWN TO FLORIDA TO HER
4   THAT SAME AFTERNOON THAT I WAS ARRESTED.
5 Q OKAY.  GOING BACK--
6 A AND I JUST DO NOT-- I'M SORRY.  I'M JUST
7   TRYING TO THINK.  I DO NOT RECALL RECEIVING
8   ANYTHING RELATIVE TO THE TAX TAKING THAT
9   MONTH-- IN THAT MONTH.
10 Q WHEN IS THE FIRST TIME YOU RECALL EVER BEING
11   INFORMED THAT THE COURT HAD ENTERED A JUDGMENT
12   AGAINST YOU FORECLOSING YOUR RIGHTS TO THE
13   PROPERTY?
14 A THE DAY I WAS ARRESTED, AT THE POLICE STATION.
15 Q AT ANY POINT IN TIME SINCE JANUARY OF 2002,
16   DID YOU FILE ANY MOTIONS WITH THE LAND COURT
17   TO REOPEN THAT JUDGMENT, OR TO GET RELIEF FROM
18   THAT JUDGMENT, OR TO CONTEST THE NOTICE OF
19   THAT JUDGMENT?
20 A I DON'T THINK I DID, BECAUSE I WASN'T AWARE
21   THAT YOU COULD.
22 Q NOW, ACCORDING TO YOUR ANSWERS TO
23   INTERROGATORIES IN THIS CASE, YOU WERE
24   ARRESTED ON JANUARY 31ST, 2002, AT YOUR

**Multi-Page**

## Page 10

1  OFFICES AT THE MILL, IS THAT CORRECT?
2  A  YES.
3  Q  AND AS YOU JUST TESTIFIED, PRIOR TO JANUARY
4     31ST, 2002, YOU NEVER HAD RECEIVED ANY NOTICE
5     THAT YOUR RIGHTS TO OWN THE PROPERTY HAD BEEN
6     TERMINATED BY THE LAND COURT?
7  A  NO.
8         MR. ROONEY:  LET'S MARK THIS AS
9     EXHIBIT 50, IF WE COULD.
10
11        (THE LETTER DATED JANUARY 31,
12        2002, FROM DENNIS FRAINE TO
13        PAUL WATSON, WAS MARKED AS
14        EXHIBIT NO. 50 FOR
15        IDENTIFICATION.)
16
17 Q  (BY MR. ROONEY)  LET ME SHOW YOU NOW, SIR,
18    WHAT WE'VE MARKED AS EXHIBIT 50, WHICH IS A
19    LETTER DATED JANUARY 31ST, 2002, FROM DENNIS
20    FRAINE TO YOURSELF, AND ASK YOU IF YOU
21    RECOGNIZE THAT DOCUMENT.
22        (HANDED TO THE WITNESS.)
23 A  YES.  I RECALL BEING HANDED THIS, OR AN
24    ORIGINAL, I GUESS, OF THIS, IN THE POLICE

## Page 11

1     STATION.
2  Q  AT ANY TIME BETWEEN THE BEGINNING OF JANUARY,
3     2002, AND THE BEGINNING OF FEBRUARY, 2002, OR
4     ACTUALLY JANUARY 31ST, HAD YOU EVER RECEIVED
5     ANY OTHER NOTICES FROM THE TOWN OF BELLINGHAM
6     ABOUT THE USE OF THE MILL PROPERTY?
7  A  I DON'T RECALL, OFFHAND.  WE MAY HAVE SOME
8     DOCUMENTATION, OR NOT.  I'M NOT SURE.  I DON'T
9     RECALL, OFFHAND.
10 Q  AT ANY TIME BETWEEN THE END OF 2001 AND THE
11    DAY OF YOUR ARREST ON JANUARY 31ST, 2002, DID
12    YOU EVER SPEAK TO ANYONE FROM THE TOWN OF
13    BELLINGHAM CONCERNING THE USE OF THE MILL
14    PROPERTY?
15 A  NO.
16 Q  NOW, EXHIBIT 50 CAME FROM SOME DOCUMENT THAT I
17    BELIEVE WAS PRODUCED BY YOU THROUGH
18    DISCOVERY,--
19 A  (INTERPOSING.)  YES.
20 Q  DO YOU SEE THE HANDWRITING AT THE BOTTOM OF
21    THAT?
22 A  YES.
23 Q  DOES THAT APPEAR TO BE YOUR HANDWRITING?
24 A  YES, YES.  AND THE DATE RECEIVED, ON 1/31/02.

## Page 12

1     YES, THAT IS MY HANDWRITING.
2  Q  NOW, THE PHOTOCOPY THAT I HAVE, THAT WE'VE
3     MARKED AS EXHIBIT NO. 50, IS NOT PARTICULARLY
4     CLEAR.
5         CAN YOU MAKE OUT ANYTHING YOU
6     WROTE THERE AT THE BOTTOM, OR DO YOU HAVE A
7     BETTER COPY, BY ANY CHANCE?
8         MR. EHRHARD:  I THINK WE HAVE A
9     BETTER COPY.
10        OFF THE RECORD.
11        MR. ROONEY:  SURE.  WE CAN GO
12    OFF, IF YOU WANT.
13
14        (OFF THE RECORD.)
15
16        MR. ROONEY:  WHILE WE'VE BEEN
17    OFF THE RECORD, MR. WATSON TRIED TO CLEAN UP
18    THE HANDWRITING THAT IS ON EXHIBIT 50.
19        WE'LL MARK THE CORRECTED COPY
20    AS EXHIBIT 51, JUST SO WE CAN KEEP THE
21    PAPERWORK STRAIGHT, AND SO IT'S CLEAR IN THE
22    RECORD.
23
24        (THE CORRECTED COPY OF EXHIBIT

## Page 13

1        NO. 50, THE JANUARY 31, 2002
2        LETTER TO MR. AND MRS. WATSON
3        FROM DENNIS FRAINE, WAS MARKED
4        AS EXHIBIT NO. 51 FOR
5        IDENTIFICATION.)
6
7  Q  (BY MR. ROONEY)  I'M GOING TO ASK YOU NOW IF
8     YOU CAN READ, AS FAR AS YOU CAN, THE PARAGRAPH
9     AT THE BOTTOM YOU HAVE CORRECTED FOR US.
10 A  "THIS WAS HANDED TO ME" BLANK "THIS DAY AT THE
11    BELLINGHAM POLICE STATION." BLANK  "I WAS
12    BAILED BY THE BAIL COMMISSIONER WHILE SITTING
13    IN ONE OF THE BOOKING ROOMS."  CAN I CHANGE
14    IT?
15 Q  SURE.
16 A  "SEATS."  YEAH.  THAT'S IT.
17        "ON THE FIRST OCCASION, THE
18    BOOKING IN SERVICE, WITH A NEW FILM IN PLACE.
19    THE VIDEO CAMERA WAS NOT ON, AND THEN
20    OBLIGED."
21        MR. EHRHARD:  "BY PUTTING THIS
22    SERVICE"?
23 A  "BY PUTTING THIS SERVICE WITH A NEW FILM IN
24    PLACE.  BY THIS TIME THE BAIL COMMISSIONER WAS

## Page 14

1 SITTING AT THE" BLANK, SEVERAL WORDS. I JUST
2 CAN'T MAKE THAT OUT.
3       MR. EHRHARD: "THE SIDE OF THE"
4 SOMETHING.
5 A SOMETHING. I DON'T KNOW. "THE ROCKING
6 CHAIR," IT LOOKS LIKE. "AND SHOULD BE VERY"
7 BLANK "I ASKED AND WAS TOLD THAT COPIES OF
8 THE BOOKING"-- SHOULD BE "TAPES"-- "WOULD BE
9 AVAILABLE TO MY ATTORNEY. AND I SAID I" BLANK
10 "OPENED THIS BEFORE BEING BAILED AND" BLANK.
11 "TO THE" BLANK. "THIS" AND BLANK. SEVERAL
12 WORDS.
13       MR. EHRHARD: "BETTER BE
14 CLEARLY VISIBLE ON IT."
15       "THIS WILL BE CLEARLY VISIBLE
16 ON THE VIDEO TAPE."
17       DOES THAT SEEM RIGHT?
18       THE WITNESS: COULD BE. IT
19 LOOKS LIKE T-A-N, AND I'M JUST NOT SURE WHAT
20 THOSE THREE WORDS ARE.
21 Q THANK YOU. FINE. THANK YOU, SIR.
22 A OH, YOU'RE WELCOME.
23 Q WHEN YOU WENT TO THE MILL PROPERTY ON JANUARY
24 31, '02, HOW DID YOU OBTAIN ENTRY INTO THAT

## Page 15

1 PROPERTY?
2 A AS I HAD FOR THE PREVIOUS 17 OR 19-- 28
3 YEARS. WITH MY KEY.
4 Q HOW LONG WERE YOU AT THE PREMISES BEFORE THE
5 POLICE CAME?
6 A (NO RESPONSE.)
7       MR. EHRHARD: IN WHAT PERIOD OF
8 TIME? DO YOU MEAN FOR THE--
9 Q ON JANUARY 31ST, '02, AFTER YOU WENT TO THE
10 OFFICE AT THE MILL PROPERTY, HOW LONG WERE YOU
11 THERE BEFORE THE POLICE ARRIVED?
12 A I DON'T RECALL EXACTLY. UHM, I DON'T THINK IT
13 WAS MUCH MORE THAN-- UHM, BECAUSE I HADN'T
14 FINISHED WITH ALL MY PAPERS, SO I DON'T
15 THINK-- IT MAY HAVE BEEN MORE THAN AN
16 HOUR--TWO HOURS, AT THE MOST.
17 Q WHAT HAPPENED WHEN THE POLICE ARRIVED?
18 A WELL, I FIRST KNEW THEIR PRESENCE FROM A KNOCK
19 AT THE FRONT DOOR. I LOOKED THROUGH THE
20 WINDOW, AND I SAW THE POLICE WERE THERE. I
21 DIDN'T KNOW WHAT THEY WANTED, SO I WENT TO
22 OPEN THE DOOR. AND SO THAT'S HOW I KNEW THAT
23 THEY WERE THERE.
24 Q DID YOU SPEAK WITH THE OFFICERS?

