**EXHIBIT 1**

```
                                    Volume:            I
                                    Pages:            97
                                    Exhibits:       None
```

## COMMONWEALTH OF MASSACHUSETTS

WORCESTER, ss.                  WORCESTER HOUSING COURT
                                Docket No.: 98-CV-0705


\* \* \* \* \* \* \* \* \* \* \* \* \*
                                \*
TOWN OF BELLINGHAM,             \*
    Plaintiff,             \*
                                \*
vs.                             \*
                                \*
PAUL WATSON,                    \*
    Defendant               \*
                                \*
\* \* \* \* \* \* \* \* \* \* \* \* \*


DATE:        Various


LOCATION:    Worcester Housing Court
             2 Main Street
             Worcester, MA   01608


**DUNN & GOUDREAU**
**COURT REPORTING SERVICE, INC.**
15 Broad Street
Boston, Massachusetts   02109
Telephone (617) 742-6900

# P R O C E E D I N G S

(Tape 1, side 1.)

THE CLERK:  98-CV-705, Town of Bellingham vs. Paul Watson, Trustee.

THE COURT:  Good afternoon, gentlemen.

MR. PAUL WATSON:  Good afternoon, Your Honor.

MR. GUERIN:  Good afternoon, Your Honor.

THE CLERK:  Anybody who may testify in this hearing, please stand and raise your right hand.

THE COURT:  Wait a minute, are you going to testify?

MR. PAUL WATSON:  They may testify, Your Honor.

(Witnesses sworn.)

THE COURT:  Chief Guerin, is it?

MR. GUERIN::  Deputy Chief Guerin, yes, Your Honor.

THE COURT:  All right, sir.

MR. GUERIN:  As you know, Your Honor, we were in this spot in front of yourself on September 24th, at which time we entered into agreement, Your Honor ordered Mr. Watson, myself,

1      Mr. O'Marra (phonetic), housing specialist for

2      the court, to enter some sort of an agreement

3      which you, Your Honor, signed, told Mr. Watson

4      that it would become your order and the order of

5      the court, and that Mr. Watson would have to

6      comply.

7              As you also know, Your Honor, from past

8      history, this is the second agreement that has

9      actually been entered into.  The town entered

10     into an agreement with Mr. Watson -

11             THE COURT:  Let's cut to the chase, Chief.

12             MR. GUERIN:  Okay.  Mr. agreement - Mr.

13     Watson has not complied with the order.  He has

14     only complied with one section of the order -

15             THE COURT:  Which is . . .?

16             MR. GUERIN:  - and that was the clean-up

17     situation.

18             THE COURT:  He cleaned it up?

19             MR. GUERIN:  He cleaned up brush and

20     debris around the premises.

21             THE COURT:  No fire extinguishers?

22             MR. GUERIN:  Fire extinguishers are not

23     acceptable, Your Honor, the ones that he has in

24     there.  Legally, under the statute, he has to

**DUNN & GOUDREAU COURT REPORTING SERVICE, INC.**

4

1    have extinguishers that are tagged by a

2    Massachusetts company.  This morning, I was in

3    there this morning, Your Honor.  He has one fire

4    extinguisher for the entire premises, that I

5    could see.

6         THE COURT:  Gas meter?  Gas heater?

7         MR. GUERIN:  Unvent - still vented inside

8    the building, Your Honor.

9         THE COURT:  Architectural plans?

10         MR. GUERIN:  None.

11         THE COURT:  Sprinkler drawings -

12         MR. GUERIN:  No.

13         THE COURT:  - fire alarm drawings?

14         MR. GUERIN:  None, Your Honor.

15         THE COURT:  Is there a business going on

16    in this building?

17         MR. GUERIN:  Excuse me?

18         THE COURT:  Is there a business going on

19    in this building?

20         MR. GUERIN:  There are a number of

21    businesses going on in this building.  He's also

22    taken extra tenants into the building, which I

23    kindly explained to Mr. Watson that was an unsafe

24    situation, the circumstances that the building is

**DUNN & GOUDREAU COURT REPORTING SERVICE, INC.**

1    unsafe.

2         And I have speaken (sic) to those - some

3    of those tenants, I've kind of learnt (sic) that

4    he's kind of led them into the building with

5    false pretenses, thinking -

6         THE COURT:  Well -

7         MR. GUERIN:  - the system was up and

8    running.

9         THE COURT:  Let's hear from Mr. Watson.

10   Your name and address, sir?

11        MR. PAUL WATSON:  My name?

12        THE COURT:  Yes, sir.

13        MR. PAUL WATSON:  Paul Watson.

14        THE COURT:  Sit down, Chief.

15        MR. PAUL WATSON:  Are you interested in my

16   home address or my business address?

17        THE COURT:  Whatever you want to give me,

18   Mr. Watson, just so we can (inaudible) -

19        MR. PAUL WATSON:  My residential address

20   is 7 Sherman Road, Millis, Massachusetts.

21        THE COURT:  Okay.

22        MR. PAUL WATSON:  02054.

23        THE COURT:  All right, sir.  What would

24   you like to say?

**DUNN & GOUDREAU COURT REPORTING SERVICE, INC.**

1        MR. PAUL WATSON:  Well, I would like

2   to - first of all, Your Honor, I'd like to ask

3   you again, you, as a Judge, you make - you weigh

4   both sides, right?  And you make a decision.  And

5   in order to make a just decision, I would think

6   you need to know all the facts.

7        There was a previous case to this, Your

8   Honor, as I think you will recall, a criminal

9   case, which I welcomed, because it would, for the

10  first time, give me an opportunity to present -

11       THE COURT:  Let me ask you a couple of

12  questions, Mr. Watson.  Forgive me for

13  interrupting.

14       MR. PAUL WATSON:  Go ahead, Your Honor.

15       THE COURT:  You signed an agreement on

16  September 24th that you would do certain things.

17       MR. PAUL WATSON:  Yes, Your Honor.

18       THE COURT:  You said that you would have

19  fire extinguishers installed by a licensed fire

20  extinguisher contractor on or before October 15th.

21       MR. PAUL WATSON:  Yes, Your Honor.

22       THE COURT:  Have you done that at all,

23  sir?

24       MR. PAUL WATSON:  Regarding fire

**DUNN & GOUDREAU COURT REPORTING SERVICE, INC.**

1    extinguishers, Your Honor, I made contact with

2    a fire extinguisher company.  They were prepared

3    to do them, I ordered them, but prior to placing

4    the order, I received a telephone call, a message

5    on my answering machine, which unfortunately I

6    was unable to save, because it's one of the

7    digital type.

8            And the message referred to the Bellingham

9    Fire Department calling them daily, and it was a

10   sort of rather distressed message, and they said

11   to me that they didn't know what to - how to

12   respond to the fire department.

