1          THE COURT:  Let me interrupt, if I may.

2     The recall that I have from this situation is

3     that there are – as you point out, there are

4     certain situations that have to be corrected,

5     brought in compliance with regulations and law in

6     the building.  The fire department, building

7     inspector, wiring inspector and others I don't

8     think expect Mr. Watson –

9               (Tape 1, side 2.)

10         THE COURT:  – I think it is 1995 that this

11    thing has been kicking around, and nothing has

12    happened, so now they are frustrated and they

13    say, well, gee, if nothing's going to happen,

14    we're going to empty the building.

15         So it would seem to me that you and the

16    chief and the building inspector, because I

17    understand he wants to get in there and take a

18    look too, should be able to sit down and develop

19    a prioritized list of work that will be done by

20    certain dates.

21         MR. CANNON:  That's exactly what we'd like

22    to do.

23         THE COURT:  Clearly, the first thing would

24    have to be unblocking the means of egress, and

1    somewhere close to top priority would be some

2    sort of alarm system.  And then you can get into

3    the sprinklers and the debris and everything

4    else.  But I think they're willing to work with

5    you.  On the other hand, you know, the town does

6    not want to take a piece of tax-paying property

7    off the tax rolls.  You know?

8        MR. CANNON:  That was the suggestion

9    (inaudible).

10       THE COURT:  But I think we can balance

11   these –

12       MR. CANNON:  Well, the suggestion I made

13   to the town's representative is that we set up

14   some sort of – exactly, there's a list of things

15   that need to be done, let's pick concrete dates,

16   this'll be done by this date, this'll be done by

17   this date –

18       THE COURT:  Well, I think that that might

19   fly.  Let me hear from the chief.  What do you

20   think?

21       MR. GUERIN:  Well, (inaudible) I was not

22   privy to the other cases, Your Honor, in which

23   (inaudible) –

24       THE COURT:  I understand that.

53

1      MR. GUERIN:  When I became Deputy Chief,

2   this was kind of given to me as one of the many

3   problems we have in the community.  And my

4   research on the case is that Mr. Watson has been

5   before the court in the past, that he was

6   supposedly (inaudible) exactly what he's

7   suggesting by the court, we were supposed to go

8   and sit down with Mr. Watson and his attorney and

9   our attorney, town counsel at the time, and

10   supposedly that was done.

11      But (inaudible) sent over back and forth,

12   and Mr. Watson refused to sign because he didn't

13   like something on it.  And I'm not exactly sure

14   what happened (inaudible) -

15      THE COURT:  Well, here's -

16      MR. GUERIN:  (inaudible) excuse me, Your

17   Honor, (inaudible) Mr. Watson (inaudible) Mr.

18   Watson has paid no taxes (inaudible) -

19      THE COURT:  Yeah, (inaudible) tax

20   liability, he's got a tax liability (inaudible).

21   Here's what I will do for you:  I will volunteer

22   the offices of my Chief Housing Specialist to

23   coordinate this, and with this understanding:

24   That he will be like the arbitrator, because he

**DUNN & GOUDREAU COURT REPORTING SERVICE, INC.**

54

1    will be speaking for me, and if he decides that

2    it's going to be X done by October 15th, then it

3    will be X done by October 15th and it will become

4    an order of the court.  So that, you know,

5    whether the parties agree or not -

6            MR. GUERIN:  That would be fine with us,

7    Your Honor.

8            THE COURT:  Okay?

9            MR. CANNON:  That's fine.

10           THE COURT:  Good.  So by propitious event,

11   he has just walked into the room.  Mr. O'Marra,

12   this is Mr. Cannon, Mr. Watson's attorney, and

13   this is the Deputy Chief for the Town of

14   Bellingham.  Mr. Watson has a commercial building

15   that has a lot of things that need to be done,

16   and I'd ask you to work with them in developing a

17   prioritized schedule of things to happen.  And

18   you will call the shots.  If you think it's

19   reasonable, then it is reasonable.

20           MR. O'MARRA:  (inaudible)

21           THE COURT:  Clear?

22           MR. CANNON:  Fine, Your Honor.

23           MR. GUERIN:  Thank you, Your Honor.

24           THE COURT:  Thank you, gentlemen.

**DUNN & GOUDREAU COURT REPORTING SERVICE, INC.**

1    MR. CANNON:  Thank you.

2    THE COURT:  You can wait for Mr. O'Marra –

3        (Whereupon the proceedings were

4        concluded.)

5

6                    *  *  *  *

7

8    THE CLERK:  98-CV-705, Town of Bellingham

9    vs. Watson.  Mr. Watson?

10    MR. PAUL WATSON:  Yes, ma'am?

11    THE CLERK:  (inaudible)

12    MR. CANNON:  Thank you.

13    THE COURT:  Who do we have this morning or

14    this afternoon?

15    MR. PAUL WATSON:  Good afternoon, Your

16    Honor.

17    MR. CANNON:  Good afternoon, Your Honor.

18    THE COURT:  Good afternoon.

19    MR. CANNON:  Your Honor, this is my

20    motion, this is a motion to withdraw as counsel

21    for Mr. Watson for the reasons set forth in my

22    motion, which is essentially that, Your Honor,

23    we've not been able to agree on essentially

24    almost every aspect of Mr. Watson's case.  As a

1    result, it's become impossible to represent

2    Mr. Watson's interests.

3         As you can see also from Mr. Watson's

4    reply, the level of animosity has become

5    exceedingly great, compounding that.  I would

6    also like to add, Your Honor, for the record that

7    I object to every allegation made in Mr. Watson's

8    reply, but I would point to the reply as a - in

9    its totality as just illustrating the difficulty

10   that I'm having in representing Mr. Watson.  For

11   those reasons, Your Honor, I would ask that my

12   motion be allowed.

13        THE COURT:  Mr. Watson?

14        MR. PAUL WATSON:  Yes, Your Honor?

15        THE COURT:  Anything you want to say, sir?

16        MR. PAUL WATSON:  Yeah, I'd just like to

17   say, Your Honor, that I am not objecting to Mr.

18   Cannon's withdrawal.  Mr. Cannon had been giving

19   me advice and counsel that, based on my past

20   experience with the Town of Bellingham, did not

21   seem fair or just -

22        THE COURT:  That's all right, well -

23        MR. PAUL WATSON:  Well, I -

24        THE COURT:  - we don't have to get into

DUNN & GOUDREAU COURT REPORTING SERVICE, INC.

1       it.

2               MR. PAUL WATSON:  Could I just finish,

3       Your Honor, if I may, please, if I may?  However,

4       I decided to accept Mr. Cannon's counsel of

5       getting rid of the property or closing the

6       building, and I asked him if he'd be kind -

7       because this was going to have a major impact on

8       my family and myself.  In fact, it would make me

9       destitute.  And that's a very, very considerable

10      effect.

11              So I asked him to put in writing for me

12      all these things that he - these various pieces

13      of advice that he was giving me, and Mr. Cannon's

14      response to that is to withdraw from the case.