## Page 16

1 A YES, I DID.
2 Q AND WHAT DID THEY TELL YOU?
3 A THEY TOLD ME TO LEAVE IMMEDIATELY, THAT I WAS
4 TRESPASSING.
5 Q WHAT DID YOU SAY, IF ANYTHING?
6 A I TOLD THEM THAT THEY WERE TRESPASSING, AND
7 THAT THEY SHOULD LEAVE IMMEDIATELY. AND THEY
8 TOLD ME-- I THINK THEY TOLD ME IF I DIDN'T
9 LEAVE THEY WERE GOING TO ARREST ME, SO AND SO.
10 I THINK I REPEATED AGAIN-- I TOLD THEM TO
11 LEAVE, BECAUSE AT THIS POINT I HAD NO
12 KNOWLEDGE THAT I WAS TRESPASSING. I HAD NO
13 KNOWLEDGE OF THAT EXHIBIT. (INDICATING.)
14 Q THE JUDGMENT FROM THE WAYLAND COURT?
15 A I HAD KNEW NOTHING ABOUT THAT. SO FAR AS I
16 WAS CONCERNED, I HAD EVERY RIGHT TO BE THERE,
17 AND THEY HADN'T CHANGED THE LOCKS, OR ANYTHING
18 LIKE THAT. AS I SAY, I LET MYSELF IN WITH MY
19 OWN KEY, AS I HAD SINCE DECEMBER, '85, AND SO
20 I WASN'T ABOUT TO LEAVE. SO, THEY THREW ME
21 AGAINST THE WALL, AND PINNED MY HANDS BEHIND
22 MY BACK AND HANDCUFFED ME. THEY WOULDN'T EVEN
23 ALLOW ME TO GO AND CLOSE THE-- YOU KNOW,
24 SECURE THE VAULT, WHICH WAS OPEN WITH ALL MY

## Page 17

1 PERSONAL PAPERS AND MY MOTHER'S PAPERS. THEY
2 WOULDN'T ALLOW ME TO GET MY MOTHER'S FILE.
3 THEY TOOK AWAY FROM ME KEYS TO THE OFFICE, AND
4 PUT ME IN A CRUISER, HANDCUFFED, AND TOOK ME
5 DOWN TO THE OFFICE, AND HAD MY VEHICLE TOWED.
6 Q AFTER YOU WERE BAILED, WHAT HAPPENED NEXT?
7 A I THINK IT WAS THE FOLLOWING DAY I HAD TO
8 CANCEL MY FLIGHT TO BE WITH MY DYING MOTHER,
9 AND I THINK THE NEXT DAY I WAS IN COURT WHERE
10 I WAS ARRAIGNED. I DON'T REMEMBER ALL THE
11 CHARGES NOW. ABSOLUTELY RIDICULOUS CHARGES:
12 RESISTING ARREST, UHM, UH,--
13       MR. EHRHARD: I THINK HE HAS
14 THE DOCKET THERE. (INDICATING.)
15 Q RATHER THAN-- WELL, LET ME SUGGEST THAT THE
16 CRIMINAL DOCKET INDICATES THE FIRST COUNT WAS
17 FOR DISORDERLY, AND THE SECOND COUNT WAS FOR
18 BREAKING AND ENTERING.
19 A RIGHT.
20 Q DOES THAT SOUND FAMILIAR?
21 A THAT'S WHAT EVENTUALLY THEY-- THAT'S WHAT
22 THEY EVENTUALLY CHARGED ME WITH, BUT THAT'S
23 NOT WHAT THEY SAID AT THE TIME. I WAS TOLD
24 THAT I WAS TRESPASSING. THAT WAS THE

Multi-Page

Page 18

1  INITIAL-- THEY TOLD ME THAT I WAS
2  TRESPASSING.
3      OF COURSE, WHEN I CAME TO FIND
4  OUT-- I CAME TO FIND OUT WHAT THEY SAY-- I
5  CAME TO EXPECT THAT WHAT THEY SAY AND WHAT
6  ACTUALLY HAPPENED ARE TWO DIFFERENT THINGS.
7  WHAT HAPPENED, AND WHAT APPEARS ON COURT
8  DOCUMENTS, ARE TWO DIFFERENT THINGS.
9  Q  WERE YOU REPRESENTED BY COUNSEL AT THE
10     ARRAIGNMENT?
11 A  TO BE HONEST WITH YOU, THIS IS ALL SO PAINFUL,
12     I DON'T EVEN REMEMBER.  I CAN'T EVEN REMEMBER
13     THAT, IF I HAD COUNSEL AT THE ARRAIGNMENT.  I
14     SUBSEQUENTLY DID GET COUNSEL.
15 Q  WHO WAS THAT COUNSEL?
16 A  (NO RESPONSE.)
17         MR. ROONEY:  IF YOU DON'T
18     REMEMBER THAT'S FINE, NOT A PROBLEM.
19         MR. EHRHARD:  I'LL HELP YOU.
20         MR. ROONEY:  ONE MINUTE.  IF
21     YOU'LL JUST ANSWER THE QUESTION.  IF YOU DON'T
22     REMEMBER, YOU DON'T REMEMBER.
23 A  I DON'T REMEMBER.
24 Q  OKAY.  THAT'S FINE.

Page 19

1      DO YOU RECOGNIZE THE NAME OF AN
2  ATTORNEY M. LAUREAT?  OR LAWRENCE?
3  A  (NO RESPONSE.)
4  Q  THAT NAME DOESN'T RING ANY BELLS?
5  A  NO.
6  Q  THIS WAS IN THE MILFORD DISTRICT COURT?
7  A  YES.
8  Q  OKAY.  HERE'S ANOTHER NAME THAT'S IN HERE.
9      THOMAS J. IOVENO.
10 A  ARVENO.  OKAY.
11 Q  IOVENO.  I-O-V-E-N-O.
12 A  OKAY.  HE MAY HAVE.  I HAD BEEN SEEING MR.
13     IOVENO ABOUT POSSIBLE BANKRUPTCY.  IN FACT, HE
14     WAS REFERRED TO ME BY THE BOARD OF BAR
15     OVERSEERS.  THE REFERRAL SERVICE, THE BOARD OF
16     BAR OVERSEERS.  I DON'T RECALL THAT BANKRUPTCY
17     ATTORNEY.  AND THE FIRST ATTORNEY, I PROBABLY
18     CALLED HIM IN DESPERATION, AND SO HE PROBABLY
19     HAD GIVEN ME THAT OTHER NAME, AND I MIGHT HAVE
20     BEEN ABLE TO GET HIM TO GO JUST THAT DAY, THE
21     DAY OF THE ARRAIGNMENT.
22 Q  LET ME SUGGEST THAT IT MAY HAVE BEEN THE OTHER
23     WAY AROUND, OR ON THE DOCKET SHEET ANYWAYS.
24     ATTORNEY IOVENO ENTERED AN APPEARANCE ON

Page 20

1  2/21/02, AND WITHDREW HIS APPEARANCE ON 7/02,
2  WHEN LORANDO FILED AN APPEARANCE FOR YOU.
3  A  BUT, I STILL THINK THAT MR. IOVENO REFERRED
4  THE FIRST ATTORNEY, BECAUSE I JUST DON'T
5  RECALL THAT FIRST ATTORNEY.  BUT I HAD BEEN DEALING
6  WITH MR. IOVENO PRIOR TO THAT ON THE
7  BANKRUPTCY ISSUE.  I THINK I ASKED HIM TO JUST
8  PUT IN AN APPEARANCE, BECAUSE I JUST DIDN'T--
9  I MEAN, THERE WAS AN ARREST NOW, AND I JUST
10  DIDN'T WANT TO GO TO COURT ALONE.  PRETTY BAD
11  CHARGES.  I WAS SCARED LIKE HELL TO GO THERE
12  WITHOUT LEGAL REPRESENTATION BECAUSE-- AND
13  THEN MR. LORANDO WAS THE ONE THAT TOOK OVER.
14  MR. LORANDO, I THINK.  I ALSO GOT HIM, ALSO,
15  THROUGH THE REFERRAL SERVICE OF THE BOARD OF
16  BAR OVERSEERS, IF MY MEMORY SERVES ME
17  CORRECTLY.
18 Q  AND YOUR ATTORNEYS, IN MAY OF '02, FILED A
19     MOTION TO SUPPRESS TO DISMISS THE CRIMINAL
20     CHARGES.  DO YOU RECALL THAT?
21 A  APPROXIMATELY THAT TIME, YES.
22 Q  IN FACT, YOU FILED AN AFFIDAVIT IN SUPPORT OF
23     THAT MOTION?
24 A  YES.