13           What I'm saying to you, Your Honor, is

14   that if given the opportunity, I will provide

15   evidence to the court that the town has

16   consistently -

17           THE COURT:  This is a complaint for

18   contempt, Mr. Watson.

19           MR. PAUL WATSON:  I beg your pardon?

20           THE COURT:  This is a complaint for

21   contempt.  You were ordered to do certain things.

22   You haven't done them.  All right?  At least you

23   haven't done number one.  Number two is that a

24   gas heater -

**DUNN & GOUDREAU COURT REPORTING SERVICE, INC.**

1              MR. PAUL WATSON:  Well -

2              THE COURT:  - listen to me, sir - a gas

3      heater in the building was to be properly vented

4      by October 31, 1998 by a licensed contractor.

5              MR. PAUL WATSON:  The -

6              THE COURT:  Is it vented properly?

7              MR. PAUL WATSON:  The heating units do not

8      require venting, Your Honor, they are the

9      ventless type, extremely expensive units that I

10     put in.  They are ventless type.

11             THE COURT:  Chief -

12             MR. PAUL WATSON:  I have a -

13             THE COURT:  Just a moment, Mr. Watson.

14             MR. PAUL WATSON:  Yes.

15             MR. GUERIN:  There was some confusion

16     about that heating system, Mr. - Judge.  What I

17     did is, just the day before yesterday, I checked

18     on those heating systems, their - the type they

19     are.

20             I also called Bay State Gas, which

21     services that area, I explained to him what kind

22     of heating system it was, I spoke to a Mr. Bruce

23     Bellon (phonetic).  He is, I'm gathering, one of

24     the specialists for the company, and he said they

**DUNN & GOUDREAU COURT REPORTING SERVICE, INC.**

1    have to be vented in the exterior.  I told him

2    how they were vented, he says that's illegal.

3           THE COURT:  What authority do you have to

4    say that they do not need to be vented, Mr.

5    Watson?

6           MR. PAUL WATSON:  Your Honor, that's the

7    way -

8           THE COURT:  Do you have some -

9           MR. PAUL WATSON:  Your Honor, that's the

10   way they were sold to me -

11          THE COURT:  Do you have something from the

12   manufacturer that says they don't have to be

13   vented?

14          MR. PAUL WATSON:  I don't have it with me,

15   Your Honor, but that's the way they were sold to

16   me.  And I'd just bring to Your Honor's attention

17   that those units were inspected and approved by

18   the Town of Bellingham.  If you recall, Your

19   Honor, regarding natural gas, the gas company

20   will not even turn on the gas unless they have a

21   certificate -

22          THE COURT:  Mr. Watson.

23          MR. PAUL WATSON:  - from the town.

24          THE COURT:  This is a very straightforward

**DUNN & GOUDREAU COURT REPORTING SERVICE, INC.**

1    thing.  Okay?

2                MR. PAUL WATSON:  Yes, Your Honor.

3                THE COURT:  You said and you agreed -

4                MR. PAUL WATSON:  Yeah.

5                THE COURT:  - that they would be properly

6    vented by a licensed contractor.  Now, wait a

7    minute, before you answer.

8                MR. PAUL WATSON:  Okay.

9                THE COURT:  If you believe that they do

10   not have to be vented, then today you bring me an

11   expert who says this is the type, they do not

12   have to be vented, and I'm an expert in the

13   field.  Now, just telling me that somebody told

14   you when they sold them to you that they don't

15   have to be vented, that doesn't cut it, sir.

16               MR. PAUL WATSON:  Well, I regret that,

17   Your Honor, I am not proficient in the law.

18               THE COURT:  Well, now, Mr. Watson -

19               MR. PAUL WATSON:  As far as the fire

20   extinguishers go, Your Honor, here is - I've made

21   - I was able to make contact with another

22   company, and they -

23               THE COURT:  That's not the issue.

24               MR. PAUL WATSON:  The fire extinguishers?

**DUNN & GOUDREAU COURT REPORTING SERVICE, INC.**

11

1      THE COURT:  That's not the issue.  The

2  issue is to have the fire extinguishers installed

3  on or before October 15.  This is now January 14

4  and they're not done yet, and you want to show me

5  a contract that says at some point in the future,

6  they may be done.  No, that is not the issue.

7      Item three, the owner will hire an

8  architect to develop plans to include

9  architectural drawings, sprinkler drawings and

10  fire alarm drawings on or before October 31.  Do

11  you have such plans, sir, from an architect?

12      MR. PAUL WATSON:  I have plans that were

13  drawn from long before that, Your Honor, which

14  the Town - I gave copies to the Town.  The Town

15  has - these are dated - may I look at them, Your

16  Honor?  These are dated from -

17      THE COURT:  These are architectural

18  drawings, these are sprinkler drawings -

19      MR. PAUL WATSON:  These -

20      THE COURT:  - and fire alarm drawings, is

21  that correct?

22      MR. PAUL WATSON:  Just one second, Your

23  Honor.  There's a sprinkler drawing, Your Honor,

24  dated 1980, five years before I bought the

**DUNN & GOUDREAU COURT REPORTING SERVICE, INC.**

12

1    property.  And these are drawings that I had

2    done, Your Honor, before going and buying the

3    place, I went to the Town, asked them if they had

4    any drawings.  They had none to - they had none

5    to offer me, they - for some reason, they didn't

6    (inaudible) former owner, and they did require it

7    - they required it of me before.  But I had

8    these -

9          THE COURT:  Do you remember September 24th,

10   Mr. Watson?

11         MR. PAUL WATSON:  I beg pardon?

12         THE COURT:  Do you remember September 24th?

13   You signed this agreement saying you would do

14   these things.  If you had no intention of doing

15   them, why did you sign it?

16         MR. PAUL WATSON:  Your Honor, I signed

17   because my attorney at the time, I - as Mr.

18   O'Marra will -

19         THE COURT:  (inaudible)

20         MR. PAUL WATSON:  - will recall, I said

21   that I thought that the time given, the time

22   schedule given was - well, I think the word I

23   used was ridiculous.

24         THE COURT:  All right.


**DUNN & GOUDREAU COURT REPORTING SERVICE, INC.**

13

1    MR. PAUL WATSON:  Okay?  And my

2    attorney at the time said to me not to worry,

3    it wouldn't be a problem, if we needed some more

4    time, we could come back to the court and get

5    some more time.

6        THE COURT:  And that is obviously -

7        MR. PAUL WATSON:  Okay?

8        THE COURT:  - a true statement.  It is now

9    January 14th.  You have had additional time and

10   you haven't done anything.