15      That doesn't rest well - I beg your pardon.

16              THE COURT:  I'm sorry, go ahead.

17              MR. PAUL WATSON:  That does not rest well

18      with me, because my - I put forward a motion, I'm

19      asking only that my motion be allowed to become

20      part of the file in perpetuity as a means of my

21      defending myself in terms of what -

22              THE COURT:  This is your letter of

23      November 19th?

24              MR. PAUL WATSON:  That's part of the

**DUNN & GOUDREAU COURT REPORTING SERVICE, INC.**

1    motion, Your Honor, that's a letter that I

2    wrote Mr. Cannon.  That was the last -

3              THE COURT:  Is there a motion attached to

4    it?

5              MR. PAUL WATSON:  I beg pardon?

6              THE COURT:  Is there a motion attached to

7    your letter?

8              MR. PAUL WATSON:  Yes, Your Honor, I

9    submitted a motion - Mr. Cannon's letter is part

10   of my motion to the court, part of my submission

11   to the court.

12             THE COURT:  Yup.

13             MR. PAUL WATSON:  So that it becomes a

14   permanent record -

15             THE COURT:  Fine.

16             MR. PAUL WATSON:  - of the actual fact, I

17   was prepared to consider Mr. Cannon's

18   recommendation and I merely asked him to put in

19   writing the things that he was telling me.

20             And I also asked him if he would advise me

21   whether this case that he represents me on was

22   legally filed, legally and properly filed in all

23   these aspects.  The only reason for that, Your

24   Honor, is that there have been other cases filed

**DUNN & GOUDREAU COURT REPORTING SERVICE, INC.**

1    by the town which have been either improperly

2    filed, filed in the wrong court, and in which

3    there have been instances of major fraudulent

4    information, false information, forged documents.

5              And I do believe, Your Honor - I was just

6    asking Mr. Guerin here before court convened

7    whether he felt whether or not I had a right to

8    defend myself or whether I had a right to a trial

9    by jury in the criminal case.  He tells me the

10   case has been dismissed without - I haven't been

11   notified of any hearing on that case, I haven't

12   been notified of any results on that case.  I

13   find this very bothersome, Your Honor.

14             THE COURT:  All right.

15             MR. GUERIN:  If I may, Your Honor?

16             THE COURT:  No, sir.  The issue before the

17   court is counsel's motion to withdraw.  Allowed.

18   Thank you.

19             MR. CANNON:  Thank you, Your Honor.

20             MR. PAUL WATSON:  Thank you.  Your Honor,

21   may I - if I may?  Are you permitting my motion

22   to become part of the file, Your Honor?

23             THE COURT:  That letter?

24             MR. PAUL WATSON:  Yes.

**DUNN & GOUDREAU COURT REPORTING SERVICE, INC.**

60

1      THE COURT:  Yeah, that's in there.

2      MR. PAUL WATSON:  Okay, thank you, Your

3   Honor.  Thank you.

4          (Whereupon the proceedings were

5          concluded.)

6

7                    *  *  *  *  *

8

9      THE CLERK:  - CV-705, Town of Bellingham

10  vs. Paul Watson.

11      THE COURT:  Good afternoon, sir.

12      MR. AMBLER:  Good afternoon, Your Honor,

13  Scott Ambler (phonetic), town counsel for the

14  Town of Bellingham.

15      THE COURT:  And Mr. Norman Huggins.

16      MR. HUGGINS:  Yes, Your Honor, good

17  afternoon.

18      THE COURT:  Good day, sir.  Might as well

19  - want to do the other case at the same time?

20      MR. AMBLER:  They're basically

21  intertwined, so we can -

22      THE COURT:  Call the other one, please.

23      THE CLERK:  99-CV-201, Ryan vs. Town of

24  Bellingham.

**DUNN & GOUDREAU COURT REPORTING SERVICE, INC.**

61

1      THE COURT:  All right, Mr. Ambler, why

2   don't you begin.

3      MR. AMBLER:  Which case would you like to

4   hear about first?

5      THE COURT:  You start wherever you want to

6   start.

7      MR. AMBLER:  Okay.  I'll start with the

8   issue with regard to Mr. Ryan and the tenants'

9   restraining order.

10      THE COURT:  Okay.

11      MR. AMBLER:  Basically, the town's

12   position on this matter is that as the court is

13   fully aware, on September - back in September,

14   the owner was given a timetable in which to

15   complete numerous repairs and has failed to

16   complete the majority of those or even -

17      THE COURT:  And the town has condemned the

18   property.

19      MR. AMBLER:  And the town has condemned

20   the property, posted it and had a survey board

21   and has issued the written report of that survey

22   board on the owner.

23      Basically, due to his failure - you know,

24   this building is considered by the town a

**DUNN & GOUDREAU COURT REPORTING SERVICE, INC.**

1    dangerous and unsafe structure to the public,

2    you know, the tenants included, from our point of

3    view.  Our knowledge of the condition of this

4    premises, basically, from the town's point of

5    view, leaves us with exposure which is just

6    unacceptable.

7         While we have stated to various tenants

8    who have contacted my office we would work with

9    them on a timetable to vacate the premises to

10   give them the opportunity to move their personal

11   property and equipment, the town's position is

12   that they cannot consent to allowing further

13   operations in the building, you know, to allow

14   the tenants to continue operating their

15   businesses, to allow the public to come in and

16   out of the building, especially after it has been

17   posted in accordance with the building code and

18   general laws.  You know, it's just the town's

19   position that we cannot consent to it, and we

20   would oppose a restraining order allowing

21   operations.

22        As far as giving them the timetable to

23   move their effects out of the property, the town

24   is more than willing to accommodate their

**DUNN & GOUDREAU COURT REPORTING SERVICE, INC.**

1    schedules.

2              THE COURT:  All right.  Mr. Ryan?

3         MR. RYAN:  First, Your Honor, you know,

4    had we not found out by chance that these

5    hearings were in process, the tenants had no way

6    of knowing.  Since January, I've been in

7    attendance at every session, and on the March 4th

8    session, the town was given permission to condemn

9    the building.  And that happened on the 17th of

10   March.

11             We had - I had been asking the town

12   counsel before that time when it would be

13   condemned and then when it - if it was condemned,

14   what the conditions would be.  And what we got

15   was, "We're not sure when it will be condemned,"

16   "It'll be condemned Friday," and then it would be

17   condemned Monday, then it would - this went on

18   until the Wednesday.  And then we are told that

19   we have twenty-four hours to conduct our business

20   and then call the town and make arrangements to

21   move.

22             However, that was never told to us

23   formally.  This is over the phone.  "We will

24   accommodate you."  Nothing was given as a

**DUNN & GOUDREAU COURT REPORTING SERVICE, INC.**

1    timeframe, whether it be a day, a week, a

2    month.  No time mentioned.  So that next day, I

3    appeared here in court and asked for more time

4    for the tenants to, one, conduct their business,

5    and at the same time find suitable place

6    elsewhere, get it ready or whatever, and move.

7    This can't happen overnight.  You know?

8         We found a place, myself and my partner,

9    we have found a place, but it's occupied until

10   the first of the month.  Today it's unoccupied.

11   Now it has to be readied, and that takes a month,

12   you know, and it takes a few days to move.  This

13   whole business is expensive for us.

14        THE COURT:  I understand.

15        MR. RYAN:  We didn't want the expense.

16   Whether we like it or not, it's going to end up,

17   for a small company like us, ten thousand

18   dollars, that's what it will cost by the time

19   we're finished.  We didn't want it, but we have

20   to do it.  But we have to conduct business.  We

21   can't just walk away from the place for a month.