Page 21

1  Q  WHAT DATE WAS THAT?
2  A  THAT WAS BECAUSE OF A THREAT BY THE D.A. TO
3     CONTINUE THE CASE.  IF THEY DRAGGED THE CASE
4     ON, I WAS-- BECAUSE OF FINANCIAL CONSTRAINTS,
5     NEVER GOT ANY-- I DIDN'T HAVE THE MONEY FOR
6     LEGAL FEES-- I WAS FORCED TO ADMIT TO, I
7     GUESS, SUFFICIENT FACTS ON ONE OF THE ISSUES.
8  Q  ALL RIGHT.  WE ARE COMING TO THAT IN ONE
9     SECOND.
10 A  I DIDN'T MEAN TO--
11 Q  NO.  THAT'S NOT A PROBLEM.
12 A  OKAY.
13 Q  AFTER ATTORNEY LORANDO ENTERED HIS APPEARANCE,
14     THE MATTER WAS CONTINUED TO THE FALL,
15     SEPTEMBER OF '02.
16         DO YOU RECALL THAT?
17 A  YES.
18 Q  AND THEN JUDGE POWERS DENIED THE MOTION TO
19     SUPPRESS, OR TO DISMISS, ON 9/19/02.
20         DO YOU RECALL THAT?
21 A  YES.
22 Q  AND THE NEXT TIME YOU'RE BACK IN COURT WAS ON
23     10/31/02, ON HALLOWEEN.
24         DOES THAT SOUND FAMILIAR?

Page 22

```
 1  A  SOMETHING ABOUT HALLOWEEN?  DOESN'T MEAN
 2     ANYTHING TO ME.
 3  Q  AT SOME POINT IN TIME YOU WENT BEFORE THE
 4     JUDGE ON COUNT II FOR BREAKING AND ENTERING,
 5     AND THE MATTER WAS DISMISSED AT THE REQUEST OF
 6     THE COMMONWEALTH, WITH YOUR CONSENT, ACCORDING
 7     TO THIS DOCUMENT.  DOES THAT SOUND FAMILIAR?
 8  A  SOMETHING LIKE THAT.
 9  Q  ATTORNEY LORANDO WAS WITH YOU AT THIS HEARING?
10  A  YES.  TO THE BEST OF MY MEMORY, YES.
11  Q  OKAY.  AND, AGAIN, ACCORDING TO THE DOCUMENT,
12     COUNT I WAS DISPOSED OF BY ADMISSION TO
13     SUFFICIENT FACTS AFTER COLLOQUY WAS ACCEPTED
14     AND WARNING WAS GIVEN TO YOU?
15        MR. EHRHARD:  COUNT I WAS--?
16        MR. ROONEY:  DISORDERLY
17     CONDUCT.
18  A  YES.
19  Q  DO YOU RECALL HAVING A HEARING WITH THE JUDGE
20     WHERE HE ASKED YOU ABOUT THE FACTS OF THE
21     CASE?
22  A  YES.
23  Q  AND WHERE THE COMMONWEALTH MADE A PRESENTATION
24     ABOUT WHAT THEY EXPECTED THE EVIDENCE TO
```

Page 23

```
 1     PROVE?
 2  A  YES.
 3  Q  AND AT THAT TIME, THAT POINT IN TIME, YOU
 4     ADMITTED TO SUFFICIENT FACTS TO BE FOUND
 5     GUILTY, IS THAT CORRECT?
 6  A  YES.
 7        AS I SAID, THE PRIMARY REASON
 8     FOR THAT IS-- NOT IN MY-- IT'S NEVER BEEN IN
 9     MY NATURE TO ADMIT TO SOMETHING THAT I DIDN'T
10     DO, OR WASN'T RESPONSIBLE FOR, AND THE ONLY
11     REASON I DID WAS BASED ON WHAT MR. LORANDO
12     SAID THE LIKELY COSTS OF FIGHTING THIS WOULD
13     BE.  AND IN CONFERENCE, WHICH I WAS NOT A
14     PARTY TO, IN CONFERENCE WITH THE D.A., THE
15     D.A. HAD SAID THAT IF I DID NOT CONCEDE TO, I
16     GUESS, AT LEAST ONE OF THE CHARGES THAT HE
17     ENTERED,-- YOU KNOW, TO CONTINUE FIGHTING THE
18     CASE, I DID NOT HAVE THE MONEY, WHICH LEADS ME
19     TO, IF YOU DON'T MIND, JUST SAY HERE THAT
20     THERE IS NO QUESTION IN MY MIND THAT THE
21     PRIMARY REASON THAT THE MILL WAS CLOSED WAS TO
22     DENY ME THE MONEY TO FIGHT THE TOWN.  THAT WAS
23     THE REASON FOR IT.
24  Q  AND AFTER YOU ADMITTED TO SUFFICIENT FACTS,
```

Page 24

```
 1     YOU WERE PLACED ON PROBATION, IS THAT A FACT?
 2     IS THAT CORRECT?
 3  A  YES.
 4  Q  YOU WERE ON PROBATION FOR THREE MONTHS, UNTIL
 5     1/31/03?
 6  A  YES.
 7        AND I'M HAPPY TO SAY I BEHAVED
 8     MYSELF.  I DIDN'T COMMIT ANY OTHER CRIMES.
 9  Q  AND A VICTIM WITNESS FEE WAS PAID?
10  A  YES, I BELIEVE SO.
11  Q  ANY OTHER FINES PAID AT THAT POINT IN TIME?
12  A  I CAN'T REMEMBER.  IT WAS ANOTHER ONE OF THE
13     CHAPTERS IN MY LIFE ASSOCIATED WITH THE MILL
14     AND THE TOWN, AND I CAN'T REMEMBER.
15        MR. EHRHARD:  WAS THAT MARKED,
16     MARTIN, OR NO?
17        WANT TO PUT THAT ASIDE, AND
18     SEND ME A COPY?  I HAVE THAT DOCUMENT.  I'M
19     NOT SURE IF I HAVE THE AFFIDAVIT.
20        MR. ROONEY:  SURE.
21        MR. EHRHARD:  OFF THE RECORD.
22
23        (OFF THE RECORD.)
24
```

Page 25

```
 1  Q  (BY MR. ROONEY)  NOW, AT OR ABOUT THE TIME YOU
 2     ADMITTED TO SUFFICIENT FACTS AND WERE PLACED
 3     ON PROBATION, YOU ALSO BEGAN A BANKRUPTCY
 4     CASE, IS THAT CORRECT?
 5  A  YES.
 6  Q  AND THAT WAS FILED ON 10/21/02?
 7  A  YEAH.  APPROXIMATELY.  YES.   AND YOU WERE
 8     REPRESENTED IN THAT MATTER BY A STEVEN A.
 9     KRESSLER, IS THAT CORRECT?
10  A  YES.
11  Q  AND CAN YOU BRIEFLY EXPLAIN WHAT LED TO THE
12     FILING OF THE BANKRUPTCY MATTER?
13  A  WELL, PRIMARILY, THE CLOSING OF THE MILL.  I
14     DIDN'T HAVE ANY INCOME TO PAY OFF THE CREDIT
15     CARDS WHICH I HAD BEEN FORCED TO USE TO A
16     GREAT EXTENT TO KEEP THE MILL OPERATIONAL.
17     AND, UNFORTUNATELY, MOST OF THE CREDIT CARDS
18     REMAINED IN MY PERSONAL NAME, EVEN THOUGH I
19     USED THEM EXCLUSIVELY FOR THE MILL.  BACK IN
20     THOSE DAYS IT WAS NOT VERY EASY TO GET A
21     CORPORATE CREDIT CARD FOR A SMALL
22     CORPORATION-- A SMALL BUSINESS, SO MOST OF
23     THEM WERE IN MY PERSONAL NAME.  I DID KEEP
24     THEM SEPARATED FROM MY OWN, BUT THEN IT ALSO
```

Page 26

1  MEANT BECAUSE OF THAT I HAD TO DECLARE
2  PERSONAL BANKRUPTCY AS WELL, AND THAT SOME OF
3  THEM-- MY WIFE WAS ON SOME OF THE ONES THAT I
4  USED FOR THE BUSINESS BECAUSE SHE USED TO HAVE
5  ME PAY BILLS AND THAT SORT OF A THING. SO, WE
6  BOTH HAD TO DECLARE BANKRUPTCY.
7 Q DURING THE COURSE OF THE BANKRUPTCY, DID YOU
8  LEARN YOU WERE REQUIRED TO LIST ALL YOUR
9  POTENTIAL ASSETS WITH THE BANKRUPTCY COURT?
10 A YES.
11     MR. EHRHARD: THERE'S AN
12  AMENDMENT TO THAT BANKRUPTCY SCHEDULE.
13 Q WITH REGARD TO THAT LIST OF ASSETS, DID YOU
14  LIST ANY CLAIMS AGAINST THE TOWN OF
15  BELLINGHAM?
16 A I DON'T THINK SO.
17 Q DO YOU RECALL IF YOU LISTED ANY CLAIMS AGAINST
18  RICHARD RANIERI?
19 A RANIERI? I DON'T RECALL THE LIST.
20 Q DO YOU REMEMBER ANYTHING WITH REGARD TO MR.
21  LEE AMBLER?
22 A I PRESUME YOU'RE LOOKING AT THE LIST THERE,
23  SIR. I JUST-- I'M AFRAID I DON'T RECALL.
24 Q YOU DON'T RECALL ANY OF THEM ONE WAY OR THE