11       MR. PAUL WATSON:  Your Honor, if you will

12   recall, my attorney withdrew.  Before that, I

13   began having problems with my attorney to the

14   point where you saw a letter that I submitted at

15   his withdrawal, stating that I was seriously

16   considering closing the building because of the

17   attitude of my attorney and his recommendations.

18   So there was some delay there.  Okay?  And then

19   my attorney withdrew.

20       The first time that I asked him to get

21   just a two-day extension on Mr. Guerin's first

22   visit to inspect, he told me that he couldn't do

23   that.  So he misled me, he deliberately misled

24   me.  Had he not misled me, I would not have

**DUNN & GOUDREAU COURT REPORTING SERVICE, INC.**

1    signed it, Your Honor.

2             THE COURT:  Okay.

3             MR. PAUL WATSON:  But I don't know whether

4    you will permit Mr. O'Marra to say anything, I

5    don't know whether he would care to -

6             THE COURT:  That is correct, I will not.

7    Have a seat, Mr. Watson.

8             MR. PAUL WATSON:  Thank you, Your Honor.

9             THE COURT:  Chief, the fire sprinkler plan

10   acceptable or not?

11            MR. GUERIN:  It's unacceptable, Your

12   Honor, and -

13            THE COURT:  Thank you.

14            MR. GUERIN:  And the other drawings, I've

15   never seen them, but it doesn't really make a

16   difference, Your Honor; the simple reason is,

17   what he had or Mr. Goldstein had previous to him

18   owning it, that building has been separated and

19   broken up into so many different compartments, it

20   probably has no reflection on what the plans

21   (inaudible) today, and the sprinkler drawings

22   have to reflect that particular - what is -

23   reflects what's there today, and they should be

24   stamped plans by a fire protection engineer.

**DUNN & GOUDREAU COURT REPORTING SERVICE, INC.**

1    THE COURT:  Here's my suggestion,

2    Chief:  I'm prepared to find Mr. Watson in

3    contempt of the order.  But even fining him is

4    not going to accomplish anything.  Incarcerating

5    him is not going to accomplish anything, because

6    he's simply not going to do it.  I have no faith

7    whatsoever he will do it.

8        I think that you should confer with town

9    counsel about finding a receiver to take over

10    this building and who will do the things that are

11    required in order to protect the occupants of the

12    building.

13        MR. GUERIN:  I would agree with that, Your

14    Honor, but I think what we need to do, from a

15    standpoint of safety for both the tenants, the

16    neighborhood and the person - people I may have

17    to send into that building in the interim, I

18    think I have no choice but to ask the court to

19    have the building vacated.

20        THE COURT:  You want to condemn the

21    building, sir, I'll enforce it.

22        MR. GUERIN:  Thank you, Your Honor.

23    THE COURT:  Gentlemen, who are you?

24    MR. BELHAM:  Can I make a statement?

**DUNN & GOUDREAU COURT REPORTING SERVICE, INC.**

16

1          THE COURT:  Yes, sir, stand up.

2          MR. BELHAM:  My name is Rob Belham

3     (phonetic), and I'm the owner of All Care,

4     Incorporated.

5          THE COURT:  Which is . . .?

6          MR. BELHAM:  A small landscaping company.

7     I'm a current tenant.  And I've put together a

8     letter which I'd like to -

9          THE COURT:  Just tell me about it first,

10    sir.

11         MR. BELHAM:  Okay.  The letter just states

12    the rough amount of tenants that are in the

13    building and that they are all striving small

14    businesses, we're all trying to make a living,

15    and that we're asking you for some help here, and

16    that Mr. Watson has gained a couple of people who

17    are trying to get things accomplished for him and

18    which he did not have at the time that he signed

19    that agreement.  And it's just a list of things

20    that would happen to these -

21         THE COURT:  But understand something, sir.

22    I appreciate your concern.  I know what it's like

23    to operate a small business, very difficult

24    thing.  All right?  But you have customers who

**DUNN & GOUDREAU COURT REPORTING SERVICE, INC.**

1    come on the premises to see you occasionally?

2         MR. BELHAM:  No, I don't.

3         THE COURT:  You don't.

4         MR. BELHAM:  No.

5         THE COURT:  You have employees?

6         MR. BELHAM:  Yes.

7         THE COURT:  Okay.  Now, suppose, just

8    suppose there was some disaster that were to take

9    place there.  Your life, your employees and the

10   lives of the fire department who would go in and

11   try and save the building and you would be at

12   risk.  Right?

13        MR. BELHAM:  Yes.

14        THE COURT:  Now, that's my concern.  He

15   has done absolutely nothing, nothing to allay

16   those fears.  All he does is drag his feet.  Now,

17   what I am suggesting to the town - I don't want

18   to see it condemned, because I think it's a tax-

19   generating operation for the town, it's a home

20   for businesses such as yours.  But on the other

21   hand, we can't tolerate the situation to continue

22   the way it is.  Something has to break.

23        MR. BELHAM:  I have offered, Judge, if you

24   would, my services, because of my type of

1    business, where I don't do much in the winter

2    except plow snow, I have offered my services to

3    Mr. Watson in whatever way I can.  The same with

4    my dad, who's retired.  And I've told Mr. Watson

5    that, you know, I would help him in any way -

6                THE COURT:  Are you -

7                MR. BELHAM:  - at no charge to try to

8    bring this list -

9                THE COURT:  Are you or your father a

10    licensed fire extinguisher contractor?

11                MR. BELHAM:  No, we're not, but we have

12    contacted the company that Mr. Watson is talking

13    about.

14                THE COURT:  Yup.

15                MR. BELHAM:  We have also contacted the

16    company to come in and construct the fire escape.

17    We have done most of the maintenance in that

18    building in the past two months.  So just so you

19    know what's happening behind the scenes, it's a

20    very, very large place, 150,000 square feet, but

21    we are trying to make progress.

22                If you were to come into the building in

23    September and come into the building now, you

24    would see things; all the emergency lights have

1    been replaced, all new batteries have been put

2    in, and that's why some of the tenants have come

3    here to back me up on this.  We are trying,

4    because we know the value of this mill for small

5    businesses and for the town and that we would

6    like to see it survive.

7            THE COURT:  So would I.  So would I.

8            MR. BELHAM:  Yeah, and all - I mean, may

9    not mean anything, but I'm going to offer it

10   anyway, that, you know, I will do whatever I

11   possibly can.  And I spend every day there -

12           THE COURT:  Do you have any influence with

13   him?  Because he's the guy that's got to move

14   this thing.

15           MR. BELHAM:  Yes, I do.

16           THE COURT:  Let me hear from this

17   gentleman.  You are, sir?