22   How can we do business?  I don't understand it,

23   that -

24        THE COURT:  All right.

**DUNN & GOUDREAU COURT REPORTING SERVICE, INC.**

1    MR. RYAN:  It seems that although

2  everything, I'm sure, is very legal, it doesn't

3  seem like it's very moral to myself and the rest

4  of the tenants.

5    THE COURT:  Thank you, sir.  Mr. Huggins?

6    MR. HUGGINS:  Your Honor, I'm here on

7  behalf of Mr. Watson, and I certainly - Mr.

8  Watson certainly takes the position that the

9  tenants should be given some time.  I mean, first

10  of all, he has problems, as you know, with the

11  whole procedure, but in terms of the issue of the

12  tenants having time to move out, he certainly

13  agrees that they should have some time and they

14  shouldn't be put out overnight.

15    He's willing to do whatever, within

16  reason, to ensure the safety.  I mean, my

17  understanding is, the sprinkler system in the

18  building does still work at this point.  There

19  may be some - there are - clearly there are a lot

20  of issues.

21    THE COURT:  The fire chief might have some

22  issues with that.

23    MR. HUGGINS:  Well, I'm simply stating

24  what my understanding is of it at this point.

**DUNN & GOUDREAU COURT REPORTING SERVICE, INC.**

1    Obviously it doesn't work up to the standards

2    that the fire chief would like it to work up to

3    at this point.

4        But Mr. Watson certainly feels that the

5    tenants should have as much time as they need to

6    be able to conduct their business and to be able

7    to relocate.

8        In addition, Mr. Watson is in the same

9    position; he has his office in that building.

10   Now, the section that he has his office in is

11   somewhat separated; it's only connected to the

12   main building by a small passageway.  We don't

13   feel that there's any real danger to Mr. Watson,

14   and his is not such a building that has a lot of

15   traffic – or, his is not such a business that has

16   a lot of traffic going in and out.  Basically,

17   it's himself who is in there.

18       And we'd certainly like Mr. Watson to be

19   able to remain in the building to be able to

20   conduct his business and to try to resolve

21   whatever issues have to be resolved so that he

22   can keep this – get this building back into

23   operation.  So we would ask that time be granted

24   for all the parties concerned here to wrap up

**DUNN & GOUDREAU COURT REPORTING SERVICE, INC.**

67

1    their business and allow Mr. Watson himself to

2    stay there.

3         THE COURT:  All right.  I have not seen

4    the order of condemnation, Mr. Ambler.  Was it

5    done under the building code?

6         MR. AMBLER:  Yes, Your Honor.  What the

7    town did, the process the town followed was, the

8    building - excuse me, Your Honor.  Sorry.

9         THE COURT:  That's all right.

10        MR. AMBLER:  The building was posted by

11   the building commissioner of the town, stating

12   that it was a dangerous and unsafe structure.

13        THE COURT:  Yeah.

14        MR. AMBLER:  After noon the following day,

15   we put together a written report of the

16   inspection conducted by the survey board, which

17   was delivered in-hand to Mr. Watson on the day

18   that (inaudible) conducted their inspection,

19   which would have been the 23rd of March.

20        That written report, with a listing of all

21   of the violations and so forth, was mailed to the

22   court.  I mailed a copy of that under a cover

23   letter of March 24th, along with my motion.  I

24   have a copy here as well if -

**DUNN & GOUDREAU COURT REPORTING SERVICE, INC.**

68

1    THE COURT:  Well, I would like to see

2    it, please.  I don't see it here.  Thank you.

3    All right.  My understanding of the building code

4    is that to remove the tenants, you have to make

5    use of Chapter 239, is that your understanding?

6        MR. AMBLER:  If we want to formally evict

7    them, that's what it would imply, Your Honor.

8    The town's reading of the building code is that

9    once the building has been inspected by the

10   survey board and that written report served, that

11   if the owner continues to neglect to and fails to

12   remedy the situation and public safety so

13   requires, the building official can enter the

14   structure and, you know, require - he can secure

15   the same and order the tenants to vacate -

16        THE COURT:  Padlock it.

17        MR. AMBLER:   - or evict them, yes, and can

18   make it secure.  Basically, the town's position

19   is, we're not - from my discussions with the

20   various town officials, the town does not intend

21   to go through the formal eviction process at this

22   time, due to the expense that the town would be

23   facing in terms of filing fees and so forth.  You

24   know, the town is in the process of taking this

**DUNN & GOUDREAU COURT REPORTING SERVICE, INC.**

69

1    property by tax-taking.  Once we become

2    owners, that may be a process that we pursue if

3    it still is necessary.

4           Basically, the town's point of view is,

5    we've ordered that the building is condemned, and

6    the building code states that during the time

7    that that order is in effect, it's essentially

8    unlawful for anyone to use or occupy the

9    premises.

10          And just as a further note, Your Honor,

11   the town, again, we're not relishing this role.

12   However, the – while Mr. Ryan makes out the

13   town's (inaudible) we did not know we were going

14   to have to pursue this remedy until after the

15   March 4th hearing before this court.  It was never

16   the final intent of the town to condemn this

17   building.  We had entered that agreement,

18   September agreement, and if Mr. Watson had just

19   complied with what he agreed to, we wouldn't be

20   here.  So –

21          THE COURT:  Well, I think we should

22   perhaps just review, for the benefit of the

23   tenants who are here, just what the – briefly

24   what the history of this thing is.

**DUNN & GOUDREAU COURT REPORTING SERVICE, INC.**

1     In September, the fire department

2  brought an action before this court to compel

3  the building owner to make certain repairs to

4  the building to correct code violations.  And a

5  number of orders were issued, there were

6  agreements entered into by the parties.

7     The result was that even though some money

8  had been spent, it was a glass of water poured

9  into the ocean; there was just so much to be done

10  that wasn't done, effectively.

11     Then we were in a situation where the fire

12  department said to this court, "We would like you

13  to order the tenants out."  And this court

14  replied that based on the issue that was before

15  the court, that was not a viable alternative,

16  that the building would have to be condemned

17  before anything took place.  And I recall my

18  words to the deputy chief, "Do what you have to

19  do."  And shortly thereafter, the building was,

20  in fact, condemned.

21     Now, I think in view of the length of time

22  that has transpired here, the most efficacious

23  thing that can happen is for the three parties -

24  you representing the town, Mr. Ryan representing

**DUNN & GOUDREAU COURT REPORTING SERVICE, INC.**

71

1    the tenants, and Mr. Huggins representing Mr.

2    Watson and Mitzen Realty Trust - to sit down and

3    work out some kind of schedule.

4         I understand the town's concern that it is

5    illegal for businesses to operate.  On the other

6    hand, there's a practical and - well, let's just

7    say it's a practical concern that we have some

8    people's livelihoods intertwined here.  And, you

9    know, the condemnation is a reflection of the

10   frustration of the town and of this court in

11   getting the building brought up to code, but the

12   businesses operated in the interim.

13        So yes, it is a piece of paper, and as of

14   this day, it is effective, but the day before,

15   the business was operating, I think as long as

16   there is darkness at the end of the tunnel, that

17   when the building will, in fact, be vacant, and

18   if that occurs within a reasonable period of

19   time, then that would satisfy most entities.

20   It's certainly not going to satisfy Mitzen Realty

21   Trust, I understand that.  But from the town's

22   point of view and from the tenants' point of

23   view, I think what I'm saying is that you should

24   be able to negotiate a quick vacating schedule.