Page 27

1  OTHER?
2 A IT'S ANOTHER VERY PAINFUL CHAPTER. I REALLY
3  DON'T, MR. ROONEY. IF I WERE TO DWELL ON
4  THOSE THINGS, I WOULD GO CRAZY, SO I DON'T
5  KNOW-- YOU KNOW, JUST DAY TO DAY.
6     OF COURSE, I STILL PAY THE
7  PRICE WITH THE BANKRUPTCY. I CAN'T GET
8  CREDIT. I NEED A NEW CAR-- EXORBITANT
9  INTEREST RATES.
10     THEY DID A GOOD JOB ON ME.
11     MR. EHRHARD: OFF THE RECORD.
12
13     (OFF THE RECORD.)
14
15 Q (BY MR. ROONEY) WHAT IF ANYTHING BECAME OF
16  THE BANKRUPTCY CASE?
17 A IT WAS FILED IN COURT AND EVENTUALLY WENT
18  THROUGH-- WHAT IS THE CORRECT WORD?
19     MR. EHRHARD: DISCHARGED?
20 A DISCHARGED.
21     THE WITNESS: THANK YOU.
22 Q AND THAT WAS IN MAY OF 2003?
23 A SOMEWHERE ABOUT THAT TIME, SIR.
24 Q SINCE MAY OF 2003, HAVE YOU FILED ANY OTHER,

Page 28

1  OR FURTHER BANKRUPTCY PETITIONS?
2 A NO.
3 Q SINCE MAY OF 2003, HAVE YOU SOUGHT TO REOPEN
4  YOUR PRIOR BANKRUPTCY?
5 A NO, NO.
6     THE WITNESS: IT'S INTERESTING
7  TO NOTE THAT I STILL KEEP GETTING BILLED FOR
8  DEBTS THAT HAVE BEEN DISCHARGED.
9     MR. EHRHARD: OFF THE RECORD.
10
11     (OFF THE RECORD.)
12
13 Q (BY MR. ROONEY) SUBSEQUENT TO THE END OF THE
14  CRIMINAL CASE IN THE MILFORD DISTRICT COURT IN
15  2002, THROUGHOUT THE REST OF 2002, DID YOU
16  HAVE ANY OTHER DISCUSSIONS WITH ANYONE FROM
17  THE TOWN OF BELLINGHAM CONCERNING THE MILL
18  PROPERTY?
19 A NO, SIR. NOT ME PERSONALLY.
20 Q DO YOU KNOW IF YOUR ATTORNEYS, OR ANYBODY ELSE
21  ON YOUR BEHALF, HAD SUCH CONVERSATIONS?
22 A WELL, I WAS TRYING TO GET BACK MY FILES. I
23  NEEDED ACCESS TO MY FILES, MY PERSONAL PAPERS.
24  BY THIS TIME MY MOTHER HAD DIED. HER WILL WAS

Page 29

1  IN PROBATE, AND I WANTED TO GET ALL MY
2  PERSONAL EFFECTS FROM THERE, BUT I DIDN'T HAVE
3  ACCESS-- THE CHANGE DIDN'T COME ALONG UNTIL,
4  UHM,--
5 Q DO YOU RECALL APPROXIMATELY WHEN-- WHAT DATE
6  THAT WAS?
7 A (NO RESPONSE.)
8 Q OR WHAT YEAR?
9 A SHORT-TERM MEMORY. MAYBE 2003. I THINK IT
10  MAY BE 2004. WELL, YOU WERE PRESENT, MR.
11  ROONEY. I THINK IT WAS 2004. AM I RIGHT? AM
12  I CORRECT?
13 Q AFTER THE BEGINNING OF THE LAWSUIT THAT WE'RE
14  HERE TODAY ABOUT?
15 A YES.
16 Q BETWEEN 2002 AND 2004, DID YOU HAVE ANY
17  CONTACT WITH ANYONE FROM THE TOWN OF
18  BELLINGHAM?
19 A NOT ME PERSONALLY.
20     MR. EHRHARD: THAT'S INCORRECT.
21  FOR THE RECORD,-- DID I COMMUNICATE WITH YOU
22  UNTIL THE SUIT WAS FILED? THE RECORDS WERE
23  RETRIEVED PRIOR TO 2000.
24     MR. ROONEY: BUT, HE DOESN'T

Page 30

1  REMEMBER THAT, SO THAT'S FINE.
2  Q  (BY MR. ROONEY)  NOW, LET ME ASK YOU THAT
3  QUESTION.
4          ACCORDING TO YOUR COMPLAINT IN
5  PARAGRAPH 40, ON ONE DAY, JUNE 7TH, 2003, YOU
6  DID FINALLY GAIN ACCESS TO THE MILL.
7          DOES THAT REFRESH YOUR MEMORY
8  AT ALL?
9  A  JUST WHAT IT SAYS.
10 Q  YOU HAVE NO MEMORY ONE WAY OR THE OTHER TODAY?
11 A  (NO RESPONSE.)
12 Q  IS THAT IT?
13 A  I DON'T REMEMBER THE EXACT DATE.
14 Q  THAT'S PERFECTLY FINE.
15 A  I'M SORRY, SIR.  AS I SAID EARLIER, THE WHOLE
16 THING HAS BEEN SO TRAUMATIC.  I'M GETTING OLD.
17 MY BRAIN ISN'T AS GOOD AS IT USED TO BE.
18         MR. ROONEY:  OFF THE RECORD.
19
20         (OFF THE RECORD.)
21
22 Q  (BY MR. ROONEY)  MR. WATSON, OTHER THAN THAT
23 ONE OCCASION, WHATEVER THE DATE WAS, YOU WENT
24 BACK TO THE MILL TO RETRIEVE PERSONAL

Page 31

1  BELONGINGS AND DOCUMENTS, HAVE YOU HAD ANY
2  OTHER OCCASION TO GO BACK TO THE MILL?
3  A  NO, SIR, I HAVE NOT.  I WAS LEGALLY PREVENTED
4  FROM GOING BACK THERE.
5  Q  WERE YOU PRESENT WHEN WE DID AN INSPECTION OF
6  THE MILL LAST SUMMER?
7  A  YES.  WHEN WE WALKED THROUGH.  YES.
8  Q  OTHER THAN THE VIDEO INSPECTION, TAPING,
9  WHATEVER THEY WANT TO CALL IT THAT WAS DONE IN
10 THE SUMMER OF 2005, HAVE YOU HAD ANY OTHER
11 OCCASION TO BE BACK AT THE MILL?
12 A  NO, SIR, I HAVE NOT.
13         AND, THE BEST OF MY KNOWLEDGE,
14 I WAS LEGALLY PREVENTED FROM GOING THERE, I
15 THINK, FOREVER.
16 Q  RIGHT.  AND ACCORDING TO THE DOCKET IN THE
17 CRIMINAL CASE FOR THE MILFORD DISTRICT COURT,
18 YOU WERE ORDERED TO STAY AWAY FROM 26 PEARL
19 STREET, BELLINGHAM, MASS., AS A SPECIAL
20 CONDITION OF YOUR RELEASE?
21 A  RIGHT.  THERE'S NO TIME LIMIT ON THAT.
22 Q  OTHER THAN THIS CASE, WHICH IS PENDING IN THE
23 U.S. DISTRICT COURT FOR MASSACHUSETTS, HAVE
24 YOU FILED ANY OTHER COMPLAINTS SINCE 2002

Page 32

1  AGAINST ANYONE FROM THE TOWN OF BELLINGHAM, OR
2  THE TOWN ITSELF?
3  A  NO, SIR.  NO.
4  Q  NOW, IN THIS LAWSUIT, NAMED AS AN ADDITIONAL
5  PLAINTIFF IS JANET WATSON.  IS THAT YOUR WIFE?
6  A  THAT IS MY WIFE, YES.
7  Q  AND SHE STILL LIVES WITH YOU IN MILLIS?
8  A  IN MILLIS, MASSACHUSETTS, YES.
9  Q  ANDREW WATSON, WHO IS HE?
10 A  HE'S MY ELDEST SON.
11 Q  AND WHERE DOES HE RESIDE?
12 A  HE CURRENTLY LIVES IN NEW YORK WITH HIS WIFE.
13 Q  WHEREABOUTS IN NEW YORK?
14 A  NEW YORK CITY.
15 Q  IN THE CITY?
16 A  IN THE CITY.
17 Q  ALL RIGHT.  DAVID WATSON?
18 A  DAVID WATSON IS MY SECOND SON.
19 Q  AND WHERE DOES HE RESIDE?
20 A  HE IS IN CALIFORNIA.
21 Q  STILL IN SAN DIEGO?
22 A  SAN DIEGO.  THANK YOU.
23 Q  DO YOU KNOW WHEN THE LAST CONTACT WAS BETWEEN
24 ANDREW WATSON AND THE TOWN OF BELLINGHAM, OR