18           MR. DAVID WATSON:  My name is David

19   Watson, I am Paul Watson's son.  First off, Your

20   Honor, you have said that he has done nothing to

21   comply with the fire extinguishers, and that is

22   not true.

23           THE COURT:  Chief said there's one fire

24   extinguisher there.

**DUNN & GOUDREAU COURT REPORTING SERVICE, INC.**

1          MR. DAVID WATSON:  In fact, I received a

2     phone call today, they wanted to come and deliver

3     the fire extinguishers today.  I believe the

4     count was seventeen.  They came in, the company

5     came in, they surveyed the building, they

6     determined how many needed to be done, what ones

7     we had could be recharged and put in place, and

8     they were willing to come today.  And he has

9     documentation, the check has been signed - has

10    been sent to them -

11         THE COURT:  Let me see the documentation.

12    Give it to the court officer (inaudible) -

13         MR. DAVID WATSON:  They also agreed to

14    take a look - to survey the fire system, which

15    has not gone fully operational, and also come up

16    with a contract on a payment plan with my father

17    to have the system activated.

18         THE COURT:  Just a moment, sir.

19         MR. DAVID WATSON:  Okay.

20         THE COURT:  FM Fire Control Company in

21    West Roxbury, are you familiar with them?

22         MR. GUERIN:  No, I'm not, Your Honor.

23         THE COURT:  All right.  Let's assume that

24    they are a kosher outfit.  They say fourteen ten-

**DUNN & GOUDREAU COURT REPORTING SERVICE, INC.**

1    pound ABC fire extinguishers.

2        MR. GUERIN:  That might suffice, Your

3    Honor, for fire extinguishers, but that would be

4    a temp. situation; unless the tenants actually

5    know how to use the fire extinguishers is one

6    thing, but there's no -

7        THE COURT:  Well -

8        MR. GUERIN:  - there's no fire alarm

9    system, there's no warning device for people on

10   the second floor -

11       THE COURT:  Let's -

12       MR. GUERIN:  - there is no sprinkler

13   system -

14       THE COURT:  Let's take it -

15       MR. GUERIN:  - throughout the building.

16       THE COURT:  - one thing at a time.  We

17   didn't talk about training or anything else -

18       MR. GUERIN:  I understand.

19       THE COURT:  - Chief, when we wrote this

20   agreement.

21       MR. GUERIN:  I - true.

22       THE COURT:  You wanted fire extinguishers.

23       MR. GUERIN:  I agree.

24       THE COURT:  He's paid $992.25 to get fire

1    extinguishers.

2            MR. GUERIN:  That's true - that may be,

3    Your Honor, but they're not in there as of right

4    now.

5            THE COURT:  They'll be in tomorrow?

6            MR. DAVID WATSON:  They wanted to deliver

7    them today, but because we were going to be here,

8    they couldn't.  We can call them back and have

9    them delivered tomorrow.  I will personally see

10   that they get delivered to the place.

11           MR. PAUL WATSON:  I don't - I don't -

12           THE COURT:  You dodged bullet number one.

13           MR. PAUL WATSON:  I don't - excuse me,

14   Your Honor, I don't think they can deliver them

15   tomorrow.  I don't think they can deliver them

16   tomorrow.

17           THE COURT:  Why?

18           MR. PAUL WATSON:  Because of their

19   schedule and where they are.

20           THE COURT:  When are they going to -

21           MR. PAUL WATSON:  But they might - pardon?

22           THE COURT:  When will they have it done?

23           MR. PAUL WATSON:  They're going to call

24   and leave a message this afternoon while we're

1    here as to when -

2            THE COURT:  I'll cut you a little slack,

3    Mr. Watson.

4            MR. PAUL WATSON:  - they can deliver them,

5    hopefully by - hopefully by Monday.  I beg your

6    pardon?

7            THE COURT:  I said I'll cut you a little

8    slack.  They will be in before next Thursday,

9    2:00 p.m.

10           MR. DAVID WATSON:  I will call - I will

11   personally call the company tonight -

12           THE COURT:  Or he comes with a toothbrush.

13           MR. PAUL WATSON:  Okay.  Your Honor -

14           THE COURT:  Is that understood?

15           MR. PAUL WATSON:  Your Honor -

16           THE COURT:  Okay, let's move on.  Now,

17   they say - now, are they licensed to do sprinkler

18   systems?

19           MR. DAVID WATSON:  Yes, they are, and they

20   did look at the system, and we're still talking

21   about that.  We have to do an installment plan.

22   So the whole contract that was signed with the

23   town, it's very, very expensive.

24           And as the court does know that they're -

**DUNN & GOUDREAU COURT REPORTING SERVICE, INC.**

1    because of environmental problems, you cannot

2    go to a bank and finance any of these things.

3    Therefore, we depend on our tenants for money.

4         Now, I have - we have proof in writing and

5    tenants will testify that the Town of Bellingham

6    has come in and scared them.  The tenants are

7    aware of this situation, they are aware that my

8    father is trying to come to - come up and bring

9    up - bring the whole building up to code.  And in

10   fact, if you look at the building from when he

11   bought it in 1985 to now, there's a major, major

12   improvement.  He wants this place to succeed, I

13   want this place to succeed, and we are asking the

14   court for some - for - the court for some help.

15        THE COURT:  Let's understand something,

16   Mr. Watson the younger, just so that we're on the

17   same page.  This is not my first exposure to Mr.

18   Watson, Sr. here.  Okay?

19        MR. DAVID WATSON:  I am aware of that,

20   sir, I was here - I was here -

21        THE COURT:  All right.

22        MR. DAVID WATSON:  - I believe, in

23   September, I may have been (inaudible) September.

24        THE COURT:  He has a reputation of

**DUNN & GOUDREAU COURT REPORTING SERVICE, INC.**

1    dragging a big anchor behind him, slows him

2    down, nothing seems to happen.  No, I'm talking

3    now.

4        MR. DAVID WATSON:  Okay.

5        THE COURT:  Okay?  As long as he would

6    have been able to show progress towards what the

7    town wanted, he would have bought time.  But

8    every once in a while, he digs his heels in and

9    nothing happens.  Nothing has happened,

10   substantially, since September 24th.

11       Now here it is crunch time on January 14th,

12   five months later, now all of a sudden we see

13   something from the fire extinguisher that they

14   were going to deliver on January 14th.  That is

15   not progress.  That is infuriating to the town,

16   it is an affront to this court.  Do we understand

17   each other?