**DUNN & GOUDREAU COURT REPORTING SERVICE, INC.**

72

1      MR. AMBLER:  If I may, Your Honor?

2      THE COURT:  You may.

3      MR. AMBLER:  Due to the situation, if I

4  may try to effectively put forth the town's point

5  of view, we're in the position where we feel we

6  can't consent to their continued operation.  It's

7  condemned, we're not going to be taking formal

8  eviction proceedings at this time.  By law, you

9  know, no one is to use or occupy the building, so

10  if it were to continue happening, they would

11  essentially be trespassers.  If it's ordered that

12  they have a bit more time, that's one thing, but

13  the town cannot enter - my position, the way I've

14  been instructed to handle this matter precisely

15  is not to consent to anything, not to enter into

16  an agreement allowing them two more weeks -

17      THE COURT:  I understand.

18      MR. AMBLER:  - or anything of that sort.

19      THE COURT:  I understand, you have your

20  marching orders.  Mr. Ryan, it would seem, sir,

21  that you and your partner have, you know, based

22  on my quick walk-through, the most elaborate

23  operation in the building.  Is that a fair

24  assessment?

1       MR. RYAN:  I wouldn't call it elaborate,

2   but it -

3       THE COURT:  Well, as a relative term, you

4   have more -

5       MR. RYAN:  (inaudible) organized, and

6   there's a lot going on there, yes, it's a

7   engineering -

8       THE COURT:  All right, so in terms of -

9       MR. RYAN:  - production facility.

10      THE COURT:  Yeah.  In terms of vacating

11  the building, yours is a more complex, time-

12  consuming operation than perhaps most other

13  tenants?

14      MR. RYAN:  I'd say that no, there are -

15  there's probably one other tenant that is far

16  more complicated than myself.  He has -

17      THE COURT:  Far more?

18      MR. RYAN:  He has heavy equipment, he has

19  to have a place to move it to.  That's MRC

20  Rubbish Removal, right, Metropolitan Rubbish

21  Removal.

22      THE COURT:  Yeah, a lot of his stuff is

23  outside.

24      MR. RYAN:  That's right, but he has to put

74

1    it someplace.

2         THE COURT:  Well, I understand.

3         MR. RYAN:  Yeah.

4         THE COURT:  We're not concerned with the

5    outside, they didn't condemn the outside.

6         MR. RYAN:  Okay, okay, all right.  All

7    right, then -

8         THE COURT:  It's the inside.

9         MR. RYAN:  Okay.  Then yes, what you said

10   before (inaudible).

11        THE COURT:  Good.  And you say you can be

12   out in a month, if you had to be.

13        MR. RYAN:  Yeah, in a month, if I had to

14   be.

15        THE COURT:  And the others - and I know

16   you're not really speaking for them, but I want

17   them to at least hear what I'm saying - I presume

18   would be able to vacate between now and the end

19   of the month.  That a fair assessment?

20        MR. RYAN:  I asked them, and two months

21   would make some people feel more comfortable.

22   Okay?  I asked them.  You asked me, I -

23        THE COURT:  Okay.  Yeah, it would make me

24   feel more comfortable too.

DUNN & GOUDREAU COURT REPORTING SERVICE, INC.

75

1          MR. RYAN:  Okay.

2          THE COURT:  That is not going to make Mr.

3     Ambler and the Town of Bellingham feel more

4     comfortable.

5          MR. RYAN:  Yes, I understand that.

6          THE COURT:  Okay.  Now, let's lay all the

7     cards on the table.  Mr. Ambler very graciously

8     suggested to the court that if the court wants to

9     assume the responsibility of some disaster

10    befalling all of you, then so be it.

11         MR. RYAN:  Yeah.

12         THE COURT:  But the town is not going to

13    assume any responsibility.  (inaudible) towns.

14    Go ahead.

15         MR. RYAN:  I could explain, you know, just

16    - we've been chasing this place, you know, we've

17    got - we have just about got it, but we have not

18    signed a lease yet, because the tenant moves out

19    today, you know.

20         And so, you know, we'd like it to be ready

21    in a month, but if it isn't, you know - but we

22    will move in in a month, but we can move in in an

23    interim space.  I don't want to move in with a

24    whole lot of painting going on, but if we move in

**DUNN & GOUDREAU COURT REPORTING SERVICE, INC.**

76

1   in an interim space, that means moving again;

2   in the same building, but we have to move

3   everything again, which is another expense that,

4   you know, if we set up and then re-set up, that's

5   all -

6          THE COURT:  I understand.

7          MR. RYAN:  Okay.

8          THE COURT:  I understand what you're

9   saying.  Do you understand what he's saying?

10         MR. RYAN:  Your Honor, I - not always.  I

11  was going to ask him to clarify the business

12  about the tenants, they wouldn't evict, but

13  however, they couldn't go in, that was some

14  legalese -

15         THE COURT:  I'll clarify it for you.

16         MR. RYAN:  I've got it now, you know -

17         THE COURT:  Well -

18         MR. RYAN:  - that we are trespassers.

19         THE COURT:  No, you're not.

20         MR. RYAN:  Unless you decide otherwise.

21         THE COURT:  No, you are not trespassers

22  under any interpretation of the law that I'm

23  aware of, because you originally entered upon

24  this property with permission.  You may be

**DUNN & GOUDREAU COURT REPORTING SERVICE, INC.**

77

1    occupants at sufference, you may not have any

2    legal status to remain there, but you are not

3    trespassers as yet.  All right?

4         The town at some point is going to do a

5    tax-taking, according to Mr. Ambler.  Then the

6    town will become the landlord (inaudible).  And

7    if the town then finds that there are tenants,

8    then they will institute eviction actions, if I

9    hear what Mr. Ambler is saying.

10        The town now could initiate an eviction

11   action if that were their desire, and that might

12   very well be a viable course.  I understand you

13   don't want to incur the cost, but - how many

14   tenants are there, Mr. Ryan?

15        MR. RYAN:  I don't know the number of

16   tenants.

17        THE COURT:  Well, just -

18        MR. RYAN:  I'd say probably a dozen at

19   this point.  There's been an exodus.

20        THE COURT:  So maybe we're looking at

21   twelve hundred bucks.

22        MR. AMBLER:  Well -

23        THE COURT:  (inaudible)

24        MR. AMBLER:  That's just the filing fees.

**DUNN & GOUDREAU COURT REPORTING SERVICE, INC.**

78

1    You know, I'm aware of several cases in

2    Holliston where the town spent $65,000 trying to

3    evict one lady.  So, you know -

4         THE COURT:  Well, when she was before this

5    court, the landlord didn't spend that kind of

6    money.

7         MR. AMBLER:  Well, that wasn't our firm,

8    but it's just a scenario.  I mean, that would

9    just be the pure, you know, filing fees, not

10   service fees or anything else associated with it.

11        THE COURT:  Listen, you have people who

12   are essentially cooperative.  They want to do the

13   right thing.  Okay?  They're asking for a little

14   forbearance.  I think that's the - in fact,

15   that's precisely the word that I want.  They are

16   not saying we understand that you can't give us

17   permission to stay, but at least let us earn a

18   dollar so that we can vacate in two weeks, three

19   weeks, four weeks and be gone, but if you shut us

20   down now, you put us out of business.  That's, I

21   think, what they're saying.