Page 33

1  ANY OF ITS OFFICIALS?
2  A  I'M NOT A HUNDRED PERCENT CERTAIN, BUT I'M NOT
3  SURE THAT ANDREW WAS REALLY EVER IN TOUCH,
4  PERSONALLY, WITH ANY OF THEM.
5  Q  DO YOU RECALL WHEN YOUR SON, DAVID WATSON,
6  LAST HAD CONTACT WITH THE TOWN OF BELLINGHAM,
7  OR ANY OFFICIAL THEREOF, RELATING TO THE MILL?
8  A  TO THE BEST OF MY MEMORY, THAT WAS IN 1999,
9  WHEN THE TOWN WAS TAKING ACTION TO-- IN THE
10 COURT-- IN THE HOUSING COURT-- TO CLOSE THE
11 BUILDING.
12 Q  WHAT ROLE DID DAVID WATSON PLAY IN THAT SERIES
13 OF EVENTS?
14 A  I GUESS YOU COULD SAY THAT, I WAS SO DEPRESSED
15 AT THE TIME, THAT HE CAME TO MY AID, AND HE
16 ATTENDED COURT-- VARIOUS COURT SESSIONS WITH
17 ME.
18         HE SOMETIMES SPOKE ON MY BEHALF
19 TO THE JUDGE, TO ADDRESS THE COURT ON MY
20 BEHALF.  HE TRIED TO HELP ME ORGANIZE, YOU
21 KNOW, VARIOUS DOCUMENTS AND BITS OF PAPERWORK
22 AND THINGS THAT WERE-- THAT I NEEDED TO GET
23 TOGETHER FOR THE COURT.  HE WAS TALKING WITH
24 THE TENANTS, AND YOU KNOW, TRYING TO QUIET--

## Page 34

1    CLEAR UP THE AFFAIRS OF THE PLACE BEING CLOSED
2    AND THEIR BUSINESSES BEING RUINED.
3  Q IN YOUR COMPLAINT IN THIS CASE YOU SUED A
4    NUMBER OF INDIVIDUALS, AS WELL AS THE TOWN,
5    THE FIRST OF WHICH IS RICHARD RANIERI, WHO IS
6    THE FIRE CHIEF OF THE TOWN, CORRECT?
7  A YES.
8  Q WE HAVE TALKED ABOUT CHIEF RANIERI ON NUMEROUS
9    OCCASIONS?
10 A YES, WE HAVE.
11 Q YOU'VE ALSO SUED LEE G. AMBLER, IN HIS
12   CAPACITY AS TOWN COUNSEL FOR THE TOWN OF
13   BELLINGHAM, IS THAT CORRECT?
14 A YES.
15 Q AND YOU'VE ALSO SUED MR. AMBLER INDIVIDUALLY,
16   AND NOT IN HIS CAPACITY AS THE TOWN COUNSEL,
17   IS THAT CORRECT?
18 A RIGHT.
19 Q WHAT ALLEGATIONS DO YOU MAKE AGAINST MR.
20   AMBLER INDIVIDUALLY?
21 A I'M NOT SURE IF I KNOW HOW TO ANSWER THAT
22   PROPERLY.
23      THE WITNESS: IS IT
24   APPROPRIATE, OR I DON'T KNOW WHETHER IT'S

## Page 35

1    APPROPRIATE OR INAPPROPRIATE FOR ME TO SPEAK
2    WITH MY COUNSEL.
3       MR. EHRHARD: I THINK IT'S
4    INAPPROPRIATE AT THIS POINT.
5  A WELL, AGAIN, I'M NOT QUITE CERTAIN, BECAUSE OF
6    MY UNFAMILIARITY WITH THE LAW, BUT--
7  Q ALL RIGHT. THAT'S FINE.
8  A MR. AMBLER,--  WHAT I CAN SAY IS THAT MR.
9    AMBLER KNEW, IN THE CASE-- THE VERY FIRST CASE
10   THAT WAS FILED-- MY UNDERSTANDING IS THAT MR.
11   AMBLER HAD LOOKED AT THE CASE, LOOKED AT THE
12   LAW, AND I DON'T-- I CAN'T UNDERSTAND BY
13   HAVING LOOKED AT THE LAW AND ALSO KNOWN THE
14   FACT THAT I HAD NOT TURNED OFF THE WATER-- I
15   HAD NOTHING TO DO WITH THE TURNING OFF OF THE
16   WATER, AND THE FACT THAT THE CASE-- THE PROPER
17   JURISDICTION OF THE CASE WAS THE SUPERIOR
18   COURT. I GUESS I DON'T UNDERSTAND WHY MR.
19   AMBLER ALLOWED THE CASE TO BE FILED IN
20   DISTRICT COURT, AND WHY HE ALLOWED A CASE THAT
21   WAS NOT REALLY A CASE TO BE FILED AT ALL. I
22   HAD ABSOLUTELY NOTHING TO DO WITH TURNING OFF
23   THE WATER. IF ANYTHING, IT WAS AN ACT OF
24   GOD,--  COLD WEATHER, BROKEN PIPE, FREEZING.

## Page 36

1       HOW BY ANY STRETCH OF THE
2    IMAGINATION I COULD BE RESPONSIBLE FOR THAT IS
3    BEYOND ME.
4       FURTHERMORE, AS IT TURNS OUT,
5    AS I LEARNED LATER, THE LAW DOESN'T EVEN
6    REQUIRE THAT I CORRECT THE SITUATION.  ALL THE
7    LAW SAYS IS THAT I SHOULD NOT DELIBERATELY--
8    UHM, I GUESS WHAT THE LAW IS REALLY DESIGNED
9    TO DO IS TO PROTECT SPRINKLER SYSTEMS FROM
10   BEING VANDALIZED.
11 Q COURSE, AT THIS TIME YOU WERE ALSO REPRESENTED
12   BY ATTORNEY GESSLER, WHO NEVER RAISED ANY OF
13   THOSE ARGUMENTS IN ANY OF THE COURTS YOU WERE
14   IN, CORRECT?
15 A YES. PAINFULLY SO, SIR. PAINFULLY SO.
16 Q WHAT ROLE DID SCOTT AMBLER PLAY IN ANY OF THE
17   EVENTS YOU'VE ALLEGED IN YOUR COMPLAINT?
18 A I CAN'T REMEMBER EXACTLY WHEN IT FIRST TOOK
19   PLACE, BUT I THINK IT MAY HAVE BEEN IN 1999,
20   BUT IT MAY ALSO HAVE BEEN BEFORE THAT.  I
21   MEAN, I'VE MADE SO MANY COURT APPEARANCES, I
22   LOST TRACK OF HOW MANY COURT APPEARANCES I
23   MADE OVER THE YEARS.
24      SCOTT AMBLER APPEARED AS

## Page 37

1    COUNSEL FOR THE TOWN, INSTEAD OF HIS FATHER,
2    AND CERTAINLY IN THE CASE OF THE ARREST--
3  Q THE 2002 CASE?
4  A THE 2002 CASE, YES-- HE HAD-- I DON'T WANT TO
5    SAY THAT HE REPRESENTED THE TOWN, BECAUSE I
6    GUESS IN A CRIMINAL CASE IT'S REALLY THE
7    DISTRICT ATTORNEY THAT REPRESENTS THE
8    PLAINTIFF, BUT HE APPEARED ON-- HE APPEARED
9    ON BEHALF OF THE TOWN, AND HE GAVE SWORN
10   TESTIMONY ON BEHALF OF THE TOWN.
11 Q YOU HAVE ADDED AS A DEFENDANT A BERTRAND
12   GUERIN,--
13 A GUERIN.
14 Q G-U-E-R-I-N?
15 A YES.
16 Q --WHO YOU BELIEVE TO BE THE DEPUTY FIRE CHIEF
17   FOR BELLINGHAM, IS THAT CORRECT?
18 A TO THE BEST OF MY KNOWLEDGE, THAT IS HIS
19   OFFICIAL POSITION, AND I BELIEVE HE'S ALSO THE
20   BROTHER-IN-LAW OF RICHARD RANIERI, THE FIRE
21   CHIEF.
22 Q AND WHAT IF ANYTHING WAS MR. GUERIN PERSONALLY
23   INVOLVED IN IN THE ALLEGATIONS YOU'VE MADE IN
24   THIS LAWSUIT?