18       MR. DAVID WATSON:  May I speak, Your

19   Honor?

20       THE COURT:  Yes, you may.

21       MR. DAVID WATSON:  Okay.  If our lawyer

22   had done what he was supposed to do and represent

23   us, which we have, time and time again, had

24   problems with lawyers -

**DUNN & GOUDREAU COURT REPORTING SERVICE, INC.**

1          THE COURT:  Mr. Watson has told me

2     several times about the fourteen lawyers he's

3     gone through and the eight hundred thousand

4     dollars that he has spent on them or the three

5     hundred thousand - whatever the number -

6          MR. DAVID WATSON:  Well, Your Honor,

7     that's not what I'm - what I'm getting at, okay,

8     is the fact - is that my father asked, asked our

9     last attorney to get an extension, okay, and that

10    started - he refused to do that, told my father

11    that he shouldn't be letting people into the

12    building.  Now, our only source of income to pay

13    for these improvements comes from the tenants.

14    Therefore, if we don't bring in more income, then

15    we can't afford to pay for that.  Is that - does

16    that -

17         THE COURT:  I understand what you're

18    saying -

19         MR. DAVID WATSON:  - is that - is that

20    right -

21         THE COURT:  I understand clearly what

22    you're saying, but you don't, apparently, hear

23    what I'm saying -

24         MR. DAVID WATSON:  I do, I do, Your Honor,

1    I do hear what you're saying.

2             THE COURT:  No.

3             MR. DAVID WATSON:  I - Your Honor -

4             THE COURT:  If you did hear what I'm

5    saying, then you would be talking to me about

6    when things are going to happen, concretely when.

7    When are you going to have a sprinkler drawing

8    presented to the town?  When are you going to

9    have a fire alarm plan presented to the town?

10            MR. DAVID WATSON:  We can't give - I can't

11   give you those things, we can't give you those

12   things if we don't have the money.  If we don't

13   have the money to authorize these people to do it

14   and the town is going in and chasing out existing

15   tenants as well as prospectives, how are we

16   supposed to pay to do those sort of things?

17            THE COURT:  Then you know what the

18   alternative that I have is?  A, as I indicated to

19   the chief, find a receiver whom I can appoint who

20   will take over the operation of the building and

21   do the things that have to be done; or B, which

22   is, by far, the worst choice for everybody,

23   condemn the building and vacate it.  Now, I don't

24   want to do that.  The town doesn't want to do

1    that.  But on the other hand, we cannot

2    continually permit this building to pose a threat

3    and a danger to the people who work in there and

4    who visit it.  That cannot happen, sir.

5             MR. DAVID WATSON:  I - and -

6             THE COURT:  This is crunch time.

7             MR. DAVID WATSON:  I understand that, Your

8    Honor, but what we are asking for is that the

9    Town of Bellingham, as well as the court,

10   recognize that we are trying.  I am on school

11   break right now from college, and I've been

12   assisting my father, trying to get these things

13   done.  He is a one-man operation right now.  He

14   has major learning disabilities, as do I, and his

15   are much worse than mine, as well as a visual

16   disability.

17            The amount of paperwork that comes in

18   there is almost impossible for him to handle on

19   his own, and so that's why I've worked with him

20   all since I came home on January - on, excuse me,

21   December 14th, I started helping him out, trying

22   to get through these things, because he was - he

23   had lost his lawyer, his lawyer turned on us, and

24   he has all this work, he - and it's one of those

**DUNN & GOUDREAU COURT REPORTING SERVICE, INC.**

1   situations where you don't -

2          THE COURT:  Mr. Watson, I say again -

3          MR. DAVID WATSON:  Right, well -

4          THE COURT:  - show me progress, I'll give

5   you time.

6          MR. DAVID WATSON:  Well, we are - we're

7   trying -

8          THE COURT:  Show me no progress and I'm

9   going to pull the string.

10         MR. DAVID WATSON:  Well, we're trying to

11  show progress, and we (inaudible) -

12         THE COURT:  Okay, now what you've bought

13  is seven days right now; I want the fire

14  extinguishers in before next Thursday, 2:00 p.m.

15         MR. DAVID WATSON:  And I will call the

16  company as soon as I - as soon as we -

17         THE COURT:  And -

18         MR. DAVID WATSON:  - get back to the mill.

19         THE COURT:  - and at that time, next

20  Thursday, 2:00 p.m., I want you to stand here and

21  tell me or him stand here and tell me what is

22  going to happen next and when.  And if I don't

23  hear anything, sir, I'm going to force them to

24  pull the plug.  This is going to come to an end.

**DUNN & GOUDREAU COURT REPORTING SERVICE, INC.**

1      MR. DAVID WATSON:  Do I need to be

2  here?  Because I would have to -

3      THE COURT:  No, no.

4      MR. DAVID WATSON:  I return to school on

5  Monday, I would -

6      THE COURT:  He's very capable of handling

7  himself.  Yes, Mr. Watson?

8      MR. PAUL WATSON:  Your Honor, could I ask

9  Mr. O'Marra whether he would verify for me or

10  not -

11      THE COURT:  No, sir, we're not getting

12  into that, Mr. Watson, no, sir.

13      MR. PAUL WATSON:  Okay.  There's a letter

14  here from Mr. Guerin dated 8th of December, and

15  he's talking about noticing that I've brought in

16  more tenants and that this is a dangerous

17  situation.

18      THE COURT:  You were not precluded from

19  bringing in tenants.  Stop dragging red herrings

20  across the path.  Mr. -

21      MR. PAUL WATSON:  Wait, could you let me

22  finish, Your Honor?

23      THE COURT:  No, sir, no, because you

24  always want to go off on a tangent, Mr. Watson.

**DUNN & GOUDREAU COURT REPORTING SERVICE, INC.**

1    All I'm saying is, there were four things that

2    you were to do.  If you had done them, you

3    wouldn't be standing here at all.  That's all.

4         MR. PAUL WATSON:  Your Honor, if I have -

5    - if I have the tenants, if I have the tenants,

6    they would be here.  Years ago, I had three times

7    the income that we have today.  The town is

8    responsible for driving them away.

9         THE COURT:  And years ago, if you had done

10   some of these things, you would have the tenants

11   still.

12        MR. PAUL WATSON:  I was in the process of

13   doing them, Your Honor.  If you would let me show

14   you the evidence, if you would let me show you

15   the evidence, I'll prove to you that I was in the

16   process of doing it, I've spent over four million

17   dollars on the building.

18        When I first started, Your Honor, I didn't

19   even pay myself a penny from December of 1985 to

20   June or July of '87, I never paid myself, just so

21   that everything could go into the building to

22   improve it.  I have two letters here showing the

23   change in value from a third-party appraiser, if

24   you'd care to look at them, dated 1988.