22        MR. AMBLER:  And we understand that.

23        THE COURT:  Okay.

24        MR. AMBLER:  And I've spoken with Mr. Ryan

**DUNN & GOUDREAU COURT REPORTING SERVICE, INC.**

79

1    a number of times.  Again, every official in

2    the Town of Bellingham feels badly about this

3    situation.  You know, it was never our end goal

4    to condemn this building.

5            THE COURT:  I understand that.

6            MR. AMBLER:  And we didn't know it until

7    March.  But I think the court understands, we

8    can't just grant them the timetable that we're

9    looking at –

10           THE COURT:  Nobody's asking for you to

11   grant them the timetable.

12           MR. AMBLER:  And the town's position had

13   been that we didn't want to expend that kind of

14   money until we became owners.

15           THE COURT:  All right.

16           MR. AMBLER:  Spending that kind of money

17   and not even having ownership of the property at

18   this time –

19           THE COURT:  How about this:  suppose we

20   were to continue this case to the first week in

21   May, with the understanding that if there's

22   anybody left in that building at that time, they

23   would be summarily ordered out or the building

24   would be padlocked?

**DUNN & GOUDREAU COURT REPORTING SERVICE, INC.**

80

1        MR. AMBLER:  If that were an order of

2     the court, the town would be happy with that,

3     with one further addition.

4        THE COURT:  Which is . . .?

5        MR. AMBLER:  We just want to have an order

6     that the owner of the building is restrained from

7     entering any further rental agreements with any

8     possible tenant.

9        THE COURT:  Well, that would be

10    counterproductive if - yes.

11       MR. AMBLER:  Yes.

12       THE COURT:  Mr. Ryan?

13       MR. RYAN:  I don't want to appear greedy,

14    but May, the middle of May would satisfy most

15    people.  That would take care of a lot.

16       MR. HUGGINS:  Your Honor, might I -

17       THE COURT:  Certainly you may, Mr.

18    Huggins.

19       MR. HUGGINS:  Might I suggest that we do

20    what you've just suggested, but with the

21    understanding that at that time, anyone who was

22    not out would at least have an opportunity to

23    present to the court why they are not out and -

24       THE COURT:  Well, there would have to be a

**DUNN & GOUDREAU COURT REPORTING SERVICE, INC.**

1    hearing.

2        MR. HUGGINS:  Right, and so that they

3    would - rather than saying they would summarily

4    be evicted -

5        THE COURT:  There would have to be a

6    hearing, you know -

7        MR. HUGGINS:  - to give them an

8    opportunity - it could be that somebody at that

9    time may come back and say, "Your Honor, I've got

10   a place all set, it's going to take me another

11   two weeks," or whatever, but with the

12   understanding that for good cause, some people

13   may still be there and need a little bit more

14   time.

15       THE COURT:  I didn't mean to imply a Judge

16   Roy Bean type thing that at first we give you a

17   fair trial, then we hang you.  I wasn't saying

18   that.  But what I was trying to convey was that

19   the degree of patience that would exist on that

20   first week in May is miniscule, and anybody who

21   was looking for two weeks is crazy.  Okay?

22       MR. HUGGINS:  Your Honor, again, though,

23   on behalf of Mr. Watson, I would suggest that his

24   situation is somewhat different, that his - the

**DUNN & GOUDREAU COURT REPORTING SERVICE, INC.**

82

1    office that he occupies is almost a separate

2    building from the main structure.

3          THE COURT:  I would leave that

4    determination to the town.  And Mr. Watson, I

5    think, has a fairly good understanding, mainly

6    because I heard one of the town officials

7    talking, and I don't know to whom he was talking,

8    but I think Mr. Watson overheard, the nature of

9    the relationship of his building to the main

10   building.  And I'm not going near that right now.

11         But I would grant Mr. Ambler's wish that I

12   would issue an injunction today enjoining Mitzen

13   Realty Trust and Mr. Watson from renting, leasing

14   or putting any other entity or body or persons

15   into that building without further order of this

16   court.  All right?

17         MR. HUGGINS:  Well, that's your order -

18         THE COURT:  That is an order -

19         MR. HUGGINS:  - Your Honor -

20         THE COURT:  - you have notice of it now.

21   It'll be confirmed in writing, and I will

22   continue this matter to - we have a date, Ms.

23   Harm?  First Thursday in May?

24         THE CLERK:  6th, May 6th.

**DUNN & GOUDREAU COURT REPORTING SERVICE, INC.**

83

1    THE COURT:  May 6th, 2:00 p.m.

2    Understand that the town is not going to be

3    patient on May 6th.  Yes, sir?

4    MR. WALSH:  Excuse me, my name is Michael

5    Walsh, I'm from MRC, and I have a rubbish-hauling

6    business.

7    THE COURT:  Yes, you do.

8    MR. WALSH:  And my dumpsters and so on

9    outside.  Will that - where that's outside

10   storage, come May 6th, do I need to have each and

11   everything - one of those moved, provided they're

12   outside the building?

13   THE COURT:  I don't want to speak for the

14   town.

15   MR. WALSH:  I understand that, I'm just

16   trying to get an idea -

17   THE COURT:  But my understanding, after

18   conferring with town officials and the fire chief

19   on several occasions, is that their concern is

20   not with the land, per se, but their immediate

21   concern is with the building and what is within

22   the building.  Now, at some point, if the town

23   were to become the landlord, and perhaps even

24   before that, the town definitely has an interest

**DUNN & GOUDREAU COURT REPORTING SERVICE, INC.**

1    in what's outside the building.

2         MR. WALSH:  Yeah, I understand that.  I

3    guess -

4         THE COURT:  But there may be a further

5    window of opportunity for that which is outside

6    the building -

7         MR. WALSH:  I'm just - I'm wondering if I

8    can get any clarity at this point, and the reason

9    I'm asking is, moving my office and all that can

10   happen, but -

11        THE COURT:  Sir, I think you're going to

12   have to read between the lines, because you're

13   not going to get -

14        MR. WALSH:  Yeah.

15        THE COURT:  - a dispositive answer from

16   me.

17        MR. WALSH:  No, that's fine.

18        THE COURT:  All right?

19        MR. WALSH:  Is that something I should

20   address with the town separately, or -

21        THE COURT:  I think that would be a very

22   wise thing to do.

23        MR. WALSH:  That's fine.  Thank you.

24        THE COURT:  Anything else, folks?  Good

DUNN & GOUDREAU COURT REPORTING SERVICE, INC.

1    luck.

2             MR. AMBLER:  Thank you, Your Honor.

3             THE COURT:  Thank you.

4             MR. HUGGINS:  Thank you, Your Honor.

5             THE COURT:  And we're issuing an

6    injunction enjoining Mr. Watson and Mitzen Realty

7    Trust from putting anybody else into that

8    building.

9             THE CLERK:  (inaudible)

10            THE COURT:  Yes.  Thank you, Mr. Huggins.

11                (Whereupon the proceedings were

12                concluded.)

13

14                    *  *  *  *  *  *

15

16            THE CLERK:  99-CV-70 - 98-CV-705 and

17    99-CV-201, Ryan vs. Town of Bellingham and Town

18    of Bellingham vs. Watson.

19            THE COURT:  Mr. Ambler, how are you doing

20    today?