**Multi-Page™**

Page 38

```
 1  A  WHY HE, UH,-- HE ACTUALLY SPEARHEADED MANY OF
 2     THE UNANNOUNCED INSPECTIONS THAT WERE DONE
 3     OVER THE YEARS-- IN FACT, STARTING WITH THE
 4     VERY FIRST ONE IN 1986.  AND THAT IS VERIFIED
 5     BY VIRTUE OF THE LETTER THAT HE WROTE AND
 6     SIGNED REGARDING THE FINDINGS OF THAT
 7     INSPECTION, WHICH I BELIEVE WAS THE FIRST
 8     UNANNOUNCED INSPECTION.
 9  Q  AND DID DEPUTY CHIEF GUERIN MAKE ANY
10     SUBSEQUENT INSPECTIONS OR ENTRIES INTO THE
11     MILL PROPERTY THAT YOU CAN RECALL
12     SPECIFICALLY?
13  A  I WOULD HAVE-- AS FAR AS IF YOU'RE LOOKING
14     FOR SPECIFIC DATES, I WOULD HAVE TO CONSULT
15     NOTES.  TO FIND THE DATES OFFHAND, I'M AFRAID
16     I JUST CAN'T REMEMBER, BUT THERE ARE NOTES OF
17     THE DATES WHERE HE WAS-- NOT NECESSARILY ON
18     HIS OWN.  AND VERY SELDOM DID ANY OF THEM COME
19     ALONE.  FOR THE MOST PART, YOU KNOW, THERE
20     WERE A GROUP OF THEM, AND HE WAS A PART OF A
21     GROUP.
22            THE WITNESS:  COULD WE TAKE A
23     BREAK?
24            MR. ROONEY:  SURE.
```

Page 39

```
 1            (OFF THE RECORD.)
 2  Q  (BY MR. ROONEY)  AN ADDITIONAL DEFENDANT
 3     LISTED IN THE COMPLAINT IN THIS CASE IS DENNIS
 4     FRAINE?
 5  A  YES.
 6  Q  AND WHAT ROLE DO YOU BELIEVE DENNIS FRAINE
 7     PLAYED IN THE INCIDENTS WE'VE BEEN DISCUSSING
 8     THE LAST SEVERAL DAYS?
 9  A  DENNIS FRAINE IS A-- DENNIS FRAINE, FIRST AS
10     ADMINISTRATIVE-- ADMINISTRATOR-- I BELIEVE
11     HIS POSITION WAS FIRST ADMINISTRATIVE
12     ASSISTANT TO THE BOARD OF DIRECTORS, AND THEN
13     FINALLY, AFTER A CONSTITUTIONAL CHANGE AT
14     BELLINGHAM WENT THROUGH, HE WAS THEN
15     APPOINTED, RATHER THAN ELECTED, AS HE WAS
16     SUPPOSED TO BE, TO THE POSITION OF TOWN
17     ADMINISTRATOR.
18  Q  WHAT PERSONAL INVOLVEMENT DID HE HAVE IN ANY
19     OF THE ISSUES AT THE MILL?
20  A  WELL, ON SEVERAL OCCASIONS I APPEALED TO HIM
21     REGARDING THE SUITS THAT WERE FILED, AND ALSO
22     THE QUESTION OF-- I CAN'T REMEMBER NOW EXACTLY
23     WHICH SUIT IT WAS, OR WHAT TIME IT WAS, BUT AT
24     ONE POINT I HAD HIM ARRANGED WITH BOTH HIMSELF
```

Page 40

```
 1     AND SEVERAL MEMBERS OF THE BOARD OF SELECTMEN
 2     TO TRY AND GET THINGS RESOLVED.  BUT HE WAS
 3     ALSO FAMILIAR WITH THE QUESTION THAT-- ONE OF
 4     THE MANY PROBLEMS THAT I HAD THERE WAS WHILE
 5     THE TOWN WAS PURSUING ME ON, UHM,-- ON WHAT I
 6     CONSIDERED TO BE BASELESS AND FRIVOLOUS
 7     CHARGES, THE FORMER OWNER, MR. GOLDSTEIN, HAD
 8     BEEN ALLOWED TO OPERATE THE BUILDING AND THE
 9     PROPERTY, GENERALLY, WITH MANY OF THE CODE
10     VIOLATIONS THAT I HAD BEEN CHARGED WITH, AND
11     IN FACT, IN THE ACTUAL OPERATION OF HIS
12     BUSINESS, HAD NUMEROUS CODE VIOLATIONS.  AND
13     HAVING BROUGHT THOSE TO THE SPECIFIC ATTENTION
14     OF THE VARIOUS TOWN OFFICIALS, INCLUDING MR.
15     FRAINE, NOTHING WAS EVER DONE TO MR.
16     GOLDSTEIN, AND THIS IS PART OF THE CONTENTION
17     OF MY SUIT THAT I WAS TREATED VERY DIFFERENTLY
18     THAN MR. GOLDSTEIN.
19  Q  WITH REGARD TO WHAT COULD HAVE BEEN DONE WITH
20     REGARD TO MR. GOLDSTEIN, WHAT ONGOING CODE
21     VIOLATIONS ARE YOU REFERENCING?
22  A  UH,--
23  Q  IS THAT CLEAR?
24  A  I DON'T THINK SO.
```

Page 41

```
 1  Q  LET ME ASK IT IN A DIFFERENT WAY.
 2  A  IF YOU WOULD.
 3  Q  IT WOULD HAVE BEEN IMPOSSIBLE FOR THE TOWN TO
 4     HAVE GONE BACK IN TIME AND CITED HIM FOR CODE
 5     VIOLATIONS THAT HAD OCCURRED WHEN HE OWNED THE
 6     MILL BEFORE YOU DID, CORRECT?
 7  A  OH, OBVIOUSLY.
 8  Q  ALL RIGHT.
 9            WE'VE DISCUSSED, IN PRIOR
10     DEPOSITIONS, THE ALLEGATIONS THAT MR.
11     GOLDSTEIN, IN HIS BUSINESS, HAD VIOLATED
12     VARIOUS DISCHARGE REQUIREMENTS?
13  A  YES.
14  Q  AND THAT LED TO THE INVOLVEMENT IN D.E.P., OR
15     THE LACK OF INVOLVEMENT BY D.E.P.
16            OTHER THAN THOSE CHARGES WHICH
17     D.E.P. MAY OR MAY NOT HAVE BEEN INVESTIGATING,
18     WERE THERE ANY OTHER MATTERS INVOLVING MR.
19     GOLDSTEIN THAT YOU THINK THE TOWN SHOULD HAVE
20     TAKEN ACTION IN?
21  A  YES.  THE WHOLE OPERATION OF HIS BUSINESS, AND
22     I CAN-- ONE OF THE THINGS I CAN RECALL IS THE
23     ONLY EMERGENCY EXIT DOOR THAT HE HAD-- FOR
24     INSTANCE, HE WAS ALLOWED TO OPERATE A BUSINESS
```

**Multi-Page**

## Page 42

1  EMPLOYING DOZENS OF PEOPLE, HAD THAT DOOR
2  BARRED AND BLOCKED.  OPERATING FORK TRUCKS ON
3  THE HUGE ELECTRICAL-- HIGH VOLTAGE ELECTRICAL
4  JUNCTION BOXES WITHOUT COVERS.
5 Q  I'M NOT SURE I UNDERSTAND THAT ONE.
6        YOU THINK IT'S A VIOLATION TO
7  OPERATE A FORKLIFT WHERE THERE'S HIGH VOLTAGE?
8 A  GRAVE DANGER, YEAH.  THE FORK TRUCK GOING UP
9  A HUGE-- UHM, WHERE THE WHOLE TOP OF THE TRUCK
10  COULD FIT RIGHT IN THE-- WITHIN THE JUNCTION
11  BOX, WHICH IS ALSO VERY CLOSE TO A
12  MANUFACTURING AREA.
13        BUT, PUT IT THIS WAY:
14        ONE OF THE THINGS THAT I-- IF I
15  REMEMBER CORRECTLY, ONE OF THE THINGS I WAS
16  CITED FOR WAS OPEN ELECTRICAL BOXES, WHICH
17  WERE IN AREAS THAT-- FOR THE MOST-- IN SOME
18  INSTANCES WHERE THEY WERE-- UH, THE PUBLIC
19  DIDN'T EVEN HAVE ACCESS TO THEM.  AND THEN
20  SEVERAL OF THE OTHER VIOLATIONS-- THE OBVIOUS
21  VIOLATIONS WERE-- WAS ACTIONS THAT THE TOWN
22  COULD HAVE TAKEN-- STUFF, IN SOME INSTANCES,
23  THAT THEY WERE TAKING ACTION AGAINST ME FOR.
24  THEY COULD HAVE TAKEN ACTION AGAINST GOLDSTEIN

## Page 43

1  ALSO, BUT DIDN'T.
2        ONE OF THE THINGS I HAD DONE IS
3  I KNEW THE, AT ONE TIME, THE HEALTH INSPECTOR
4  FOR THE TOWN OF MILLIS, PAUL JACOBSON, AND I
5  ASKED HIM, FOR INSTANCE, IF HE WOULD GO WITH
6  ME ONE DAY, AS A PERSONAL FAVOR, AND TAKE A
7  LOOK AT GOLDSTEIN'S OPERATION AND GIVE ME HIS,
8  YOU KNOW, HIS PERSONAL OPINION, AND HE DID.
9        AND HIS OPINION WAS THAT THERE
10  WERE SEVERAL-- THERE WERE ENOUGH CODE
11  VIOLATIONS TO WARRANT CLOSING THE OPERATION.
12        I ASKED HIM IF HE'D BE, YOU
13  KNOW, BE GOOD ENOUGH TO PUT THAT IN WRITING,
14  AND WHAT'S THE WORD-- POLITICAL-- I DON'T
15  QUITE REMEMBER THE WORD HE USED, POLITICAL
16  ETIQUETTE, OR WHATEVER IT WAS, YOU KNOW, BUT
17  HE DECLINED, YOU KNOW, ONE HEALTH AGENT IN ONE
18  TOWN NOT WANTING TO OFFEND OTHERS IN ANOTHER
19  TOWN, HE DECLINED FROM DOING THAT.  BUT,
20  AGAIN, THAT WAS HIS OPINION OF THE CONDITIONS.
21 Q  DO YOU KNOW WHERE MR. JACOBSON IS CURRENTLY?
22 A  YES.  HE STILL LIVES IN MILLIS.  HE'S NO
23  LONGER HEALTH INSPECTOR.  HE'S A BIG
24  REPUBLICAN NOW.