**DUNN & GOUDREAU COURT REPORTING SERVICE, INC.**

1       THE COURT:  You miss the point, Mr.

2   Watson.

3       MR. PAUL WATSON:  Your Honor, I'd just ask

4   you if you would let Mr. O'Marra testify to one

5   of the conditions (inaudible) -

6       THE COURT:  And I said no once, I'm not

7   saying no again.  The answer is no.

8       MR. PAUL WATSON:  Okay.

9       THE COURT:  He does not testify.  You

10  committed to doing certain things.  You have not

11  done them.

12      MR. PAUL WATSON:  Right.

13      THE COURT:  You have a week to get the

14  fire extinguishers in and you have a week to tell

15  me what is going to happen next, and that means

16  date and time.  All right?

17      MR. PAUL WATSON:  Okay.

18      THE COURT:  Thursday, 2:00 p.m.,

19  gentlemen.

20      MR. PAUL WATSON:  Thank you, Your

21  Honor.

22      MR. GUERIN:  Thank you, Your Honor.

23          (Off the record.)

24      THE COURT:  - the committee of tenants or

33

1    whatever it is, start exercising it.

2              (Whereupon the proceedings were

3              concluded.)

4

5                   *  *  *  *  *  *  *

6

7              THE CLERK:  - Town of Bellingham vs. Paul

8    Watson, Trustee.

9              THE COURT:  Mr. Watson and Mr. Watson, how

10   are you doing today?

11             MR. PAUL WATSON:  Fine, Your Honor.

12             MR. DAVID WATSON:  Good afternoon, Your

13   Honor.

14             MR. GUERIN:  Good afternoon, Your Honor.

15             THE COURT:  Have we made some progress,

16   gentlemen?

17             MR. GUERIN:  Your Honor, since the last

18   time we were in court roughly thirty days ago,

19   you gave Mr. Watson those thirty days to come up

20   with $6,000 to retain that architect, a Mr.

21   Clinton.

22             I called Mr. Clinton yesterday just to see

23   how things were progressing myself.  He told me

24   that Mr. Watson didn't even get in touch with him

1    until Tuesday of this past week. So if we

2    were to have shown up in court last Thursday as

3    we should have, outside of the snowstorm, he

4    wouldn't have even contacted Mr. Clinton.

5        As of right now, the heaters, Your Honor,

6    they have been found to be illegal. Not only

7    that, but several other violations have been

8    noted by the state. So things are actually going

9    downhill, Your Honor.

10        I think at this time, Your Honor, where

11   Mr. Watson is looking strictly for time, and I'm

12   not exactly sure for what, but I think he's just

13   eating up time, our time and the time of the

14   court, he's being - I don't - we see no way that

15   he could ever bring this building up to code.

16        He owes - as present, he owes the town

17   over $263,000 of back taxes. He only pays - he

18   told the court that he collects roughly a little

19   over $13,000 in rent, pays about $14,000 in

20   bills. We don't see where he can actually pay

21   that. The only bill that we could find was an

22   $82.40-a-month water bill, when you average it

23   out. But we don't - since he's not paying taxes,

24   we don't see his heat or his electricity coming

1    anywheres near that.

2         Speaking to his tenants, I'm gathering - I

3    spoke to two of them.  Speaking to them, they

4    said that Mr. Watson includes - charges them per

5    square footage of space and then pays a little -

6    they pay a little extra for their own heat and

7    electricity.  So I'm not exactly sure where all

8    that money is going, but it's definitely not

9    going into the building, Your Honor.

10        So at this time, we're still asking for -

11   you know, we see no alternative but to have the

12   building vacated.  He's - there's no progress

13   that he made, and we don't see anything in the

14   future.

15        THE COURT:  Mr. Watson, either one.

16        MR. DAVID WATSON:  Your Honor, first off,

17   he has been making progress.  Because of the low

18   number of tenants in the building, we have been

19   looking to obtain finances through banks.

20        One of the biggest problems that we have

21   come across with the banks is that, they are

22   interested, however, we can't guarantee to the

23   bank that the Town of Bellingham will not come in

24   and chase away our tenants.  The town has, even

1    since the last time we saw you, Your Honor,

2    they conducted an inspection with the state -

3    Bay State Gas inspector, and my father never was

4    notified.  Now, I -

5            THE COURT:  He doesn't have to be

6    notified.

7            MR. DAVID WATSON:  Under law, he does not

8    have to be notified, I - to my understanding was

9    that he had to be notified unless it was an

10   emergency case.  I mean, and it causes - the

11   tenants go in there and they see these inspectors

12   come in, they have - my father has no clue what's

13   going - what's happening, and they get scared.

14   And that is part of it, that is part of the

15   reason why they leave.

16            Now, since the last time we saw you, we

17   have also obtained two new tenants, and my father

18   has called umpteen banks, which he has a list of

19   all the banks that he's called.  He has also

20   talked to a mortgage - what was the mortgage -

21            MR. PAUL WATSON:  A mortgage broker.

22            MR. DAVID WATSON:  - a mortgage broker,

23   and there are three banks, as well as a mortgage

24   broker, who are interested in trying to help us.

**DUNN & GOUDREAU COURT REPORTING SERVICE, INC.**

37

1    Again, a month-long period to come up with

2    $6,000 to even pay a retainer, we're - I mean,

3    as part of what I understood was, this next

4    meeting was to show progress towards making the

5    $6,000, not having the $6,000.

6         THE COURT:  How much do you have?

7         MR. PAUL WATSON:  Beg pardon, Your Honor?

8         THE COURT:  How much do you have?

9         MR. PAUL WATSON:  Towards the $6,000?

10        THE COURT:  Yeah.

11        MR. PAUL WATSON:  Well, our monthly

12   billings have gone from $10,000 in January -

13        THE COURT:  No, sir -

14        MR. PAUL WATSON:  - to $14,000 at the

15   beginning of March -

16        THE COURT:  - it's a very simple question,

17   very simple -

18        MR. PAUL WATSON:  We don't -

19        THE COURT:  You don't have any money.  Is

20   that right?

21        MR. PAUL WATSON:  Well, we - no, Your

22   Honor, we do not.  Okay?  We have, I think, a

23   fairly good prospect in Metro Boston Mortgage

24   Company.  They - I've been to see them, I have a

**DUNN & GOUDREAU COURT REPORTING SERVICE, INC.**

1    whole lot of material to get for them, most

2    of it is ready.  They want copies of the leases,

3    they have asked for financial statements, income

4    tax returns.  Those are all ready.

5        They asked for a copy of the environmental

6    report that was prepared for FDIC some years ago,

7    and that is copied and ready to go to them.  I

8    don't know whether I'll be able to see them

9    tomorrow or not.