21            MR. AMBLER:  Oh, not so bad, Your Honor.

22    Yourself?

23            THE COURT:  In the pink.

24            MR. AMBLER:  The first statement is, the

1    Ryan case, I don't have any notice of.  I

2    don't know if that one involves my office

3    specifically.

4         THE CLERK:  The case is (inaudible)?

5         THE COURT:  Yeah.

6         MR. AMBLER:  Is that the temporary

7    restraining order?

8         THE COURT:  It is.

9         MR. AMBLER:  Oh, okay.

10        THE COURT:  The - yes.  The order

11   enjoining Mr. - well, enjoining the town.

12        MR. AMBLER:  Okay.

13        THE COURT:  Yes.  And the -

14        MR. AMBLER:  Okay.

15        THE COURT:  Yeah.  All right.

16        MR. AMBLER:  Essentially, this is a review

17   date from our April 1st hearing, which was, I

18   believe, on the 98-CV-201, the temporary

19   restraining order against the town.

20        THE COURT:  Um-hum.

21        MR. AMBLER:  We had discussions on April

22   1st, there were more parties here then than there

23   are today, and the case was continued until

24   today.  I do know that - I guess there's at least

**DUNN & GOUDREAU COURT REPORTING SERVICE, INC.**

1      two tenants here today in the crowd.

2          Basically what I'm looking for today is

3      just the removal of the restraining order against

4      the town.  It's come to my attention, the

5      officials of the town went to the mill complex

6      today, said there is approximately five or six

7      tenants still occupying the premises, despite the

8      notice and the ongoing matters here.

9          So what I would like is the removal of

10     that restraining order so that the town can, at

11     this time, if they so choose, take the necessary

12     steps to enforce their order to condemn the

13     building and remove all occupants.

14          THE COURT:  All right.  Is there anybody

15     opposing this motion?  Who are you, sir?

16          MR. WALSH:  My name is Michael Walsh from

17     Metropolitan (inaudible), I was here at the April

18     1st meeting as well.

19          THE COURT:  Dumpsters?

20          MR. WALSH:  That's me.

21          THE COURT:  That's you.

22          MR. WALSH:  Good memory.

23          THE COURT:  Okay.

24          MR. WALSH:  I'd like to - he's -

**DUNN & GOUDREAU COURT REPORTING SERVICE, INC.**

88

1        UNIDENTIFIED:  Come on up.

2        MR. WALSH:  Excuse me.

3        THE COURT:  We want to record your dulcet

4   tones for posterity.

5        MR. WALSH:  What type of tones?

6        THE COURT:  Never mind.

7        MR. WALSH:  Okay.  I'm Michael Walsh from

8   Metropolitan, and I was here on the 1st of April,

9   and I am the guy with the dumpsters.  The town

10   were able to work out an arrangement for our

11   outside storage, which was great on the town's

12   part, and I believe we've pulled the appropriate

13   permits we need, at least the majority of them.

14   That's not an issue.

15        The town attorney is right, there's five

16   or six tenants left.  They have been moving their

17   stuff out.  I'm in the process of moving my stuff

18   out as well.  My phone lines are going to be set

19   up in my new office on the 10th or the 12th of

20   May, and at that point, I want to move my office

21   and get out of the way.  And I'm pretty clear

22   everyone in the mill is clear on what your order

23   was or what we read it to (inaudible) -

24        THE COURT:  It wasn't much of an order, it

**DUNN & GOUDREAU COURT REPORTING SERVICE, INC.**

1    was -

2         MR. WALSH:  Well, it was a pretty good

3    idea of what was going to happen, so I think

4    everyone's reacting pretty appropriately.  I

5    mean, I don't think everyone can feasibly be out

6    tomorrow morning, but I think -

7         THE COURT:  Well, I understand that and I

8    think Mr. Ambler understands that.

9         MR. AMBLER:  Yeah.

10         THE COURT:  But there is a question on, I

11    don't know if the person is here, The Pitter-

12    Patter of Little Feet, is that still pitter-

13    pattering?

14         MR. AMBLER:  I believe she is one of the

15    tenants that is -

16         UNIDENTIFIED:  We don't know about

17    (inaudible), Your Honor.

18         THE COURT:  Okay.

19         MR. WALSH:  Yeah, we don't know either,

20    and I think we -

21         THE COURT:  She had a recital or something

22    going.

23         UNIDENTIFIED:  Yeah, from what I can

24    remember, there was - she had some dance

1    recitals, and I guess if the town go ahead and

2    calls for (sic) the eviction, it's going to be -

3    if they call on it today, it's -

4        THE COURT:  Well, but she was mid-May, as

5    I recall.  Isn't that right, wasn't -

6        UNIDENTIFIED:  My understanding was the

7    month of May.

8        THE COURT:  Well -

9        UNIDENTIFIED:  (inaudible).

10       THE COURT:  First week in June?  I don't

11   even remember that, okay.

12       UNIDENTIFIED:  Yeah.

13       THE COURT:  Well, the issue before the

14   court right now is whether I should lift this

15   order, dissolve it, putting aside for the moment

16   that it may very well dissolve by itself by

17   virtue of its ten-day life, but while I

18   understand the circumstances, I take it the town

19   would then institute whatever appropriate legal

20   action it would be necessary to -

21       MR. AMBLER:  Well, I - yes, as I -

22       THE COURT:  And there would be notice and

23   an opportunity to be heard for all the people who

24   would be affected?

91

1       MR. AMBLER:  Obviously, Your Honor.

2   At this time - we had an intermediary meeting, I

3   believe, in April on a receivership plan.  As I

4   notified the court at this time, we're probably a

5   month and a half to two months away from

6   completing our tax-taking.

7       If the restraining order is dropped or

8   dissolved and one is not issued today, I would

9   have to talk with the town administrative board

10  of selectmen, get my marching orders from them

11  whether to start eviction process immediately,

12  which would obviously, even if it was deemed

13  immediate, notice to the individuals, obtaining a

14  court date, you know, several weeks away,

15  probably -

16      THE COURT:  Yeah, I think you're probably

17  right.

18      MR. AMBLER:  They may wish to, you know,

19  not commence until we actually have completed the

20  tax-taking.  Their desires, I don't really know

21  at this point.

22      THE COURT:  Okay.

23      MR. AMBLER:  I will have to talk with them

24  after this hearing.

**DUNN & GOUDREAU COURT REPORTING SERVICE, INC.**

92

1    THE COURT:  All right.  Well, you seem

2    to be pretty much on-track.

3        MR. WALSH:  I'm on-track -

4        THE COURT:  And -

5        MR. WALSH:  - (inaudible) -

6        THE COURT:  Well, I understand, I

7    understand.

8        MR. WALSH:  But yeah, I think everyone

9    else is pretty (inaudible), from what I can

10    gather.

11        THE COURT:  Well, if you hear what Mr.

12    Ambler is saying, nobody's coming in with -

13        MR. WALSH:  Yeah, no, I understand

14    where -

15        THE COURT:  - padlocks tomorrow.  I don't

16    think.  I don't think that would be - no.

17        MR. AMBLER:  No, we would have to start -

18    as this court can't issue the evictions -

19        THE COURT:  Right.

20        MR. AMBLER:  We would have to start the

21    process.

22        THE COURT:  Yup.  Okay.  I'm going to

23    dissolve the order.