## Page 44

1 Q  WELL CONNECTED, OR LARGE?
2 A  I THINK HE'S-- NOT LARGE, BUT I THINK HE'S
3  WELL CONNECTED.  IN FACT, I BELIEVE HE'S WAY
4  UP THERE IN THE REPUBLICAN PARTY.  HE DOES A
5  LOT OF WORK FOR THEM.
6        MR. EHRHARD: OFF THE RECORD.
7
8        (OFF THE RECORD.)
9
10 Q  (BY MR. ROONEY) YOU'VE ALSO MADE ALLEGATIONS
11  AGAINST JERALD A. MAYHEW.
12        WHO IS MR. MAYHEW?
13 A  AS I RECALL, MR. MAYHEW-- I THINK MR. MAYHEW
14  IS ONE OF THE SELECTMEN.
15 Q  AND WHAT PERSONAL INVOLVEMENT DID MR. MAYHEW
16  HAVE IN ANY EVENTS AT THE MILL?
17 A  IF I RECALL CORRECTLY, IT STEMS FROM MY GOING
18  TO THE BOARD OF SELECTMEN, AND I
19  APPEALING TO THEM REGARDING, AGAIN, WHAT I
20  CONSIDERED THESE FRIVOLOUS CHARGES, AND NOBODY
21  TOOK ANY ACTION.  AGAIN, AS I SAY, I CAN'T
22  QUITE REMEMBER WHEN THAT MEETING WITH HIM WAS,
23  BECAUSE AT ONE POINT I WAS ALSO REQUESTING OF
24  HIM HELP, ASSISTANCE IN TRYING TO FIND

## Page 45

1  ALTERNATE FINANCING.
2        BUT, WHAT IT COMES DOWN TO IS
3  THAT THE BOARD OF SELECTMEN KNEW WHAT WAS
4  GOING ON, BECAUSE I BROUGHT IT TO THEIR
5  ATTENTION, AND THERE WAS NO HELP FORTHCOMING
6  FROM ANY OF THEM.
7 Q  DID MR. MAYHEW EVER COME TO THE MILL PROPERTY?
8 A  I CAN'T RECALL RIGHT NOW.  I CAN'T RECALL,
9  OFFHAND.
10 Q  DID HE EVER APPEAR IN COURT ON ANY OF THE MANY
11  OCCASIONS?
12 A  I DON'T RECALL.  I TEND TO THINK NOT, BUT I
13  DON'T RECALL EXACTLY.
14 Q  OTHER THAN THE ONE MEETING OR TWO MEETINGS YOU
15  HAD WITH THE BOARD THAT YOU'VE JUST DESCRIBED,
16  DID YOU EVER MET WITH MR. MAYHEW PERSONALLY OR
17  SINGLY?
18 A  NOT THAT I RECALL.
19        MR. EHRHARD: OFF THE RECORD.
20
21        (OFF THE RECORD.)
22
23 Q  (BY MR. ROONEY) YOU'VE SPOKEN ABOUT MR. EMIDY
24  ON NUMEROUS OCCASIONS?

## Page 46

```
 1  A  YES.
 2  Q  AND HE WAS THE BUILDING INSPECTOR FOR A
 3     SIGNIFICANT PORTION OF THE TIME PERIOD WE HAVE
 4     BEEN DISCUSSING?
 5  A  YES, HE WAS.
 6  Q  ED WIRTANEN WAS A HEALTH AGENT AT SOME POINT
 7     IN TIME, IS THAT CORRECT?
 8  A  YES.
 9  Q  AND WE PROBABLY HAVE COVERED THIS, BUT WHAT IS
10     IT THAT YOU ALLEGE MR. WIRTANEN WAS PERSONALLY
11     INVOLVED WITH IN THIS MATTER?
12  A  AGAIN, IF I REMEMBER CORRECTLY, THE FIRST
13     INVOLVEMENT-- SIGNIFICANT INVOLVEMENT THAT I
14     HAD WITH MR. WIRTANEN WAS WHEN THEY-- THE TOWN
15     WANTED ME TO SET ASIDE-- I'M TRYING TO THINK
16     OF THE YEAR-- PROBABLY 1987-- THE TOWN WANTED
17     ME TO-- AS THE NUMBER OF TENANTS INCREASED,
18     THE TOWN WANTED ME TO SET ASIDE, BECAUSE THE
19     PROPERTY WAS ON SEPTIC, THEY WANTED ME TO SET
20     ASIDE A SUFFICIENT AREA TO ENSURE THAT THE
21     SEPTIC SYSTEM WOULD WORK.
22  Q  OKAY. NOTHING WRONG WITH THAT, RIGHT?
23  A  A PART OF THE IRONY OF THAT WAS THAT, YOU
24     KNOW, THE NUMBER OF PEOPLE THERE, AND THE
```

## Page 47

```
 1     NATURE OF THE BUSINESS HAD CHANGED
 2     DRAMATICALLY FROM WHEN THE MILL WAS IN ITS
 3     PRIME, WHICH WAS IN THE WAR YEARS, WORLD WAR
 4     II YEARS, AND THEY KNEW WHAT TYPE OF
 5     BUSINESSES THAT WE HAD-- THAT WE PLANNED ON
 6     HAVING THERE, WE WOULD NEVER HAVE HAD THE
 7     TOTAL NUMBER OF PEOPLE PRESENT ON THE PROPERTY
 8     AT ANY ONE TIME AS THEY HAD BACK IN THE WAR
 9     YEARS, WHICH I CAN'T REMEMBER EXACTLY WHAT
10     THAT FIGURE WAS, BUT NONETHELESS, THAT WAS
11     SOMETHING THAT I DIDN'T MIND DOING BECAUSE
12     ENVIRONMENTAL-- I'M AN ENVIRONMENTALIST, AND
13     SOMETHING I THOUGHT WAS OF PRIMARY IMPORTANCE
14     TO ME, PERSONALLY, WHETHER IT WAS REALLY
15     NECESSARY OR NOT.
16            SO, THAT WAS THE FIRST
17     SIGNIFICANT INVOLVEMENT THAT I HAD WITH MR.
18     WIRTANEN, WHO, BY THE WAY, I FOUND TO BE A
19     VERY, VERY NICE GENTLEMAN. VERY PLEASANT.
20            THEN I VENTURED INTO THE
21     PROBLEM WITH HIM, NOT PERSONALITY-WISE OR
22     ANYTHING LIKE THAT, BUT WHEN I BROUGHT TO HIS
23     ATTENTION ON SEVERAL OCCASIONS THE PROBLEMS
24     WITH THE-- IN WHICH MR. GOLDSTEIN OPERATED HIS
```

## Page 48

```
 1     BUSINESS, THE DISCHARGE OF EFFLUENT PROCESSING
 2     WATER, RAW SEWAGE, AND IN PARTICULAR, THE RAW
 3     SEWAGE WHERE IT WAS RUNNING DIRECTLY INTO THE
 4     RIVER-- INTO THE CHARLES RIVER. THEY TOOK
 5     NO-- THEY TOOK NO ACTION AGAINST MR.
 6     GOLDSTEIN. AND A LOT OF THIS ACTUALLY
 7     HAPPENED DURING THE-- BETWEEN 1990 AND 1991
 8     WHEN THE TOWN WAS ACTIVELY PURSUING THE FIRST
 9     FALSE CRIMINAL CHARGE AGAINST ME.
10            I-- I DON'T KNOW WHAT MY
11     PERSONAL OPINION MEANS HERE, BUT I DO BELIEVE
12     THAT MR. WIRTANEN WAS INFLUENCED BY OTHERS.
13     HIS LACK OF ACTION IN THIS JUST DID NOT SEEM
14     TO BE HIS NATURE, AND IT SEEMED SO CONTRARY TO
15     HIS APPARENT AND PROFESSED INTEREST IN THE
16     ENVIRONMENT THAT I PERCEIVED IN MY FIRST
17     DEALINGS WITH HIM IN 1987, WHEN WE WERE
18     DEALING WITH THIS SEPTIC SYSTEM.
19            AND I RECALL AT ONE TIME I SAID
20     TO HIM, I SAID, YOU KNOW, I SAID, "ED, WHAT ON
21     EARTH IS GOING ON HERE?" AND HIS RESPONSE TO
22     ME WAS, "PAUL, I'M AFRAID IT'S GOING TO GET A
23     LOT WORSE BEFORE IT GETS BETTER." AND I ASKED
24     "WHAT DO YOU MEAN BY THAT?" AND HE WOULD NOT
```