10        My understanding, though, Your Honor, was

11    that this session, which should have been last

12    week, was a question of showing if we are making

13    any progress and what progress we are making

14    towards -

15        THE COURT:  I haven't heard of any

16    progress, sir.  You made a lot of telephone

17    calls.  You haven't got a doggone thing to show

18    me.  You've got nothing that says that anything

19    is going to happen, you haven't got anything.

20        MR. PAUL WATSON:  Your Honor, at the last

21    session, I asked, because I've had experience

22    with this, I asked for a period of six months.

23    You said no and - but you gave us a month to come

24    back to show what progress we had made towards

1    (inaudible) -

2          THE COURT:  What progress have you made?

3    That's what I keep asking.

4          MR. PAUL WATSON:  Well, Your Honor, this

5    is financing, this is financing a building that

6    has an environmental - major environmental

7    problem.  Okay?  And it's not that easy.  I've

8    been this route before.

9          What I might - what I'd like to mention to

10   Your Honor is that in talking to some of these

11   banks and one of the first things that they

12   wanted to see was that the building could support

13   - what type of income could the building support.

14   The easiest way to do that was to go back to 1988

15   when we were billing over $30,000 a month.

16          And so they saw that, and then they asked

17   what happened and why.  And so I showed them, I

18   produced documents, Your Honor, which showed that

19   the town, during the period of time that I was

20   spending substantial sums of money and millions

21   of dollars repairing and improving the building,

22   the town came in and started a systematic chasing

23   away my tenants, and they have continued this.

24          A few of the people said, well, why don't

40

1    you sue the town?  It appears as though, you

2    know, these documents tend to support your case,

3    and, you know, there's a potential source of

4    money to do the - finish your repairs.

5              That's not the route I'd like to take,

6    Your Honor, but the fact - these are the facts,

7    this is what the town has done.  The town started

8    this, okay, while I was fixing a building that

9    they allowed to get into a serious state of

10    disrepair.  When I bought that building, it was

11    rated unsprinklered.  And I can prove that.  I

12    can prove that.  And it was occupied, tenanted.

13    I spent over three million - four - now over four

14    million dollars on that building, Your Honor.

15    Okay?

16              THE COURT:  Where'd all that money come

17    from?

18              MR. PAUL WATSON:  Bank.

19              THE COURT:  Which bank?

20              MR. PAUL WATSON:  From Medford Savings

21    Bank, went under, FDIC - FDIC -

22              THE COURT:  (inaudible)

23              MR. PAUL WATSON:  Beg pardon?

24              THE COURT:  The FDIC took them over.

**DUNN & GOUDREAU COURT REPORTING SERVICE, INC.**

1          MR. PAUL WATSON:  Yeah, and closed

2     them.

3          THE COURT:  Yeah.

4          MR. PAUL WATSON:  Yeah.  And then when the

5     FDIC found the - I told them about the

6     environmental problem, because just about the

7     time that the - I became suspicious of a really

8     bad environmental problem, that's when the town

9     started this.  The bank had just cut off my

10    funding, and so I didn't have the money to test

11    the place environmentally.  But eventually FDIC

12    did.

13         They didn't even have the courtesy, Your

14    Honor, to share this with me.  I didn't get this

15    until five and a half years after, (inaudible)

16    the Freedom of Information Act to get this from

17    them.  My lawyers didn't help me get it from

18    them.

19         But based on that report, the FDIC wrote

20    me, telling me that they were abandoning the

21    property and writing off the debt.  (inaudible)

22    my fault.  And you have to understand, Your

23    Honor, I bought this place subject to it being

24    clean, it was certified to me as being clean.

1    (inaudible) Your Honor, I've had this

2    building - I am the only one and the first one,

3    in sixteen years prior to my buying it, that has

4    spent any money of any significance repairing

5    that place.  Why isn't the town working with me?

6    Why is it - Your Honor, everything that I have

7    from this town is a letter of condemnation or a

8    threatening letter, a letter taking me to court,

9    filing forged criminal charges against me, forged

10   documents supporting criminal cases.  This has

11   been an outrageous act of harassment, Your

12   Honor -

13       THE COURT:  I've heard (inaudible).

14       MR. PAUL WATSON:  - ongoing.  Well, give

15   me the opportunity, Your Honor, and I'll prove

16   this -

17       THE COURT:  You've had -

18       MR. PAUL WATSON:  - and I'll prove it.

19       THE COURT:  Well, you've had the

20   opportunity, sir.

21       MR. DAVID WATSON:  Your Honor, I mean, as

22   for the finances, a month is not a lot of time.

23   There are fourteen banks alone on here.  To make

24   a meeting with each one, to go and see someone,

**DUNN & GOUDREAU COURT REPORTING SERVICE, INC.**

1    producing documents, and then you turn around

2    and they say, "Well, I'm sorry, I can't help you,

3    because we're afraid the town is going to chase

4    out the tenants."

5        How can we prove that, how can we say the

6    town will not?  The only way is if you order the

7    town to come in - if they need to do an

8    inspection, you know, how about having the

9    courtesy to tell my father?  It's his building.

10        THE COURT:  What's that got to do with -

11        MR. DAVID WATSON:  Well, what it has to do

12    with is that when they come in unannounced, his

13    tenants are the ones coming to him, telling him,

14    and then they're scared, they are scared.  They

15    have spent -

16        THE COURT:  No, I -

17        MR. DAVID WATSON:  They themselves spent

18    hundreds of -

19        MR. PAUL WATSON:  Your Honor, if I may?

20        MR. DAVID WATSON:  - thousands of dollars.

21        THE COURT:  No, no, enough.  Enough.  Is

22    the building condemnable?

23        MR. GUERIN:  Yes, it is, Your Honor.

24        THE COURT:  Do your thing.

**DUNN & GOUDREAU COURT REPORTING SERVICE, INC.**

44

1          MR. GUERIN:  All right.

2          THE COURT:  I will not stand in your way.

3          MR. PAUL WATSON:  And then, Your Honor,

4      I'd like to know (inaudible) I have a right of

5      appeal, I believe, I intend to appeal this.

6          THE COURT:  You do what you have to do.

7          MR. PAUL WATSON:  Thank you.

8          MR. GUERIN:  I'm going to need something

9      from Your Honor to vacate the property, tenants

10     vacate the property, some sort of -

11         THE COURT:  You have to condemn it first,

12     and then if they're still there, I'll give you

13     what you need.

14         MR. GUERIN:  Very good, thank you, Your

15     Honor.

16         THE COURT:  Yup.

17         (Whereupon the proceedings were

18         concluded.)

19

20          * * * * * * *

21

22         THE CLERK:  - Town of Bellingham Fire

23     Department vs. Paul Watson, Trustee.

24         THE COURT:  Good afternoon, Mr. Watson.

**DUNN & GOUDREAU COURT REPORTING SERVICE, INC.**

1          MR. PAUL WATSON:  Good afternoon, Your

2   Honor.

3          THE CLERK:  Anybody who's going to

4   testify, please raise their right hand.