24        MR. AMBLER:  Thank you, Your Honor.

**DUNN & GOUDREAU COURT REPORTING SERVICE, INC.**

93

1      THE COURT:  Okay?

2      MR. AMBLER:  Now, that's just the 201?

3      THE COURT:  Correct.

4      MR. AMBLER:  Yes.

5      THE COURT:  Oh, yes, that's right, the

6  other one against -

7      MR. AMBLER:  The one against -

8      THE COURT:  - Mr. Watson -

9      MR. AMBLER:  - Mr. Watson -

10     THE COURT:  - and Mitzen Realty Trust -

11     MR. AMBLER:  I would - I believe -

12     THE COURT:  That's a preliminary -

13     MR. AMBLER:  - that is a preliminary

14  injunction.

15     THE COURT:  Preliminary injunction, that

16  sticks.

17     MR. AMBLER:  Thank you very much, Your

18  Honor.

19     MR. WALSH:  Thank you very much.

20     THE COURT:  Okay, good luck, folks.

21          (Whereupon the proceedings were

22          concluded.)

23

24

**DUNN & GOUDREAU COURT REPORTING SERVICE, INC.**

94

1          (Tape 2, side 1.)

2

3          THE CLERK:  95-CR (inaudible), Town of

4    Bellingham vs. Mitzen Realty Trust.

5          THE COURT:  Mr. Emmity is not here?

6          MR. LANGER:  Apparently not, Your Honor.

7    My name is Keith Langer, I represent the

8    defendant, Mitzen Realty Trust, Mr. and Mrs. Paul

9    Watson.

10          THE COURT:  All right, Mr. Langer, what

11   can we do for you?

12          MR. LANGER:  I would like a continuance,

13   Your Honor.  As set forth briefly in the

14   affidavits just filed with Mr. Sheglia

15   (phonetic), I just got the case Sunday afternoon,

16   filed for pertinent documents from the Town of

17   Bellingham Monday.  I have not even received the

18   requisite documents, let alone had a chance to

19   analyze them and respond to the charges by the

20   town.

21          THE COURT:  Well, I take it by

22   Mr. Emmity's absence that he is agreeing with

23   you.

24          MR. LANGER:  One could call it (inaudible)

**DUNN & GOUDREAU COURT REPORTING SERVICE, INC.**

95

1    consent, yes, Your Honor.

2            THE COURT:  And how much time are we

3    talking about?

4            MR. LANGER:  I requested four weeks, Your

5    Honor.

6            THE COURT:  Did he agree to that?

7            MR. LANGER:  I have not heard from him at

8    all on this matter, Your Honor.

9            THE COURT:  Well -

10           MR. LANGER:  The motion was hand-delivered

11   to -

12           THE COURT:  I'll nominally grant you a

13   continuance, but if he objects to that, I'm going

14   to hear his side of it too.  And you understand

15   that this thing has taken on a life of its own,

16   it started last year, and your client's

17   difficulty in getting an attorney is his problem

18   and not mine.  And at some point, it is going to

19   come to fruition, and it should come to fruition

20   long before the file gets to be double the size

21   that it is now.  Okay?

22           MR. LANGER:  Understood, Your Honor.

23           THE COURT:  Good.  Thank you.  That'll be

24   April 4th.

**DUNN & GOUDREAU COURT REPORTING SERVICE, INC.**

96

1          THE CLERK:   April 4th?

2          THE COURT:   Um-hum.

3                       (Whereupon the proceedings were

4                       concluded.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**EXHIBIT 2**

| CRIMINAL DOCKET | DOCKET NO. 0266CR000214 | ATTORNEY NAME |
|---|---|---|

| COURT DIVISION Milford | ☐ INTERPRETER REQUIRED | DATE and JUDGE | DOCKET ENTRY |
|---|---|---|---|

NAME, ADDRESS AND ZIP CODE OF DEFENDANT

WATSON, PAUL J
26 PEARL ST
BELLINGHAM, MA 02019

*7 Sherman Rd., Milles MA 02045  2.1.02*

*2.1.02  Powers J*

*Stay away fr. 26 Pearl St Bellingham M+*

*10.31.02*

☐ Attorney appointed (SJC R. 3:10)  *own*
☐ Atty denied and Deft Advised per 211D §2A
☐ Waiver of counsel found after colloquy

Terms of release set:
☑ PR   ☐ Bail:
☐ Held (276 §58A)
☐ See back for special conditions

Arraigned and advised:
☐ Potential of bail revocation (276 §58)
☐ Right to bail review (276 §58)
☐ Right to drug exam (111E §10)

Advised of right to jury trial:
☐ Does not waive
☑ Waiver of jury trial found after colloquy

Advised of trial rights as pro se (Supp. R. 4)
Advised of right of appeal to Appeals Ct (R. 28)

| DEFT. DOB AND SEX 05/25/1938    M | | |
|---|---|---|
| DATE OF OFFENSE(S) 01/31/2002 | PLACE OF OFFENSE(S) BELLINGHAM | |
| COMPLAINANT GUZOWSKI, EDWARD | POLICE DEPARTMENT (if applicable) BELLINGHAM PD | *10.31.02* |
| DATE OF COMPLAINT 02/01/2002 | RETURN DATE AND TIME 02/01/2002 08:30:00 | |

| COUNT/OFFENSE 1. 272/53/F  DISORDERLY CONDUCT c272 §53 | FINE *100* | SURFINE | COSTS | RESTITUTION | V/W ASSESSMENT *35* ☐ WAIVED |
|---|---|---|---|---|---|

DISPOSITION DATE and JUDGE  *10.31.02   Powers J*

DISPOSITION METHOD
☐ Guilty Plea or Admission to Sufficient Facts accepted after colloquy and 278 §29D warning
☐ Bench Trial
☐ Jury Trial
☑ None of the Above

FINDING
☐ Not Guilty
☐ Guilty
☐ Not Responsible
☐ Responsible
☐ No Probable Cause
☐ Probable Cause

SENTENCE OR OTHER DISPOSITION
☑ Sufficient facts found but continued without guilty finding until:
☐ Probation   *xtm*  ☐ Pretrial Probation (276 §87) - until: *3 mos  1-31-03*
☐ To be dismissed upon payment of court costs/restitution
☐ Dismissed upon:  ☐ Request of Comm.  ☐ Request of Victim
   ☐ Request of Deft  ☐ Failure to prosecute  ☐ Other:
☐ Filed with Deft's consent  ☐ Nolle Prosequi  ☐ Decriminalized (277 §70C)

FINAL DISPOSITION:
☑ Dismissed on recommendation of Probation Dept.
☐ Probation terminated: defendant discharged

JUDGE *Powers Jr*   DATE *2/13/03*

| COUNT/OFFENSE 2. 266/16A  B&E FOR MISDEMEANOR c266 §16A | FINE | SURFINE | COSTS | RESTITUTION | V/W ASSESSMENT ☐ WAIVED |
|---|---|---|---|---|---|

DISPOSITION DATE and JUDGE  *10.31.02   Powers J*

DISPOSITION METHOD
☐ Guilty Plea or Admission to Sufficient Facts accepted after colloquy and 278 §29D warning
☐ Bench Trial
☐ Jury Trial
☑ None of the Above

FINDING
☐ Not Guilty
☐ Guilty
☐ Not Responsible
☐ Responsible
☐ No Probable Cause
☐ Probable Cause