## Page 49

```
 1     ELABORATE. HE JUST WOULD NOT ELABORATE, BUT
 2     HE COULDN'T LOOK ME IN THE EYE. HE TURNED HIS
 3     HEAD, AND HE WALKED AWAY.
 4            UNFORTUNATELY, APPARENTLY, I
 5     DIDN'T MAKE ANY PARTICULAR NOTE. I WAS
 6     LOOKING FOR SOMETHING. YOU KNOW, AGAIN, I
 7     DON'T KNOW EXACTLY WHAT SIGNIFICANCE IT MIGHT
 8     HAVE ON THE CASE, BUT AGAIN, IT'S JUST ONE OF
 9     THOSE THINGS. AND, OF COURSE, IT DID GET A
10     LOT WORSE. IT NEVER GOT BETTER.
11  Q  SO, YOU'VE LISTED THOSE THREE OR FOUR THINGS
12     INVOLVING MR. WIRTANEN.
13            AND ANYTHING SUBSEQUENT TO THE
14     EARLY '90S EVER INVOLVE HIM?
15  A  I DON'T RECALL. HE ULTIMATELY LEFT THE TOWN'S
16     EMPLOYMENT. I DON'T REMEMBER EXACTLY WHEN
17     THAT WAS, BUT WHENEVER I CAME ACROSS--
18     PROBABLY-- IT WAS PROBABLY UP TO ABOUT '92,
19     POSSIBLY 1993, BECAUSE THE DAY AFTER THE FIRST
20     CRIMINAL CASE WAS DISMISSED IN WORCESTER,
21     GOLDSTEIN STARTED MOVING OUT, AND HE WAS GONE
22     BY-- I DON'T REMEMBER EXACTLY WHEN HE WAS
23     GONE BY-- SOMETIME, BECAUSE THAT CASE WAS
24     DISMISSED, IF MY MEMORY SERVES ME CORRECTLY,
```

## Page 50

```
 1   THE 12TH OF DECEMBER, 1991, AND HE STARTED
 2   MOVING OUT THE 13TH OF DECEMBER.  AND I THINK,
 3   IF I REMEMBER CORRECTLY, BY JUNE OR SO OF '92
 4   HE WAS GONE.
 5         AND THEN THERE WAS, IMMEDIATELY
 6   AFTER HE LEFT, WE WERE ABLE TO GET IN AND SEE
 7   EXACTLY WHAT HE HAD BEEN UP TO, WHICH WAS EVEN
 8   WORSE THAN I HAD THOUGHT.  AND I BELIEVE AT
 9   THAT POINT THAT ALSO INVOLVED ED WIRTANEN.
10         AND, AS I SAY, I CAN'T REMEMBER
11   EXACTLY WHEN HE LEFT, BUT IT MAY HAVE BEEN NOT
12   TOO LONG AFTER THAT.
13 Q  YOUR ANSWERS TO INTERROGATORIES IN THIS CASE,
14   INTERROGATORY NO. 5, YOU CAME UP WITH A
15   CALCULATION WHICH YOU BELIEVE TO BE YOUR
16   ECONOMIC LOSSES IN THIS CASE, IS THAT CORRECT?
17 A  YES, SIR.
18 Q  IN PREPARING THE ANSWER TO INTERROGATORY NO.
19   5, WHAT IF ANY INFORMATION DID YOU CONSULT?
20         MR. EHRHARD:  CAN I TAKE A LOOK
21   AT THE ACTUAL INTERROGATORY?
22         MR. ROONEY:  SURE.
23         (HANDED TO MR. EHRHARD.)
24 A  I THINK IT PRETTY MUCH SAYS IT HERE.
```

## Page 51

```
 1         MR. ROONEY:  I ONLY HAVE MY
 2   COPY, SO I DON'T KNOW IF YOU HAVE YOURS.
 3         (HANDED TO MR. ROONEY.)
 4 Q  WELL, FOR EXAMPLE, INTERROGATORY NO. 5A,
 5   "ACTUAL LOSSES REGARDING INCOME," YOU MAKE A
 6   CALCULATION BASED UPON A SQUARE FOOTAGE, ONE
 7   HUNDRED AND SIXTY THOUSAND SQUARE FEET?
 8 A  YES.
 9 Q  AT WHAT POINT IN TIME WAS THE MILL ACTUALLY
10   OPERATING AT ONE HUNDRED AND SIXTY THOUSAND
11   SQUARE FEET OF TENANT SPACE?
12 A  IT WASN'T.  IT WOULD HAVE BEEN-- THAT
13   INCLUDED-- THAT PROJECTED IN IMPROVEMENTS TO
14   BE MADE TO THE EXISTING BUILDING.
15 Q  WHAT WAS THE ACTUAL HIGHEST SQUARE FOOTAGE OF
16   USE THAT YOU OBTAINED DURING YOUR OWNERSHIP OF
17   THE MILL?
18 A  I DON'T HAVE THAT FIGURE OFFHAND, SIR, BUT I
19   CAN GET IT FOR YOU.
20 Q  FROM WHERE WOULD YOU GET THAT INFORMATION?
21 A  I'D HAVE TO GO THROUGH MY RECORDS.  I'D HAVE
22   TO GO THROUGH-- UHM, UHM,-- I GUESS I COULD
23   PROBABLY WORK IT BACK MAYBE FROM WHATEVER TAX
24   RETURNS WHERE WE HAVE-- WHERE WE SHOWED, YOU
```

## Page 52

```
 1   KNOW, GROSS INCOME, AND CHECK BACK AND SEE
 2   FROM THAT YEAR, TO GET THE FIGURES FROM THAT
 3   YEAR AND SEE WHAT SPACE WAS RENTED, AND GIVE
 4   YOU A TOTAL.  I DON'T RECALL, OFFHAND, EXACTLY
 5   WHAT IT WAS, BUT WE COULD FAIRLY ACCURATELY
 6   ESTABLISH THAT IF YOU NEED IT.
 7 Q  WHEN YOU FIRST--
 8         FOR THE FIRST THREE YEARS THAT
 9   YOU WERE INVOLVED WITH THIS PROPERTY, I
10   BELIEVE YOUR TESTIMONY HAS BEEN YOU HAD
11   MINIMAL CONTACT WITH THE TOWN OF BELLINGHAM
12   WITH REGARD TO INSPECTIONS OR CITATIONS, IS
13   THAT CORRECT?
14 A  CITATIONS, YES.  INSPECTIONS, AS I JUST
15   MENTIONED, THE VERY FIRST ONE, IF I RECALL, IT
16   WAS MAY OF '86 BY GUERIN, THE DEPUTY FIRE
17   CHIEF.  AND THERE'S A LETTER FROM HIM THAT
18   MONTH, YOU KNOW, TELLING OF THE INSPECTION.
19   TO THE BEST OF MY MEMORY, THAT WAS THE FIRST.
20 Q  IN '86, '87, '88, '89, THE MILL WAS NOT AT
21   YOUR FULL PROJECTED CAPACITY OF ONE HUNDRED
22   AND SIXTY THOUSAND SQUARE FEET?
23 A  NO.  NO, IT WAS NOT.
24 Q  WAS IT EVEN HALF THAT MUCH?
```

## Page 53

```
 1 A  IN TERMS OF RENTED--
 2 Q  IN TERMS OF SQUARE FOOTAGE.
 3 A  USABLE SQUARE FOOTAGE, YOU MEAN?  YEAH, WE
 4   WERE BETTER THAN-- WE WERE, UHM,-- OH, I
 5   HAD-- I HAD-- JUST LET ME HAVE A MINUTE.
 6   I HAD--  THE MILL WAS APPROXIMATELY A HUNDRED
 7   AND FIFTY THOUSAND-- ONE HUNDRED AND FIFTY TO
 8   ONE HUNDRED AND FIFTY-FIVE THOUSAND SQUARE
 9   FEET.  AND I HAD BROUGHT IT TO THE POINT WHERE
10   I HAD AVAILABLE FOR USE NOW-- I HAD AVAILABLE
11   FOR USE UP TO ABOUT A HUNDRED AND THIRTY
12   THOUSAND SQUARE FEET AVAILABLE FOR USE.  ALL
13   RIGHT?
14         THIS IS NOT TO SAY THAT IT WAS
15   COMPLETELY REHABED SPACE.  IN SOME INSTANCES,
16   WHAT I'M TELLING YOU, IT MAY HAVE JUST BEEN A
17   QUESTION THAT I REPAIRED THE ROOF, SO THE
18   PLACE WAS DRY AND IT COULD BE RENTED AT MAYBE
19   A MINIMAL AMOUNT, OR THOSE CERTAIN SECTIONS
20   WHERE THE ROOF WAS FINE, BUT I HADN'T REHABED
21   AT ALL, SO IT RENTED FOR A LOWER AMOUNT.  BUT
22   I HAD BROUGHT IT TO THE POINT WHERE THERE WAS
23   APPROXIMATELY A HUNDRED AND TWENTY-FIVE OR A
24   HUNDRED AND THIRTY THOUSAND USABLE SQUARE
```