5             (Witnesses sworn.)

6          THE COURT:  Have you filed an appearance,

7   sir?

8          MR. CANNON:  I have not, Your Honor, if I

9   could file that right now.  Good afternoon,

10  Edward Cannon, Your Honor, for Mr. Watson.

11         THE COURT:  Edward . . .?

12         MR. CANNON:  Cannon.

13         THE COURT:  Cannon?

14         MR. CANNON:  Cannon, C-A-N-N-O-N.

15         THE COURT:  Okay, Mr. Cannon, have a seat,

16  please.  Chief, go ahead.  Name, business

17  address, please?

18         MR. GUERIN:  My name is Thomas Guerin, and

19  I'm (inaudible) Bellingham Fire Department Deputy

20  Chief, and the address of the fire station is 28

21  Blackstone Street, Bellingham.

22         THE COURT:  All right.

23         MR. GUERIN:  And I've come before you,

24  Judge, to ask the court for an order to vacate

**DUNN & GOUDREAU COURT REPORTING SERVICE, INC.**

1    the premises at 26 Pearl Street due to some

2    (inaudible) safety violations -

3        THE COURT:  What kind of building is 26

4    Pearl Street?

5        MR. GUERIN:  26 Pearl Street is a very

6    old, turn-of-the-century mill, it was a spinning

7    mill.  Mr. Watson, Mitzen (phonetic) Realty, I

8    believe he's the trustee for Mitzen Realty,

9    turned this building from a spinning mill into a

10   multi-faceted dwelling, where he broke the mill

11   into compartments, without (inaudible) -

12        THE COURT:  Apartments?

13        MR. GUERIN:  Compartments in the sense,

14   Your Honor, like separations, Your Honor, with a

15   doorway, and what he does is, he rents these

16   spaces out to businesses -

17        THE COURT:  So they're not - it's not

18   apartments, these are like -

19        MR. GUERIN:  No, not living - not living

20   space.

21        THE COURT:  Building space.

22        MR. GUERIN:  Exactly, Your Honor.

23        THE COURT:  Office space or whatever.

24        MR. GUERIN:  Right.

**DUNN & GOUDREAU COURT REPORTING SERVICE, INC.**

1      THE COURT:  Commercial space.

2      MR. GUERIN:  Yes, Your Honor.  And

3  (inaudible) there's no sprinkler system in

4  operation (inaudible) building.  On a visual

5  inspection by myself and two compliance officers

6  with the state fire marshal, we found violations

7  of the sprinkler system, fire department

8  connections not being intact, no fire alarm

9  system throughout the building, no fire escape,

10  locked exits, no exits.

11      Talking to the tenants, we found that many

12  of them didn't even know that this was

13  (inaudible).  We asked one individual on the

14  second floor (inaudible) smoke coming down the

15  hallway, how would you know (inaudible).  I says

16  how would you get out of the building, he pointed

17  to a door in the back of the building which led

18  to the roof.  I said how do you get off the roof?

19  He says a ladder (inaudible).

20      THE COURT:  How many stories?  How many

21  stories?

22      MR. GUERIN:  It's a two-story building.

23      THE COURT:  All right.  So you found

24  multiple violations of the various fire and

**DUNN & GOUDREAU COURT REPORTING SERVICE, INC.**

1    building codes?

2         MR. GUERIN:  That's correct.

3         THE COURT:  Have a seat, sir.  Mr. Cannon?

4         MR. CANNON:  Thank you, Your Honor.  Your

5    Honor, I'm somewhat (inaudible) as to the need

6    that this had to be brought in on such short

7    notice.  I was retained by Mr. Watson yesterday.

8    Apparently this is a short order on this because

9    of the town's concerns about the safety hazards.

10        I'm trying to pull myself up to speed on

11   this, but my understanding is that this has been

12   an ongoing problem for a number of years, dating

13   back – I believe that the first court involvement

14   in this is probably 1995, and that –

15        THE COURT:  Is this the same building that

16   Mr. Emmity (phonetic) was in on?

17        UNIDENTIFIED:  Excuse me, Your Honor?

18        THE COURT:  Is this the same building that

19   Mr. Emmity was in on?

20        UNIDENTIFIED:  Yes, correct.

21        THE COURT:  Oh, yeah, I remember Mr.

22   Watson now, yes, okay.

23        MR. CANNON:  So that's the first concern

24   is that physically, I just haven't had a chance

**DUNN & GOUDREAU COURT REPORTING SERVICE, INC.**

1    to speak to the town too much to try to come

2    to a resolution on this.

3        What I see as a solution is, while the

4    town obviously has some legitimate concerns about

5    some hazards that need to be addressed - and I've

6    spoken to the representative from the Bellingham

7    Fire Department prior to coming in here out in

8    the lobby, and he has some concerns that also he

9    said this has been going on a long time, they've

10   tried things, nothing seems to work.

11       I can't speak for what's gone on before, I

12   can only suggest as to what is an appropriate way

13   to address the town's concerns and also to make

14   my client - to continue to operate the building.

15       Rather than to get into some procedural

16   problems in terms of jurisdiction of this court

17   in terms of the fact that there is no housing

18   involved here, I'd like to try to -

19       THE COURT:  Doesn't have to be.

20       MR. CANNON:  I would respectfully suggest,

21   Your Honor, that there would have to be some

22   nexus to housing, and I don't believe that the

23   town has shown any of that in the complaint

24   paperwork that I have seen.

**DUNN & GOUDREAU COURT REPORTING SERVICE, INC.**

50

1      THE COURT:  Well, my reading of 185C, 3

2   says there is sufficient - and since the prior

3   case involving a similar building in Worcester

4   went to the Appeals Court, jurisdiction was found

5   in that case, I'm comfortable with having

6   jurisdiction -

7      MR. CANNON:  Certainly, Your Honor, and if

8   it came to it, I would, with all due respect,

9   Your Honor -

10      THE COURT:  I understand.

11      MR. CANNON:  - like to reserve that right.

12   But what I see as the goal here today is to reach

13   some sort of accord so - and what I'd like to do

14   and what I had suggested to the town is, my

15   client's concern is that if the building is

16   ordered vacated, which is the remedy that the

17   town is seeking today -

18      THE COURT:  That's (inaudible) we

19   understand that.

20      MR. CANNON:  Right, my client won't have

21   the resources to be able to address the -

22      THE COURT:  Right.

23      MR. CANNON:  - code concerns that the town

24   has.

**DUNN & GOUDREAU COURT REPORTING SERVICE, INC.**