SENTENCE OR OTHER DISPOSITION
☐ Sufficient facts found but continued without guilty finding until:
☐ Probation   ☐ Pretrial Probation (276 §87) - until:
☐ To be dismissed upon payment of court costs/restitution
☑ Dismissed upon:  ☐ Request of Comm.  ☐ Request of Victim
   ☐ Request of Deft  ☐ Failure to prosecute  ☐ Other:
☐ Filed with Deft's consent  ☐ Nolle Prosequi  ☐ Decriminalized (277 §70C)

FINAL DISPOSITION:
☐ Dismissed on recommendation of Probation Dept.
☐ Probation terminated: defendant discharged

JUDGE    DATE

| COUNT/OFFENSE | FINE | SURFINE | COSTS | RESTITUTION | V/W ASSESSMENT ☐ WAIVED |
|---|---|---|---|---|---|

DISPOSITION DATE and JUDGE

DISPOSITION METHOD
☐ Guilty Plea or Admission to Sufficient Facts accepted after colloquy and 278 §29D warning
☐ Bench Trial
☐ Jury Trial
☐ None of the Above

FINDING
☐ Not Guilty
☐ Guilty
☐ Not Responsible
☐ Responsible
☐ No Probable Cause
☐ Probable Cause

SENTENCE OR OTHER DISPOSITION
☐ Sufficient facts found but continued without guilty finding until:
☐ Probation   ☐ Pretrial Probation (276 §87) - until:
☐ To be dismissed upon payment of court costs/restitution
☐ Dismissed upon:  ☐ Request of Comm.  ☐ Request of Victim
   ☐ Request of Deft  ☐ Failure to prosecute  ☐ Other:
☐ Filed with Deft's consent  ☐ Nolle Prosequi  ☐ Decriminalized (277 §70C)

FINAL DISPOSITION:
☐ Dismissed on recommendation of Probation Dept.
☐ Probation terminated: defendant discharged

JUDGE    DATE

| COUNT/OFFENSE | FINE | SURFINE | COSTS | RESTITUTION | V/W ASSESSMENT ☐ WAIVED |
|---|---|---|---|---|---|

DISPOSITION DATE and JUDGE

DISPOSITION METHOD
☐ Guilty Plea or Admission to Sufficient Facts accepted after colloquy and 278 §29D warning
☐ Bench Trial
☐ Jury Trial
☐ None of the Above

FINDING
☐ Not Guilty
☐ Guilty
☐ Not Responsible
☐ Responsible
☐ No Probable Cause
☐ Probable Cause

SENTENCE OR OTHER DISPOSITION
☐ Sufficient facts found but continued without guilty finding until:
☐ Probation   ☐ Pretrial Probation (276 §87) - until:
☐ To be dismissed upon payment of court costs/restitution  8347B000111/13/02COST   100.00
☐ Dismissed upon:  ☐ Request of Comm.  ☐ Request of Victim
   ☐ Request of Deft  ☐ Failure to prosecute  ☐ Other: 8347B000111/13/02VWF   35.00
☐ Filed with Deft's consent  ☐ Nolle Prosequi  ☐ Decriminalized (277 §70C)

FINAL DISPOSITION:
☐ Dismissed on recommendation of Probation Dept.
☐ Probation terminated: defendant discharged

JUDGE    DATE

☐ ADDITIONAL COUNTS ATTACHED

| A TRUE COPY ATTEST:  X | CLERK-MAGISTRATE/ASST. CLERK | ON (DATE) | COURT ADDRESS Milford District Court 161 West Street Milford, MA 01757 |
|---|---|---|---|

DOCKET NUMBER: 0266CR000214    Case 1:04-cv-11577-GAO    Document 20-3    NAME: WATSON, PAUL    Filed 11/30/2006    Page 3 of 11

## SCHEDULING HISTORY

| NO. | SCHEDULED DATE | SCHEDULED EVENT | RESULT | | | JUDGE | TAPE NO. | START | STOP |
|---|---|---|---|---|---|---|---|---|---|
| 2 | 2.22.02 | ptc | ☐ Held | ☐ Cont'd | | | | | |
| 3 | 3-15-02 | ptc | ☐ Held | ☐ Cont'd | | | | | |
| 3 | 5.10.02 | mo | ☐ Held | ☐ Cont'd | (to Suppress) | | | | |
| 4 | 7.12.02 | mo | ☐ Held | ☐ Cont'd | to Suppress | | | | |
| 5 | 9·12·02 | mo/stat | ☐ Held | ☐ Cont'd | | | | | |
| 6 | 9·20·02 | mo/stat | ☐ Held | ☐ Cont'd | | | | | |
| 7 | 10.31.02 | ptc (CWF) | ☐ Held | ☐ Cont'd | OK to advance | any time per Powers | | | |
| 8 | 1.31.03 | Prob | ☐ Held | ☐ Cont'd | 10/31/02 | tape 543 - around | | | |
| 9 | 11.5.02 | srp | ☐ Held | ☐ Cont'd | Pd - | "2600 - " | | | |
| 10 | | | | | Close | | | | |

ARR=Arraignment  PT=Pretrial hearing  CE=Discovery compliance and jury election  T=Bench trial  J=Jury Trial  PC=Probable cause hearing  M=Motion hearing  SR=Status review
SRP=Status review of payments  FA=First appearance in jury session  S=Sentencing  CW=Continuance-without-finding scheduled to terminate  P=Probation scheduled to terminate
DFTA=Defendant failed to appear and was defaulted  WAR=Warrant issued  WARD=Default warrant issued  WR=Warrant or default warrant recalled  PR=Probation revocation hearing

| ENTRY DATE | OTHER DOCKET ENTRIES |
|---|---|
| 2/21/02 | Thomas J. Iovieno's appearance filed |
| 2/21/02 | Def's Motion to Continue filed (list 2/21/02) |
| 2/21/02 | Motion Allowed per Despotopoulos |
| 5/6/02 | MOTION FILED BY ATTY IOVIENO (MB) |
| 5/8/02 | AMENDED MOTION FILED by ATTY IOVIENO (MB) |
| 7.1.02 | Atty Laurano filed appearance - Atty Iovieno to withdraw |
| 9-9-02 | DA Greenhalgh + Atty Laurano request cont. - Prob notified |
| 9.19.02 | motion to dismiss/suppress denied - Warren Powers J |
| 11/4/02 | DEF PH CC, VWF (MB) |

## ADDITIONAL ASSESSMENTS IMPOSED OR WAIVED

| DATE IMPOSED and JUDGE | TYPE OF ASSESSMENT | AMOUNT | DUE DATES and COMMENTS | ✓WAIVED |
|---|---|---|---|---|
| | Legal Counsel Fee (211D §2A ¶2) | | | |
| | Legal Counsel Contribution (211D §2) | | | |
| | Court Costs (280 §6) | | | |
| | Drug Analysis Fee (280 §6B) | | | |
| | OUI §24D Fee (90 §24D ¶9) | | | |
| | OUI Head Injury Surfine (90 §24[1][a][1] ¶2) | | | |
| | Probation Supervision Fee (276 §87A) | | | |
| | Default Warrant Assessment Fee (276 §30 ¶2) | | | |
| | Default Warrant Removal Fee (276 §30 ¶1) | | | |